1 │ Jorge Franco, Jr. (No. 013834)
  │ E-Mail: jf@jhc-law.com
2 │ Larry J. Crown (No. 013133)
  │ E-Mail: ljc@jhc-law.com
3 │ William F. Begley (No. 010157)
  │ E-Mail: wfb@jhc-law.com
4 │ **JENNINGS, HAUG & CUNNINGHAM, L.L.P.**
  │ 2800 North Central Avenue, Suite 1800
5 │ Phoenix, Arizona 85004-1049
  │ Telephone: 602-234-7800
6 │ Facsimile:  602-277-5595
7 │
  │ Attorneys for Defendants Maricopa County Board of Supervisors
8 │     and Maricopa County
9 │
10 │            **UNITED STATES DISTRICT COURT**
11 │                 **DISTRICT OF ARIZONA**

| | |
|---|---|
| Sandra Dowling and Dennis Dowling, husband and wife, | Case No. CV 09-1401-PHX-JAT |
| Plaintiffs, | **DEFENDANTS MARICOPA COUNTY BOARD OF SUPERVISORS AND MARICOPA COUNTY'S SECOND MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| Sheriff Joseph Arpaio and Ava Arpaio, husband and wife; Maricopa County Board of Supervisors; Maricopa County, a Municipal entity; et al., | (Assigned to the Honorable James A. Teilborg) |
| Defendants. | **(Oral Argument Requested)** |

20        Defendants Maricopa County Board of Supervisors and Maricopa County

21 (collectively, the "Board Defendants"), through undersigned counsel, and pursuant

22 to Fed.R.Civ.P. 56(a), hereby move for summary judgment in this action for the

23 reason that, with respect to the remaining claims of Plaintiffs' Complaint that

24 pertain to the Board Defendants, there is no genuine issue as to any material fact,

25 and the Board Defendants are entitled to the entry of judgment as a matter of law.

26 This Second Motion for Summary Judgment is supported by the following

27 Memorandum of Points and Authorities and the Board Defendants' separate

28 Statement of Facts ("BdSOF") filed herewith and incorporated herein by reference.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   Background

This Court previously recited the following pertinent "Background" information in its March 8, 2011 Order regarding Defendants' First Motion for Summary Judgment (Dkt. 151 at pp. 2-4):

> Plaintiff Sandra Dowling ("Dowling") was the Superintendent of Public Instruction for Maricopa County, Arizona from 1988 to 2008.   (Defendants' Statement of Facts, Dkt. 58 ["DSOF"] ¶ 1; Plaintiffs' Controverting and Supplemental Statement of Facts, Dkt. 71 ["PSOF"] ¶ 1.)  As Superintendent, Dowling oversaw an accommodation district, known as the Maricopa County Regional School District (the "MCRSD").  (DSOF ¶ 2; PSOF ¶ 2.)  Dowling served as the sole member of the governing board of the MCRSD. (DSOF ¶ 3; PSOF ¶ 3.)  By 2006, there were 12 schools in the MCRSD, which included three campuses of the Thomas J. Pappas School for homeless children.   (DSOF ¶ 2; PSOF ¶ 2.)   The Maricopa County Board of Supervisors (the "Board") was required to annually budget an amount that would meet the requirements of the special county school reserve fund, including the necessary expenses for conducting accommodation schools.  A.R.S. § 15-1001(A)(5). The MCRSD operated a budget deficit for many years. (DSOF ¶ 4; PSOF ¶ 4.) Each year in which the deficit occurred, the Maricopa County Treasurer covered the MCRSD deficit with County funds. (PSOF ¶ 43.)
>
> In 2005, the Board asked Tom Horne, State Superintendent of Public Instruction, to investigate the financial situation of the MCRSD.   (DSOF, Ex. 3 at p. 5; PSOF ¶¶ 48-50.). Mr. Horne determined that the MCRSD had been under-funded by $3.5 million over approximately five years. (PSOF ¶ 4; DSOF ¶ 5 & Ex. 3 at p. 5.)
>
> On January 11, 2006, ... the Maricopa County Sheriff's Office ("MCSO") initiated a[n] ... investigation of Dowling and others at the MCRSD.  (DSOF ¶ 7; PSOF ¶ 7.)  As part of its investigation, MCSO obtained and executed a search warrant for MCRSD offices on January 25, 2006.  (DSOF ¶ 8; PSOF ¶ 8.)  Also on January 25, 2006, MCSO obtained and executed a search warrant for Dowling's home. (DSOF ¶¶ 13-14; PSOF ¶¶ 13-14.)
>
> * * *
>
> The criminal investigation conducted by MCSO resulted in a grand jury's indictment of Dowling on 25 felony counts on November 16, 2006.  (DSOF ¶ 7; PSOF ¶¶ 7, 17.) .... On May 4, 2007, based on motions filed by Dowling's attorney, counts 1-10 of the indictment were remanded to the grand jury.  (DSOF ¶ 19; PSOF ¶ 19.)  In or around June 2007, the prosecution of the criminal case was transferred from the Arizona Attorney General's Office to the United States Attorney's Office due to a conflict of interest.  (DSOF

¶ 20; PSOF ¶ 20.)

On August 26, 2008, the Court accepted a Plea Agreement, dated July 11, 2008, entered into by the State of Arizona and Dowling. (DSOF ¶ 23; PSOF ¶¶ 22-23.)   The Plea Agreement, in the case captioned CR 2008-007162, provided that Dowling agreed to plead guilty to a misdemeanor (employment of a relative) .... (DSOF, Ex. 15 ....)

\* \* \*

On June 3, 2009, Plaintiffs filed the Complaint in this action in Maricopa County Superior Court (Dkt. 1-1, Ex. A), and Defendants subsequently removed this action to the United States District Court (Dkt. 1).

On July 27, 2010, the Court permitted Defendants to file two motions for summary judgment.   (Dkt. 53.)   A first motion for summary judgment could be filed on statute of limitations issues, and a second motion for summary judgment on the merits could be filed after the close of discovery.

Defendants Arpaio filed their First Motion for Summary Judgment (Dkt. 56) on August 27, 2010, and the Board Defendants joined in that motion (Dkt. 57).   On March 8, 2011, this Court granted Defendants' First Motion in part with respect to Counts I and III of Plaintiffs' Complaint, and denied same as to Counts IV, V and VI. (Dkt. 151.)    In its Order filed on March 8, 2011, the Court also stated that "Defendants may file a second motion for summary judgment on the merits of Counts II, IV, V and/or VI in accordance with the schedule previously set forth by the Court." (*Id.* at p. 13.)

## II.   Counts II, IV and VI Are Not and Could Not Be Directed at the Board.

All counts of Plaintiffs' Complaint are pled non-specifically and in generality against all "Defendants".   Consequently, the Board and the Arpaio Defendants are left to logically deduct which counts are, or are not, directed at them.   The Board Defendants submit that, by their terms, 3 of the remaining 4 counts of Plaintiffs' Complaint can relate solely to the alleged conduct of the Arpaio Defendants, and cannot logically be directed at <u>not</u> the Board Defendants.

### A.   Count II – Malicious Prosecution

In Count II (entitled "**Malicious Prosecution**"), Plaintiffs allege:

1
2
3
4
5

> Defendants wrongfully initiated a **criminal investigation and prosecution** ... of Dr. Dowling without probable cause and in retaliation for the exercise of her First Amendment rights and for other improper and unlawful. [sic]  Defendants also sought to have Dr. Dowling falsely accused and prosecuted, provided flawed, incomplete and misleading information and evidence to this end and, instigated and encouraged the **criminal prosecution**, all for their own political gains for improper and unlawful retaliatory reasons, and with malice.

6   (Emphasis added.) (Dkt. 1-1, Ex. A, ¶ 80.)  The Board Defendants did not request a

7   criminal investigation.  The Board's concerns regarding financial matters involving

8   Dr. Dowling and the MCRSD were first brought to the attention of MCSO on

9   January 11, 2006, and on that date, Brian Hushek, the deputy budget director at the

10  Office of Management Budget for Maricopa County ("OMB"), was interviewed by

11  MCSO personnel, including Sergeant Kim Seagraves.  (BdSOF ¶ 1.)  Mr. Hushek has

12  described the purpose of his interview with MCSO in January 2006 as merely

13  information gathering by MCSO:

14
15
16

> I went over there to provide the information that I had in my possession or what I had been told for them, the Sheriff's Office, that is, to determine whether or not there was any merit to it moving forward into whatever type of investigation they would be handling.

17  (BdSOF ¶ 2.)  When Mr. Hushek was asked at his deposition, "[W]hose idea was it

18  to begin a criminal investigation of ... Sandra Dowling?", he answered:  "[I]t was the

19  Sheriff's Office ultimately, because we did not know if there was any proof that

20  there was anything criminal in the matter or not."  (BdSOF ¶ 3.)

21          MCSO Lt. (formerly Sgt.) Seagraves has testified that from the time MCSO

22  initiated its investigation of Dr. Dowling on January 11, 2006, all decisions as to how

23  to investigate the case were made by MCSO and not by the Board Defendants:

24
25

> Q.    ... your first involvement in this Dowling investigation was the meeting that you attended with Chief Hendershott present in which he initiated the investigation; correct?

26

> A.    [by Lt. Seagraves:] Yes.

27

> * * *

28

> Q.    .... [W]hen this investigation gets started as of the meeting of

4

1          January 11, 2006, that was the first event; correct?

2     A.   Yes.

3     Q.   From MCSO's perspective?

4     A.   From the investigator's perspective, yes.

5     Q.   ....   And from the investigator's perspective, there was no
           involvement by Maricopa County Supervisors or Office of
6          Management and Budget or anyone else from County in that
           meeting; correct?
7
      A.   Correct.
8
      Q.   All right.  Decisions as to how to then investigate this case, I
9          assume were made within that meeting and forward in time;
           correct?
10
      A.   Yes.
11
                                * * *
12
      Q.   At any point during your involvement in the investigation,
13         did you have the sense or even hear a rumor or come across
           any information whatsoever that suggested that anyone from
14         the County, meaning Board of Supervisors or Office of
           Management and Budget, was having any involvement in the
15         decision-making as to the MCSO investigation?

16    A.   The answer is no.

17    Q.   In talking to your superior during the course of your
           investigation, did you ever get the sense from their direction
18         to you that they were essentially following orders from
           anyone at County, meaning Board of Supervisors or OMB?
19
      A.   No.
20
      Q.   Is it a fair statement that anything that was a decision in the
21         investigation was derived and made by MCSO personnel
           only, as far as you know?
22
      A.   Yes.
23
                                * * *
24
      Q.   ....  So when you talked to Brian Hushek in the first interview,
25         to you, he's a source of information only?

26    A.   Yes.

27    Q.   Not a participant in the investigation either that day or any
           time in the future; correct?
28

A.   Correct.

* * *

Q.   .... Do you have any recollection of Brian Hushek ever saying anything to you or anyone else in MCSO what he thought the direction of the investigation should be?

A.   About him giving direction to us?  Never happened, no.

Q.   Or him imposing him – his opinion as to what you should do in the investigation?

A.   No.

Q.   Okay.  And if he had done that or anyone else from County had done that, would you be required to listen to it and abide by it?

A.   Listen to it.

Q.   Abide by it?

A.   No.

Q.   Okay.  So in the end, MCSO and MCSO alone makes those investigative decisions?

A.   Yes.

(BdSOF ¶ 4.)   Lt. Seagraves establishes that the **criminal investigation** of Dr. Dowling in this case was clearly undertaken and conducted solely by MCSO, without any direction by the Board.

Lt. Seagraves has also confirmed that, following a criminal investigation by MCSO, the decision as to whether to **prosecute** an individual for a particular crime or crimes is made by the prosecutor (not by MCSO and <u>not</u> by the Board):

Q.   .... And then within MCSO, decisions are going to be made on the information that you've established in your investigation as to whether or not to submit that information to perhaps a prosecutor?

A.   [by Lt. Seagraves:] Yes.

Q.   And then at some point, a decision has to be made on whether or not the facts that you have found are sufficient to establish a crime that should be prosecuted; correct?

A.   Yes.

Q.  Do you or anyone from MCSO, as far as you know, make the decisions on whether to prosecute based on the facts that you find?

A.  No.

\* \* \*

Q.  In your experience, would it be customary for anyone from MCSO to be telling a prosecutor after an investigation such as yours what the prosecutor should do?

A.  No.

Q.  And even if someone were to tell a prosecutor that, would you expect a prosecutor to use their own independent judgment on whether to go forward in court or not?

A.  Yes.

(BdSOF ¶ 5.)  After MCSO provided its findings to the Arizona Attorney General's ("AG's") Office, it was the AG's Office, <u>not</u> the Board, that decided to **prosecute** and subsequently initiate the **criminal prosecution**, which included obtaining a grand jury's indictment against Dr. Dowling and others for numerous felony counts. (BdSOF ¶ 6.)

**B.    Count IV – Unconstitutional Policies, Customs and Failure to Train**

In Count IV (entitled "**42 U.S.C. § 1983 – Unconstitutional Policies, Customs, and Failure to Train**") of the Complaint, Plaintiffs generally allege that "Defendants" violated Dr. Dowling's constitutional rights:

> ... in training (or failing to train) their officers, agents, and employees in ...:   the appropriate, lawful and constitutional policies, procedures, and protocols for investigating, processing, handling, and managing of **criminal investigations and prosecutions** in their control; adopting policies and procedures to ensure due process and equal protection for those subject to **investigation and prosecution**[; and]

> ... through fostering, encouraging and knowingly accepting formal and informal policies, procedures, practices, or customs condoning indifference to the rights of the subjects of **criminal investigations and prosecutions** under their control.

(Emphasis added.)  (Dkt. 1-1, Ex. A, ¶¶ 91-92.)  As previously verified above, the Board could not, and did not, control whether an investigation would be initiated by

7

1   MCSO or whether it would be treated as a criminal investigation. The Board did not

2   conduct the actual investigation. The Board did not refer any findings of the

3   investigation to the AG's Office. The Board did not handle the criminal prosecution.

4   Moreover, the Board did not train any officers, agents or employees as to policies

5   and procedures for handling and processing the criminal investigation and/or the

6   criminal prosecution. Plaintiffs' allegations in Count IV clearly cannot be directed at

7   the Board.

8       C.   <u>Count VI – Additional Violations of 42 U.S.C. § 1983</u>

9       Similarly, in Count VI (entitled "**Violations of 42 U.S.C. § 1983: Free Speech,**

10  **Law Enforcement Retaliatory Conduct, Malicious and Selective Prosecution, and**

11  **Abuse of Process**"), Plaintiffs contend:

12          ... Dr. Dowling ... was subjected to **malicious and selective
            prosecution**, **retaliatory conduct**, **illegal search and seizure**, and
13          was **investigated and indicted** without proper cause, with an
            unconstitutional motive and malice, and without equal protection
14          or due process in an attempt to chill Plaintiff's free speech and
            criticism.
15
                                        * * *
16
            .... Dr. Dowling was **investigated**, **indicted**, and **prosecuted** by or
17          at the behest of Defendants for improper unconstitutional motives,
            was treated differently than others similarly situated, was
18          subjected to improper **abuse of process and power** for improper
            motives, and was **indicted** without proper or probable cause and
19          with malice.

20  (Emphasis added.)   (Dkt. 1-1, Ex. A, ¶¶ 107, 109.)   Once again, the criminal

21  investigation of Dr. Dowling was conducted solely by MCSO, not the Board. MCSO

22  independently obtained and executed the search warrants. MCSO seized evidence

23  pursuant to those search warrants.   The Board did not handle the criminal

24  prosecution of Dr. Dowling. The Board was not the entity that presented evidence

25  to the grand jury which resulted in the indictment. The prosecuting entity was the

26  AG's Office. The conduct that Plaintiffs complain of in Count VI of their Complaint

27  is simply not the conduct of the Board Defendants , and no evidence exists that it is.

28  . . .

**III.    Count V is the Only Remaining Count that Arguably Implicates the Board.**

In Count V (entitled "**Conspiracy to Commit Violations of 42 U.S.C. § 1983**"), Plaintiffs allege:

> The wrongful conduct of Defendants ... was undertaken **pursuant to an agreement or meeting of the minds among Defendants** to act in concert to violate Dr. Dowling's constitutional rights, silence Dr. Dowling's opposition to the Board, and to chill Dr. Dowling's political free speech.
>
> Defendants' acts and/or omissions ... to pursue and conduct the "investigation" and prosecution of Dr. Dowling ...were undertaken **pursuant to a conspiracy among Defendants** to violate Dr. Dowling's constitutional rights.

(Emphasis added.)  (Dkt. 1-1, Ex. A, ¶¶ 101-02.)

Count V of Plaintiffs' Complaint seems to acknowledge that, to prove conspiracy under § 1983, "an agreement or meeting of minds to violate the [plaintiff's] constitutional rights must be shown."  *Woodrum v. Woodward County, Okla.*, 866 F.2d 1121, 1126 (9th Cir. 1989) (citation omitted).  Allegations of conspiracy must be supported by specific, material facts, not mere conclusory statements. *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983); *Stone v. Baum*, 409 F.Supp.2d 1164, 1176 (D. Ariz. 2005) (vague and conclusory allegations of conspiracy are insufficient).  *See also Manis v. Sterling*, 862 F.2d 679, 681 (8th Cir. 1988) (allegations of conspiracy must be pled with sufficient specificity and factual support to suggest a "meeting of the minds").

Plaintiffs' Complaint alleges that the Board Defendants *conspired* with MCSO (*i.e.*, had a meeting of the minds and reached an agreement) to initiate a criminal investigation and pursue a criminal prosecution of Dr. Dowling.  Discovery is closed and Plaintiffs are without any such evidence.  Instead, the evidence developed squarely contradicts this unsupported and merely conclusory allegation by Plaintiffs.

Marc Frazier, former assistant superintendent (or executive director of operations) at the MCRSD, has testified that numerous individuals from within the

District (the MCRSD) were the first to raise concerns about financial matters involving the District, and he met with and communicated those concerns to Ben Arredondo, chief deputy at the Maricopa County Superintendent of Schools Office.

Q.   .... Did you have any involvement in reporting any – anything that you perceived improper from the district to folks at OMB in 2005?

A.   [by Mr. Frazier:] I had a meeting with Ben Arredondo where I told him the circumstance of where we were on a cash basis in the district and that, how that money was being covered, and that I told him that I felt it was time that he visit with people at the County about it.

Q.   Okay.

A.   So that we could come up with a resolution to fix it, yes.

Q.   And did Mr. Arredondo then do that after [y]our meeting?

A.   He told me he did.

Q.   So you understood that he did.

A.   Yes.

Q.   Okay.  Prior to you having that meeting with Mr. Arredondo, were you aware of anyone else that had initiated information or concerns about the events that were happening at the district?

A.   Other employees of the district?

Q.   Yes.

A.   Yeah.  **A lot of my financial staff were concerned, absolutely.**

Q.   Okay.  **So prior to you meeting with Mr. Arredondo, you had a sense that other folks from your financial staff at the district shared the concerns that you were having.**

A.   **Yes.**

* * *

Q.   As far as you know, were you the first one to bring these concerns to Ben Arredondo to then go to OMB?

A.   Well, I had been bringing them to Ben's attention for years, but it was finally to the point where we – it was getting to where we needed some help fixing the problem.

Q.   Right.

A.  And that's why I told him he needed to go visit with them; we couldn't just let this continue.  So, yeah, it was more of a forceful meeting with Ben at that time than just letting him know in prior years of the situation.

Q.  Okay.  So by late 2005, you've lived with a history of some of these budgetary problems at the district.

A.  Yes.

Q.  You've voiced concerns about it to folks at the district, including Dr. Dowling.

A.  Yes.

Q.  And Ben Arredondo.

A.  Yes.

Q.  And by the time 2005 rolls around, before there's any investigation whatsoever, as far as you know, you have this forceful meeting with Ben Arredondo.  Correct?

A.  Yes.

Q.  And the reason you describe it as forceful, if I'm understanding your testimony, is because in the prior years that you had told Ben Arredondo about your concerns, you weren't seeing anything happen.  True?

A.  I was not seeing a solution to the problem.  The board was still continuing to give us, you know, the same money every year to try to help us with things.  But the problem of fixing that cash deficit that I explained earlier between the budget limit and the actual cash we got from the State, that was not getting resolved.  We needed to have a resolution for that.

Q.  Right.

A.  And so I just let him know, "Ben, this is going to get worse, it's going to get worse, and we've got to get a solution to this."  And he assured me he could do that through meeting with the Board of Supervisors.

(Emphasis added.)  (BdSOF ¶ 7.)  Mr. Arredondo conveyed these financial concerns regarding the MCRSD to Mr. Hushek at OMB around May or June of 2005, and that was when Mr. Hushek first learned of the District's deficit position.  (BdSOF ¶ 8.)

Supervisor Mary Rose Wilcox has testified that in order to address the fiscal concerns raised by Dr. Dowling's own employees, the Board asked for MCSO's

assistance in obtaining financial records of the MCRSD, but Supervisor Wilcox made it clear that the Board never even requested a "criminal" investigation:

> A.   [by Supervisor Wilcox:] I remember that we asked him [Sheriff Arpaio] to assist us in getting the records that would look at what the expenses were and how they'd been paid in the past and what was being paid, what was causing this deficit.
>
> Q.   Uh-huh.
>
> A.   And so I think all that led to him doing an investigation the way he thought proper.
>
> Q.   The criminal investigation?
>
> A.   I don't remember the word "criminal." I just remember that there was talk about records that were needed.
>
> * * *
>
> A.   [by Supervisor Wilcox:] You know, I don't remember us saying, "Do a criminal investigation." I just remember us saying, we need the records so that we can find out what the costs were, you know, what was causing this deficit, because we were trying to get to the bottom of it and seeing if we could assist.... And I assume that they [MCSO] started looking at records, and that's why it turned criminal.

(BdSOF ¶ 9.)

Supervisor Donald Stapley has also testified that the initiation of a "criminal" investigation with respect to Dr. Dowling was MCSO's decision, not the Board's:

> Q.   .... What do you remember about – if anything, about that January 11th [2006] day and the beginning of the criminal investigation?
>
> * * *
>
> A.   [by Supervisor Stapley:] May have gotten a phone call from Hendershott, and he may have – I vaguely recall him telling me at some point that they opened a – a criminal investigation.
>
> * * *
>
> Q.   .... When this criminal investigation was talked about between you and Hendershott on the 11th, did you or he make any plans with respect to periodic reporting as to the progress of the criminal investigation?
>
> A.   No.

12

* * *

A.   [by Supervisor Stapley:] The – the concern I had and I was trying to express to the Board that since we've become aware that the Sheriff had a criminal investigation ongoing at the same time that we were doing the audit [of the MCRSD by County Auditor Ross Tate], that we needed to make certain that we didn't, you know, miss out on any legal issues that may link the criminal investigation to the audit.

* * *

A.   [by Supervisor Stapley:] **We** [the Board] **had nothing to do with the inception of the criminal investigation. That was the decision of the Sheriff,** and so – but it – but it provided additional information for the audit process, yes.

* * *

Q.   .... Page 21 of the – of the [Board E session] minutes ... start off with a report by Supervisor Wilson, that he received calls from ten people who have had contact with the District and who were willing to testify on irregularities. Do you see that?

A.   I do.

Q.   And then it says, "Other Board members said they received similar calls with similar reports of alleged wrongdoing." Do you see that?

A.   Yes.

* * *

Q.   So these phone calls were coming in to you and to others sometime after the criminal investigation got started?

A.   Yes.

Q.   And it goes on to say, "This kind of information is sent to the Sheriff's Office for their continuing investigation"; right?

A.   Yes.

Q.   And that's – that's what you remember is that when these calls came in, they would be directed over to the Sheriff's Office for further pursuit?

A.   Correct.

* * *

Q.   .... Page 29. Bottom of the page, [Auditor] Tate is reporting that the audit team is 50 percent done with their field work

1    and reports a little bit about the audit, and then he also
2    advises the Board that – actually, he responds, apparently, to a
     question about whether or not he's providing that information
3    to the Sheriff as well, and he says that he is.   Do you
     remember him saying that?

4    A.   Yeah.

5    Q.   Okay.  And that's what you wanted him to do is provide any
     information he came across to the – to the criminal
6    investigators as well?

7    A.   Correct.  Because he is not – he's not a lawyer and – and
     wouldn't have the criminal expertise.

8                                    * * *

9

10   Q.   .... You looked at – with me early at Exhibit Number 215 ....

     This is the story that appeared in – in The Republic on the 27th
11   of January 2006 where Arpaio ... says that MCSO was – was
     prompted by the Board of Supervisors to begin looking at ...
12   Sandra's – ... quote, her activities, closed quotes.

13   As far as you were concerned now or even in late January
     2006, is that an accurate statement by Arpaio?

14
     A.   No.  And again, it depends on your definition of the word
15   "prompted."    There were conversations, but it was – we
     weren't the initiation of the decision to make – to go into a
16   criminal mode in the Sheriff's department.

17   (Emphasis added.)  (BdSOF ¶ 10.)

18        Former MCSO Chief Deputy David Hendershott's testimony about the

19   initiation of MCSO's investigation is in line with Supervisor Stapley's testimony and

20   also dispels Plaintiffs' "conspiracy" allegation:

21   Q.   Okay.  Now, this [exhibit] indicates that on Jan – the morning
     of January 11th, 2006, ... Captain Miller was advising
22   Lieutenant Tucker that you were ... "presently in a meeting
     with the Maricopa County Board of Supervisors," ... in
23   reference to the criminal investigation of Sandy [Dowling].

24                                   * * *

25   A.   [by Mr. Hendershott:] .... But I didn't have a meeting.  I got a
     phone call, and then I would have told Miller.  Miller could
26   have said something that caused him to think that I was in a
     meeting with the board, but **there was no meeting with the
27   board, ever.**

28                                   * * *

                                     14

Q.    ....   So you remember a call from Sandi Wilson [the deputy county manager] and [Brian] Hushek.  What was said to you in that call?

A.    Oh, Sandi went through a – kind of like a shopping list of things that they – that they had issues with that they were concerned about monies being paid twice and, you know, monies being moved to other accounts, things like that.  And it was just a lot of – a lot of things that they were very concerned about.

And so I told them that, "Okay.  Well, we'll get a couple of detectives."

....   [T]hey [the detectives] first started talking to Hushek, I think, and then they went from there.

And that was – you know, said, "Well, sure, **we'll** [MCSO] **look and see if there's any merit to it.**"

* * *

Q.    And what did she [Ms. Wilson] tell you were her concerns?

A.    You know, she just kind of gave an overview.  And I don't really remember with any specificity what she told me.  But what she told me certainly laid the groundwork to justify having some detectives go talk to people that Sandi felt would have information on this just to make an initial determination if the whole case had merit.

* * *

Q.    When you instructed – gathered together the investigative team with Captain Miller on January 11th of 2006, did you have any political motivation in beginning that investigation based on what –

A.    No.

Q.    – Sandi Wilson told you?

A.    Not at all....

(Emphasis added.)  (BdSOF ¶ 11.)

Bruce Tucker, who was a Sergeant with MCSO when this investigation began and was the **lead case agent**, testified that he does not recall ever meeting with any member of the Board of Supervisors during the course of the investigation, and further verified that the Board Defendants did not participate in either the criminal

investigation or the criminal prosecution:

    Q.   .... All I'm trying to find out is whether there were any people from the County OMB that attended meetings that you had with either [Assistant Attorney General] Ted Noyes, Captain Miller or Chief Hendershott?

    A.   [by Mr. Tucker:] I don't recall any meetings where they were present, staff of the County .... I don't recall any meetings in which they were present at our office where we discussed the investigation or where we were going in the investigation, along those lines.

                      \* \* \*

    Q.   Okay.  So based on conversations you had with Mr. Noyes about what you were discovering in this case, is it a fair statement that Mr. Noyes made the decision as to which specific charges or allegations you needed to focus the investigation on?

    A.   I think that's absolutely a fair statement to make.

    Q.   Do you have any knowledge that anyone from the Board of Supervisors was involved in those decisions?

    A.   Not that I'm aware of.

    Q.   Do you have any knowledge that anyone from Maricopa County or otherwise, like OMB, was involved in any of those decisions?

    A.   Almost to the contrary, no.  I – I don't think that they had any involvement in that.

                      \* \* \*

    Q.   During your investigation, did you discover any evidence that anyone from the County Board of Supervisors individually or as a body was directing the investigation of your department?

    A.   I was never told [by] anyone from the Board of Supervisors to go do anything.  I never met with anyone from the Board of Supervisors that I recall.  I would think if I had, I would remember it.  There's no reason for me to believe that anyone other than Captain Miller, [Assistant Attorney General] Noyes and the Chief Deputy [Hendershott] were involved in the direction of this investigation and myself.

    Q.   Okay.  Did you discover any evidence to suggest that anyone from the Board individually or as a body had any participation in the issuance of search warrants?  Yes or no?

    A.   No.

1   Q.   How about in the execution of search warrants?  Yes or no?

2   A.   No.

3   Q.   How about in the Attorney General's decision to indict or prosecute?  Yes or no?

4   A.   No.

5   Q.   And how about in the U.S. Attorney's decision to dismiss the indictment after the plea?  Yes or no?

6

7   A.   No.

8   Q.   ....  During your investigation, did you in any way report to the Board of Supervisors?

9

10   A.   No.

   Q.   Not in writing and not in person?

11

12   A.   No.

   Q.   As far as you know, was anyone else in your superior
13        structure reporting what was going on in your investigation to the Board of Supervisors either in person or in writing?

14

15   A.   I can't –

                           * * *

16
   Q.   You didn't discover any instance during your investigation
17        where that happened; true?

18   A.   I don't recall that ever happening.  You know, I don't recall
         anyone saying, "We need to go present anything to the Board
19        of Supervisors."

20   (BdSOF ¶ 12.)

21       Sheriff Arpaio's testimony further proves that there was no "conspiracy"

22   because there was never any "agreement or meeting of minds" between the Board

23   Defendants and MCSO to violate Plaintiffs' constitutional rights:

24   Q.   ....  When Dave Hendershott told you that either someone
         from the Board of Supervisors or from the County had – had
25        asked MCSO to get involved in this [the Dowling
         investigation], did you feel like it would be important to
26        contact any of the Board of Supervisors directly to make sure
         he was reporting to you accurately?

27                           * * *

28

                              17

A.   [by Sheriff Arpaio:] No.

* * *

Q.   Again, what David Hendershott said to you about that was enough for you, and you didn't need to verify in your mind anything that he said?

A.   Once again, he ran this operation, and I don't think I should have called the Board of Supervisors.  This is a criminal investigation, and he ran it.  **So I don't recall ever talking to the Board of Supervisors over Sandra Dowling.**

* * *

Q.   Okay.  Did he [Hendershott] ever report to you about taking direction from or providing information to the Board of Supervisors about the Dowling criminal investigation?

* * *

A.   No.

* * *

Q.   In your words, Sheriff, how would you describe your involvement with anyone from the County, whether it be a member of the Board or any other County representative outside of MCSO, in the events that led up to the beginning of the criminal investigation by MCSO?

A.   **I didn't have any involvement, quite frankly.  This is our investigation and we handled it,** and we didn't go around telling everybody – or I didn't –

Q.   Right.

A.   – about it.

* * *

Q.   Okay.  And it's your understanding that once the investigation did begin, it was conducted solely and exclusively by your office; correct?

A.   And the Attorney General.

Q.   Right.  Once it was handed over to the Attorney General's Office; right?

A.   I think during the course of the investigation, we were dealing with the prosecutor.  They were advising and that.  It wasn't just turn it over.

Q.   Understood.

1    A.   So their – it was their office and our office investigating this matter.

Q.   .... It's your understanding that no other offices, departments or individuals had involvement with the criminal investigation other than MCSO and the Attorney General's Office; correct?

A.   Uh-huh, that's right.

Q.   So in that regard, you would have to agree that as far as you know, no one from the Board of Supervisors would have had any involvement in your office's criminal investigation; correct?

A.   Not that I know of.

Q.   Right. But you wouldn't expect there to be any involvement by any of those individuals outside your office in the investigation; correct?

A.   Yes.

Q.   Other than as providers of information; right?

A.   Yes.

                                        * * *

Q.   Okay. So just to be clear, for whatever reasons, if – if Mr. Hendershott had decided not to investigate Sandra Dowling, he had that authority in 2006?

A.   Yes.

Q.   And he would be able to make that decision, in other words, to not investigate even if the complainant, whoever that was, somehow insisted on there being an investigation; correct?

A.   Yes.

Q.   Complainants don't determine whether or not MCSO conducts criminal investigations; correct?

A.   We determine it.

Q.   Right. So my statement is correct?

A.   Yes.

(BdSOF ¶ 13.)

    Summary judgment is mandated "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Plaintiffs' record is devoid of any witness who will testify in trial that a meeting of the minds between MCSO and the Board Defendants occurred or that any agreement between them to violate Plaintiffs' constitutional rights ever existed. Instead, the witness testimony in this case establishes that any inquiry into the MCRSD's financial affairs was started as a direct result of fiscal concerns raised by Dr. Dowling's own staff who, through Ben Arredondo, brought those concerns to the attention of County officials. The evidence simply contradicts Plaintiffs' allegation that MCSO and the Board Defendants initiated any inquiry into the MCRSD's financial affairs as a result of some "conspiracy" to criminally investigate, criminally prosecute and politically destroy Dr. Dowling. The Board Defendants are therefore entitled to summary judgment on the remaining counts of Plaintiffs' Complaint.

## IV.   Conclusion

For the foregoing reasons, the Board Defendants respectfully request that this Court grant their Second Motion for Summary Judgment.

RESPECTFULLY SUBMITTED this 22nd day of August, 2011.

JENNINGS HAUG & CUNNINGHAM, L.L.P.


s/ Jorge Franco, Jr.
Jorge Franco, Jr.
Larry J. Crown
William F. Begley
2800 N. Central Avenue, Suite 1800
Phoenix, AZ 85004-1049
Attorneys for Defendants Maricopa County
    Board of Supervisors and Maricopa County

# CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2011, I electronically transmitted **DEFENDANTS MARICOPA COUNTY BOARD OF SUPERVISORS AND MARICOPA COUNTY'S SECOND MOTION FOR SUMMARY JUDGMENT** to the Clerk's Office for the United States District Court, District of Arizona, using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael C. Manning, Esq.
Larry J. Wulkan, Esq.
Stinson Morrison Hecker, LLP
1850 N. Central Avenue, Suite 2100
Phoenix, AZ 85004-4584
Attorneys for Plaintiffs
    Sandra and Dennis Dowling

Lisa S. Wahlin, Esq.
Nathan D. Meyer, Esq.
Graif Barrett & Matura, P.C.
1850 N. Central Avenue, Suite 500
Phoenix, AZ 85004
Attorneys for Defendants
    Sheriff Joseph Arpaio & Ava Arpaio

I further certify that on August 23, 2011, a copy of the attached document was delivered to:

Honorable James A. Teilborg
United States District Court – Arizona
Sandra Day O'Connor US Courthouse, Room 523
401 W. Washington Street, SPC 51
Phoenix, AZ 85003

s/ Kim Cecil
WFB/kc/4047-17