Michael C. Manning (#016255)
Larry J. Wulkan (#021404)
**STINSON MORRISON HECKER** LLP
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
Email:  mmanning@stinson.com
           lwulkan@stinson.com
Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Sandra Dowling and Dennis Dowling, husband and wife,<br><br>Plaintiffs,<br><br>v.<br><br>Sheriff Joseph Arpaio and Ava Arpaio, husband and wife; Maricopa County Board of Supervisors; Maricopa County, a Municipal entity; et al.,<br><br>Defendants. | No. CV 09-1401-PHX-JAT<br><br>**CONTROVERTING STATEMENT OF FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS MARICOPA COUNTY BOARD OF SUPERVISORS AND MARICOPA COUNTY'S SECOND MOTION FOR SUMMARY JUDGMENT**<br><br>(Oral Argument Requested) |

PURSUANT TO Local Rule of Civil Procedure 56, Plaintiffs, Sandra Dowling and Dennis Dowling (collectively "Plaintiffs"), through their undersigned counsel, submit this Separate Controverting Statement of Facts in Support of their Opposition to Defendants Maricopa County Board of Supervisors and Maricopa County's Second Motion for Summary Judgment ("CSOF").

For ease of reference, Plaintiffs have replicated Defendants' Statement of Facts ("DSOF") and then provided Plaintiffs' controverted facts in bold type.  Plaintiffs have filed a single Omnibus Separate Statement of Facts in support of their Responses to Arpaio Defendants and the Board/County Defendants' Motions for Summary Judgment ("OSSOF").  At times, Plaintiffs controvert a fact by referencing to their OSSOF.  That reference includes all exhibits to that fact.

## CONTROVERTING STATEMENT OF FACTS

1.    The concerns of the Maricopa County Board of Supervisors (the "Board")

1   regarding financial matters involving Dr. Sandra Dowling and the Maricopa County
2   Regional School District (the "MCRSD") were first brought to the attention of the
3   Maricopa County Sheriff's Office ("MCSO") on January 11, 2006, and on that date,
4   Brian Hushek, the deputy budget director at the Office of Management Budget for
5   Maricopa County ("OMB"), was interviewed by MCSO personnel, including Sergeant
6   Kim Seagraves.  ("MCSO Supplemental Report to DR # 06-013489 dated July 6, 2006,
7   pp.1-5, attached hereto as Exhibit ("Ex.") 1; Deposition of Brian Hushek taken on
8   November 23, 2010 ("Hushek Dep."), [page] 11: [line]11-12:9, 30:12-18, 76:9-79:3,
9   attached hereto as Ex. 2.)

10       **DISPUTED:  Plaintiffs dispute DSOF #1 on the grounds that the MCSO**
11   **knew <u>before</u> the Hushek interview that the Board had "concerns" about**
12   **financial matters involving Dr. Dowling and the District.  In fact, those**
13   **"concerns" were the alleged reason the Board asked the Sheriff to begin the**
14   **criminal investigation of Dr. Dowling.  See. OSSOF 31.  And at 8:18 a.m. on**
15   **the day the investigation began, a "Task Force" had been formed due to the**
16   **"size and complexity" of the investigation.  *See* Exhibit 78, Tucker**
17   **Supplemental Report re: Initial Advisement of Investigation and Response.**
18   **Hushek was the first one interviewed in that investigation.**

19       2.      At his deposition, Mr. Hushek described the purpose of his interview with
20   MCSO in January 2006 as merely information gathering by MCSO, and he further
21   testified:

22       I went over there to provide the information that I had in my
23       possession or what I had been told for them, the Sheriff's Office, that
         is, to determine whether or not there was any merit to it moving
24       forward into whatever type of investigation they would be handling."

25   (Ex. 2, Hushek Dep., 191:8-16.)

26       **DISPUTED:  Plaintiffs dispute DSOF #2 on the grounds that at the time of**
27   **Hushek's interview, the Sheriff had already formed a criminal "Task**
28

2

**Force" investigation into Dr. Dowling and the District due to the "size and complexity of the investigation," and assigned 35-40 of his "best detectives" to it.** *See* **OSSOF 33; and** *see* **Exhibit 78, Tucker Supplemental Report re: Initial Advisement of Investigation and Response.**

3.    When Mr. Hushek was asked at his deposition, "[W]hose idea was it to begin a criminal investigation of … Sandra Dowling?" he answered:

> I would want to say it was the Sheriff's Office ultimately, because we did not know if there was any proof that there was anything criminal in the matter or not.

(Ex. 2, Hushek Dep., 78:12-19.)

**DISPUTED:   Plaintiffs dispute DSOF #3 on the grounds that Sheriff Arpaio, lead case agent, Lt. Bruce Tucker and investigator Sgt. Seagraves testified that the criminal investigation was begun at the request of the Board of Supervisors.** *See* **OSSOF 31.  Lt. Tucker's initial case note reflects the same.** *See* **Exhibit 78, Tucker Supplemental Report re: Initial Advisement of Investigation and Response.**

4.    MCSO Lieutenant (formerly Sergeant) Kim Seagraves testified at her deposition that from the time MCSO initiated its investigation regarding Dr. Dowling on January 11, 2006, all decisions as to how to investigate the case were made by MCSO and not by the Board Defendants:

> Q.    … your first involvement in this Dowling investigation was the meeting that you attended with Chief Hendershott present in which he initiated the investigation; correct?
>
> A.    [by Lt. Seagraves:] Yes.
>
> Q.    I think January 11?
>
> A.    Yes.
>
> * * *
>
> Q.    … [W]hen this investigation gets started as of the meeting of

3

1    January 11, 2006, that was the first event; correct?

2    A.    Yes.

3    Q.    From MCSO's perspective?

4    A.    From the investigator's perspective, yes.

5    Q.    … And from the investigator's perspective, there was no
6          involvement by Maricopa County Supervisors or office of
7          Management and Budget or anyone else from County in that
     meeting; correct?

8    A.    Correct.

9    Q.    All right.  Decisions as to how to then investigate this case, I
10         assume were made within that meeting and forward in time;
11         correct?

12   A.    Yes.

13                                    * * *

14   Q.    At any point during your involvement in the investigation, did
15         you have the sense or even hear a rumor or come across any
16         information whatsoever that suggested that anyone from the
           County, meaning Board of Supervisors or Office of
17         Management and Budget, was having any involvement in the
           decision-making as to the MCSO investigation?

18   A.    The answer is no.

19   Q.    In talking to your superior during the course of your
20         investigation, did you ever get the sense from their direction
           to you that they were essentially following orders from
21         anyone at County, meaning Board of Supervisors or OMB?

22   A.    No.

23   Q.    Is it a fair statement that anything that was a decision in the
24         investigation was derived and made by MCSO personnel
           only, as far as you know?

25

26   A.    Yes.

27                                    * * *

28

                                      4

DB04/835989.0002/5045330.1 DD02

Q.     … So when you talked to Brian Hushek in the first interview, to you, he's a source of information only?

A.     Yes.

Q.     Not a participant in the investigation either that day or any time in the future; correct?

A.     Correct.

\* \* \*

Q.     … Do you have any recollection of Brian Hushek ever saying anything to you or anyone else in MCSO what he thought the direction of the investigation should be?

A.     About him giving direction to us?  Never happened, no.

Q.     Or him imposing him – his opinion as to what you should do in the investigation?

A.     No.

Q.     Okay.  And if he had done that or anyone else from County had done that, would you be required to listen to it and abide by it?

A.     Listen to it.

Q.     Abide by it?

A.     No.

Q.     Okay.  So in the end, MCSO and MCSO alone makes those investigative decisions?

A.     Yes.

Deposition of Lt. Kim Seagraves taken on May 11, 2011 ("Seagraves Dep."), 165:15-168:8; 182:24-183:5; 184:11-185:3, attached hereto as Ex. 3.)

**DISPUTED:   Plaintiffs dispute DSOF #4 on the grounds that Hushek brought the issue of the ICF transfers to the attention of the investigators, which resulted in Counts 1-10 of the Indictment.  _See_ OSSOF 177; Exhibit 13, Hushek Depo., at 184:5-18.  Other County employees were in frequent**

5

**contact with Hendershott to give him information that shaped the course of the investigation.** *See* **Exhibit 13, Hushek Depo., at 176-177; 181:6-185. Within a week of the investigation's start, Chairman Stapley recommended to the Board, after a discussion with Hendershott, that it get a "good criminal lawyer" involved in the investigation.** *See* **OSSOF 3, 171. The Sheriff and the County shared information as the investigation and the audit were going on.**

5.      Lieutenant Seagraves also testified at her deposition that, following a criminal investigation by MCSO, the decision as to whether to prosecute an individual for a particular crime or crimes is made by the prosecutor:

> Q.      … And then within MCSO, decisions are going to be made on the information that you've established in your investigation as to whether or not to submit that information to perhaps a prosecutor?
>
> A.      [by Lt. Seagraves:] Yes.
>
> Q.      And then at some point, a decision has to be made on whether or not the facts that you have found are sufficient to establish a crime that should be prosecuted; correct?
>
> A.      Yes.
>
> Q.      Do you or anyone from MCSO, as far as you know, make the decisions on whether to prosecute based on the facts that you find?
>
> A.      No.
>
> 　　　　　　　　　* * *
>
> Q.      In your experience, would it be customary for anyone from MCSO to be telling a prosecutor after an investigation such as yours what the prosecutor should do?
>
> A.      No.
>
> Q.      And even if someone were to tell a prosecutor that, would you expect a prosecutor to use their own independent

judgment on whether to go forward in court or not?

A.   Yes.

\* \* \*

Q.   … then once your investigative agency does what it thinks needs to be done to the extent that it thinks it needs to be done, that information is passed along upstream to yet another entity; correct?

A.   Yes.

Q.   And that would be the next entity perhaps the prosecuting office for them to decide if crimes have been committed and charges should be filed?

A.   Yes.

Q.   In your experience, you don't typically see overlap of those entities in their respective roles; correct?

A.   Correct.

(Ex. 3, Seagraves Dep., 170:18-171:6, 172:2-10, 173:6-18.)

**DISPUTED:  Plaintiffs dispute DSOF #5 on the grounds that the MCSO did recommend charges to bring against Dr. Dowling and others.  *See* OSSOF 140.  The MCSO did all of the investigating.  Also, less than one week after the investigation began, Hendershott had already told Stapley that he had found evidence of criminal wrongdoing. *See* OSSOF 42.**

6.   After MCSO provided its investigative findings to the Arizona Attorney General's ("AG's") Office, the AG's Office decided to prosecute and subsequently initiated the criminal prosecution (until the case was transferred to the U.S. Attorney's Office), which included obtaining a grand jury's indictment against Dr. Dowling and others for numerous felony counts (MCSO Supplemental Report to Dr # 06-013489 dated September 13, 2006, attached hereto as Ex. 4; Indictment, 59 SGJ 06, dated November 16, 2006, attached hereto as Ex. 5; MCSO Supplemental Report to DR # 06-013489 dated March 28, 2008, attached hereto as Ex. 6.)

7

1   **DISPUTED:  Plaintiffs dispute DSOF #6 on the grounds that the MCSO**

2   **prepared Issue Summaries and included in them recommended charges**

3   **against Dr. Dowling and others.  *See* OSSOF 140.  Also 12 of the 25 counts**

4   **against Dr. Dowling were remanded because the MCSO knew of**

5   **exculpatory evidence that it failed to present to the Grand Jury, casting**

6   **doubt on the thoroughness of the investigative material it provided the**

7   **Attorney General.  *See* OSSOF 63.**

8       7.    Marc Frazier, former assistant superintendent (or executive director of

9   operations) at the MCRSD, testified at his deposition that numerous individuals from

10  within the District (the MCRSD) were the first to raise concerns about financial matters

11  involving the District, and he met with and communicated those concerns to Ben

12  Arredondo, chief deputy at the Maricopa County Superintendent of Schools Office.

13  Q.    … Did you have any involvement in reporting any – anything
14  that you perceived improper from the district to folks of OMB
    in 2005?

15
16  A.    [by Mr. Frazier:] I had a meeting with Ben Arredondo where
    I told him the circumstance of where we were on a cash basis
17  in the district and that, how that money was being covered,
    and that I told him that I felt it was time that he visit with
18  people at the County about it.

19  Q.    Okay.

20  A.    So that we could come up with a resolution to fix it, yes.

21
    Q.    And did Mr. Arredondo then do that after [y]our meeting?
22

23  A.    He told me he did.

24  Q.    So you understood that he did.

25  A.    Yes.

26  Q.    Okay.  Prior to you having that meeting with Mr. Arredondo,
    were you aware of anyone else that had initiated information
27  or concerns about the events that were happening at the
    district?
28

8

1    A.     Other employees of the district?

2    Q.     Yes.

3    A.     Yeah.  A lot of my financial staff were concerned, absolutely.

4    Q.     Okay.  So prior to you meeting with Mr. Arredondo, you had

5 a sense that other folks from your financial staff at the district shared the concerns that you were having.

6    A.     Yes.

7    * * *

8

9    Q.     As far as you know, were you the first one to bring these concerns to Ben Arredondo to then go to OMB?

10

11    A.     Well, I had been bringing them to Ben's attention for years, but it was finally to the point where we – it was getting to where we needed some help fixing the problem.

12

13    Q.     Right.

14    A.     And that's why I told him he needed to go visit with them; we

15 couldn't just let this continue.  So, yeah, it was more of a forceful meeting with Ben at that time than just letting him

16 know in prior years of the situation.

17    Q.     Okay.  So by late 2005, you've lived with a history of some

18 of these budgetary problems at the district.

19    A.     Yes.

20    Q.     You've voiced concerns about it to folks at the district,

21 including Dr. Dowling.

22    A.     Yes.

23    Q.     And Ben Arredondo.

24    A.     Yes.

25    Q.     And by the time 2005 rolls around, before there's any

26 investigation whatsoever, as far as you know, you have this forceful meeting with Ben Arredondo.  Correct?

27    A.     Yes.

28

Q.    And the reason you describe it as forceful, if I'm understanding your testimony, is because in the prior years that you had told Ben Arredondo about your concerns, you weren't seeing anything happen.  True?

A.    I was not seeing a solution to the problem.  The board was still continuing to give us, you know the same money every year to try to help us with things.  But the problem of fixing that cash deficit that I explained earlier between the budget limit and the actual cash we got from the State, that was not getting resolved.  We needed to have a resolution for that.

Q.    Right.

A.    And so I just let him know, "Ben, this is going to get worse, it's going to get worse, and we've got to get a solution to this."  And he assured me he could do that through meeting with the Board of Supervisors.

(Deposition of Marc Frazier taken on June 1, 2011 ("Frazier Dep.", 28:7-24, 30:1-31:7, 161:7-162:10, 162:15-164:6, attached hereto as Ex.7.)

**DISPUTED:  Plaintiffs admit that the deficit at the District was well known prior to 2005, even to members of County management through the Treasurer's Green Bar report and the independent audits the District underwent annually.  *See* OSSOF 15-71.  Dr. Dowling believed that the Board was statutorily required to adequately fund the District and thus take care of the deficit.  *See* OSSOF 20-21; *see* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 26.  She also believed that her Superintendant of the District and other highly placed administrative personnel needed to find the money to fund worthwhile projects, through grants or other sources.  *See* Exhibit 12, Frazier Depo., at 36-37.  The County Treasurer always paid the District's warrants even when it was in a "deficit situation."  *See* OSSOF 15. Dr. Dowling and Mark Frazier wanted Mr. Arredondo to approach the Board/County management about the deficit because he was the liaison with the Board, had a good relationship with them, and always said he**

**could make things happen with the Board.  *See* OSSOF 18; s*ee* Exhibit 12, Frazier Depo., at 161:7-14.  Dr. Dowling and Mr. Frazier believed that the Board would cover the deficit or would work with the District to get it paid down.  *See* OSSOF 29, *see* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 26.**

8.     Mr. Arredondo conveyed the financial concerns regarding the MCRSD to Mr. Hushek at OMB around May or June of 2005, and that was when Mr. Hushek first learned of the District's deficit position.  (Ex. 2, Hushek Dep., 35:4-37:2.)

**DISPUTED:  Plaintiffs dispute DSOF #8 on the grounds that the Treasurer had covered the warrants for the District even when it was in a deficit situation and reported this annually to the Board in its Green Bar report. *See* OSSOF 15, 16  Additionally, the District was audited every year and the deficit noted in those audits from the time it first appeared.  *See* OSSOF 17. These are public records and the Board received them.  *See* Exhibit 12, Frazier Depo., at 165:17-166:5.  Mr. Arredondo testified that Mr. Hushek raised the issue of the deficit to him.**

9.     When Supervisor Mary Rose Wilcox was deposed in this case, she testified that the Board asked for MCSO's assistance in obtaining financial records of the MCRSD, but she made it clear that the Board never requested a "criminal" investigation?

A.     [by Supervisor Wilcox:)] I remember that we asked him [Sheriff Arpaio] to assist us in getting the records that would look at what the expenses were and how they'd been paid in the past and what was being paid, what was causing this deficit.

Q.     Uh-huh.

A.     And so I think all that led to him doing an investigation the way he thought proper.

Q.     The criminal investigation?

DB04/835989.0002/5045330.1 DD02

1

A.    I don't remember the word "criminal." I just remember that there was talk about records that were needed.

2

3

\* \* \*

4

A.    [by Supervisor Wilcox] You know, I don't remember us saying, "Do a criminal investigation." I just remember us saying, we need the records so that we can find out what the costs were, you know, what was causing this deficit, because we were trying to get to the bottom of it and seeing if we could assist … And I assume that they [MCSO] started looking at records, and that's why it turned criminal.

5

6

7

8

(Deposition of Supervisor Mary Rose Wilcox taken on April 21, 2011 ("Wilcox

9

Depo."), 70:3-13, 71:10-18, attached hereto as Ex.8.)

10

**DISPUTED: Plaintiffs dispute DSOF #9 on the grounds that Arpaio,**

11

**Tucker and Seagraves all testified that the criminal investigation was**

12

**initiated at the request of the Board. *See* OSSOF 31. And the County audit**

13

**was ongoing and Dr. Dowling was working with County counsel to produce**

14

**the requested records. *See* OSSOF 26. The day the criminal investigation**

15

**began, the Sheriff appointed his Chief Deputy to oversee it, act as the liaison**

16

**to the Board, and appointed 35-40 of his best detectives to the Task Force –**

17

**actions that would hardly be necessary if the Sheriff was only going to help**

18

**the Board get records. *See* OSSOF 33.**

19

10.    Supervisor Donald Stapley has also testified that the initiation of a

20

criminal investigation with respect to Dr. Dowling was MCSO's decision, not the

21

Board's:

22

Q.    … What do you remember about – if anything, about that January 11th [2006] day and the beginning of the criminal investigation?

23

24

25

A.    [by Supervisor Stapley:] Been a lot of years, and I don't have any specific recall.

26

Q.    How about general?

27

A.    May have gotten a phone call from Hendershott, and he may

28

12

have – I vaguely recall him telling me at some point that they opened a – a criminal investigation.

* * *

Q.    … You didn't suggest to him [Hendershott] any – any particular areas of inquiry for this criminal investigation that was about to begin?

A.    There were people who had called, and I had referred them to him.

Q.    Who was that?

A.    Some of my – I couldn't give you their names, but I had probably four or five phone calls from former – former employees, former budget people who had worked for the Accommodation District, former superintendents who had worked there who had issues that I didn't think were appropriate for the Board to be involved in that, as I recall, centered around these kinds of things.  Nepotism was another one.  That's implicit in this overpayment to family members, and I – I just referred those people to Chief Deputy Hendershott.

* * *

Q.    … When this criminal investigation was talked about between you and Hendershott on the 11th did you or he make any plans with respect to periodic reporting as to the progress of the criminal investigation?

A.    No.

* * *

A.    [by Supervisor Stapley:] The – the concern I had and I was trying to express to the Board that since we've become aware that the Sheriff had a criminal investigation ongoing at the same time that we were doing the audit [of the MCRSD by County Auditor Ross Tate], that we needed to make certain that we didn't, you know, miss out on any legal issues that may link the criminal investigation to the audit.

* * *

A.    [by Supervisor Stapley:] We [the Board] had nothing to do

13

1    with the inception of the criminal investigation. That was the
2    decision of the Sheriff, and so – but it – but it provided additional information for the audit process, yes.

3    * * *

4    Q.    … Page 21 of the – of the [Board E session] minutes … start
5    off with a report by Supervisor Wilson, that he received calls from ten people who have had contact with the District and
6    who were willing to testify on irregularities. Do you see that?

7    A.    I do.

8    Q.    And then it says, "Other Board members said they received
9    similar calls with similar reports of alleged wrongdoing." Do
10    you see that?

11    A.    Yes.

12    * * *

13    Q.    So these phone calls were coming in to you and to others
14    sometime after the criminal investigation got started?

15    A.    Yes.

16    Q.    And it goes on to say, "This kind of information is sent to the
17    Sheriff's Office for their continuing investigation"; right?

18    A.    Yes.

19    Q.    And that's – that's what you remember is that when these
20    calls came in, they would be directed over to the Sheriff's Office for further pursuit?

21    A.    Correct.

22    * * *

23    Q.    … Page 29. Bottom of the page, [Auditor] Tate is reporting
24    that the audit team is 50 percent done with their field work and reports a little bit about the audit, and then he also advises
25    the Board that – actually, he responds, apparently, to a
26    question about whether or not he's providing that information
27    to the Sheriff as well, and he says that he is. Do you remember him saying that?

28

14

A.   Yeah.

Q.   Okay.  And that's what you wanted him to do is provide any information he came across to the – to the criminal investigators as well?

A.   Correct.  Because he is not – he's not a lawyer and – and wouldn't have the criminal expertise.

* * *

Q.   … You looked at – with me early at Exhibit Number 215 …

This is the story that appeared in – in The Republic on the 27th of January 2006 where Arpaio … says that MCSO was – was prompted by the Board of Supervisors to begin looking at, quote, Sandra's – I'm sorry, quote, her activities, closed quotes.   As far as you were concerned now or even in late January 2006, is that an accurate statement by Arpaio?

A.   No.  And again, it depends on your definition of the word "prompted."   There were conversations but it was – we weren't the initiation of the decision to make – to go into a criminal mode in the Sheriff's department.

(Deposition of Supervisor Donald Stapley taken on May 12, 2011 ("Stapley Dep."), 80:17-25, 84:10-25; 91:10-15, 102:5-11, 103:13-17, 112:1-12, 112:19-113:5, 116:18-117:6, 172:2-18, attached hereto as Ex. 9.)

**DISPUTED:   Plaintiffs dispute DSOF #10 on the grounds that Sheriff Arpaio, Lt. Tucker and Sgt. Seagraves report that the Board initiated the criminal investigation of Dr. Dowling.  *See* OSSOF 31.  Lt. Tucker's initial case note reflects the same.  *See* Exhibit 78, Tucker Supplemental Report re: Initial Advisement of Investigation and Response.  Furthermore, Stapley admits he talked to Hendershott about the criminal investigation on the day it began.  *See* Exhibit 6, Stapley Depo., at 91:10-15.**

11.   Former MCSO Chief David Hendershott testified at his deposition about the initiation of MCSO's investigation of Dr. Dowling, including that County representatives provided information to MCSO, and then MCSO investigated the matter

15

on its own:

Q.   Okay.  Now, this [exhibit] indicates that on Jan – the morning of January 11th, 2006, … Captain Miller was advising Lieutenant Tucker that you were, quote, "presently in a meeting with the Maricopa County Board of Supervisors," close quotes, in referenced to the criminal investigation of Sandy [Dowling].

Does that jog your memory about meeting with the board?

A.   [by Mr. Hendershott:]  Yeah.  That's not correct information.

Q.   Okay.

A.   It's not.  I mean, there would be – what you're reading is, is basically Tucker's stat log and – by what he's probably assuming is, is that because you know, he's saying I had a meeting.  But I didn't have a meeting.  I got a phone call and then I would have told Miller.   Miller could have said something that caused him to think that I was in a meeting with the board, but there was no meeting with the board, ever.

* * *

Q.   … So you remember a call from Sandi Wilson [the deputy county manager] and [Brian] Hushek.  What was said to you in that call?

A.   Oh, Sandi went through a – kind of like a shopping list of things that they – that they had issues with that they were concerned about monies being paid twice and, you know, monies being moved to other accounts, things like that.  And it was just a lot of – a lot of things that they were very concerned about.

And so I told them that, "Okay.  Well, we'll get a couple of detectives."

… [T]hey [the detectives] first started talking to Hushek, I think, and then they went from there.

And that was – you know, said, "Well, sure, we'll look and see if there's any merit to it."

* * *

16

1

2

3

4

5

6

7

8

9

10

11

12

13

> Q.     And what did she [Ms. Wilson] tell you were her concerns?
>
> A.     You know, she just kind of gave me an overview.  And I don't really remember with any specificity what she told me. But what she told me certainly laid the groundwork to justify having some detectives go talk to people that Sandi felt would have information on this just to make an initial determination if the whole case had merit.
>
>                            * * *
>
> Q.     When you instructed – gathered together the investigative team with Captain Miller on January 11th of 2006, did you have any political motivation in beginning that investigation based on what –
>
> A.     No.
>
> Q.     - Sandi Wilson told you?
>
> A.     Not at all …

14

15

(Deposition of David Hendershott taken on March 1, 2011 ("Hendershott Dep."), 81:20-82:12, 86:7-22, 91:18-24, 199:20-200:1, attached hereto as Ex. 10.)

16

17

18

19

20

21

22

23

24

25

26

27

28

**DISPUTED:   Plaintiffs dispute DSOF #11 on the grounds that while Hendershott testified that he was willing to send a "couple of detectives" out to talk to some people, in fact on the very day the criminal investigation began, the Sheriff had appointed Hendershott to lead it and assigned 35-40 of his "best detectives" to the Task Force that had been formed as of 8:18 a.m. that morning due to the "size and complexity" of the investigation.  *See* Exhibit 78, Tucker Supplemental Report re: Initial Advisement of Investigation and Response; *see* OSSOF 33. During the investigation, County management suggested to Tucker that he investigate the ICF transfers which led to Counts 1-10 of the Indictment.  *See* OSSOF 177. Other County officials provided information to the Sheriff throughout the investigation.  *See* Exhibit 13, Hushek Depo., at 150:23-151:16, 176-177, 181-185.**

DB04/835989.0002/5045330.1 DD02

1        12.    Bruce Tucker, who was a Sergeant with MCSO when the investigation

2 regarding Dr. Dowling began and was the lead agent on the case, testified that he does

3 not recall ever meeting with any member of the Board of Supervisors during the course

4 of the investigation, and he further verified that the Board Defendants did not participate

5 in either the criminal investigation or the criminal prosecution:

> Q.     … Within those 80 pages of your notes, are there any that reflect any meeting that you had with any members of the Board of Supervisors?
>
> A.     [by Mr. Tucker:] I don't recall meeting with the Board of Supervisors …
>
> * * *
>
> Q.     … did any members of the Maricopa County Board of Supervisors attend any of those meeting with you?
>
> A.     I never had a meting with any of the Board of Supervisors that I recall.
>
> Q.     So the answer is no?
>
> A.     No.
>
> * * *
>
> Q.     … All I'm trying to find out is whether there were any people from the County OMB that attended meeting with you had with either [Assistant Attorney General] Ted Noyes, Captain Miller or Chief Hendershott?
>
> A.     I don't recall any meeting where they were present, staff of the County … I don't recall any meetings in which they were present at our office where we discussed the investigation or where we were going in the investigation, along those lines.
>
> * * *
>
> Q.     Okay. So based on conversations you had with Mr. Noyes about what you were discovering in this case, is it a fair statement that Mr. Noyes made the decision as to which specific charges or allegations you needed to focus the investigation on?

1    A.    I think that's absolutely a fair statement to make.

2    Q.    Do you have any knowledge that anyone from the Board of Supervisors was involved in those decisions?

3

4    A.    Not that I'm aware of.

5    Q.    Do you have any knowledge that anyone from Maricopa County or otherwise, like OMB, was involved in any of those decisions?

6

7    A.    Almost to the contrary, no.  I – I don't think that they had any involvement in that.

8

9    Q.    Okay.  You were the case agent, the lead case agent?

10    A.    Correct.

11                          * * *

12    Q.    During your investigation, did you discovery any evidence that anyone from the County Board of Supervisors individually or as a body was directing the investigation of your department?

13

14

15    A.    I was never told [by] anyone from the Board of Supervisors to go do anything.  I never met with anyone from the Board of Supervisors that I recall.  I would think if I had, I would remember it.  There's no reason for me to believe that anyone other than Captain Miller, Mr. Noyes and the Chief Deputy [Hendershott] were involved in the direction of this investigation and myself.

16

17

18

19

20    Q.    Okay.  Did you discover any evidence to suggest that anyone from the Board individually or as a body had any participation in the issuance of search warrants?  Yes or no?

21

22

23    A.    No.

24    Q.    How about in the execution of search warrants?  Yes or no?

25    A.    No.

26    Q.    How about in the Attorney General's decision to indict or prosecute?  Yes or no?

27

28    A.    No.

DB04/835989.0002/5045330.1 DD02

Q.   And how about in the U.S. Attorney's decision to dismiss the indictment after the plea?  Yes or no?

A.   No.

Q.   … During your investigation, did you in any way report to the Board of Supervisors?

A.   No.

Q.   Not in writing and not in person?

A.   No.

Q.   As far as you know, was anyone else in your superior structure reporting what was going on in your investigation to the Board of Supervisors either in person or in writing?

A.   I can't –

* * *

Q.   You didn't discover any instance during your investigation where that happened; true?

A.   I don't recall that ever happening. You know, I don't recall anyone saying, "We need to go present anything to the Board of Supervisors."

(Deposition of Bruce Tucker taken on December 1, 2010 ("Tucker Dep."), 167:3-7, 241:2-9, 245:21-246:4, 247:19-248:4, 249:10-250:2, 265:11-266:22, 267:6-10, attached hereto as Ex. 11.)

**DISPUTED:   Plaintiffs dispute DSOF #12 on the grounds that County officials provided information to Hendershott during the investigation and Hushek told Tucker to look into the ICF transfers which ended up forming the basis of the first ten counts of the indictment.   *See* OSSOF 177. Hendershott and Stapley spoke regularly during the investigation and Hendershott met individually with the Supervisors throughout the course of the investigation.   *See* OSSOF 34; Exhibit 6, Stapley Depo., at 94:14-15. Tucker spoke often to Hendershott through the investigation and**

20

**Hendershott frequently gave Tucker leads to follow.  *See* Exhibit 22, Tucker Depo., at 13:5-14:10.  Sgt. Seagraves met with Supervisor Stapley during the investigation, allegedly to ask him to stop the District from selling a piece of real estate.  *See* Exhibit 6, Stapley Depo., at 174:19-175:25.**

13.     When Sheriff Joseph Arpaio was deposed in this case, he testified that this was MCSO's criminal investigation and MCSO handled it, along with the AG's Office, and that the Board Defendants were not participants in the handling of this criminal investigation:

Q       … When Dave Hendershott told you that either someone from the Board of Supervisors or from the County had - had asked MCSO to get involved in this, did you feel like it would be important to contact any of the Board of Supervisors directly to make sure he was reporting to you accurately?

MR. FRANCO:  Objection; form.

MS. WAHLIN:  Join.

A.      [by Sheriff Arpaio:]  No.

*  *  *

Q.      Again, what David Hendershott said to you about that was enough for you, and you didn't need to verify in your mind anything that he said?

A.      Once again, he ran this operation, and I don't think I should have called the Board of Supervisors.  This is a criminal investigation, and he ran it.  So I don't recall ever talking to the Board of Supervisors over Sandra Dowling.

*  *  *

Q.      Okay.  Did he [Hendershott] ever report to you about taking direction from or providing information to the Board of Supervisors about the Dowling criminal investigation?

MR. FRANCO:  Objection; form.

A.      No.

21

DB04/835989.0002/5045330.1 DD02

* * *

Q.    In your words, Sheriff, how would you describe your involvement with anyone from the County, whether it be a member of the Board of any other County representative outside of MCSO, in the events that led up to the beginning of the criminal investigation by MCSO?

A.    I didn't have any involvement, quite frankly.  This is our investigation and we handled it, and we didn't go around telling everybody – or I didn't –

Q.    Right.

A.    - about it.

* * *

Q.    Okay.   And it's your understanding that once the investigation did begin, it was conducted solely and exclusively by your office; correct?

A.    And the Attorney General.

Q.    Right.  Once it was handed over to the Attorney General's Office; right?

A.    I think during the course of the investigation, we were dealing with the prosecutor.  They were advising and that.  It wasn't just turn it over.

Q.    Understood.

A.    So their – it was their office and our office investigating this matter.

Q.    … It's your understanding that no other offices, departments or individuals had involvement with the criminal investigation other than MCSO and the Attorney General's Office; correct?

A.    Uh-huh, that's right.

Q.    So in that regard, you would have to agree that as far as you know, no one from the Board of Supervisors would have had any involvement in your office's criminal investigation; correct?

22

DB04/835989.0002/5045330.1 DD02

A.    Not that I know of.

Q.    Right.  But you wouldn't expect there to be any involvement by any of those individuals outside your office in the investigation; correct?

A.    Yes.

Q.    Other than as providers of information; right?

A.    Yes.

* * *

Q.    Okay.  So just to be clear, for whatever reasons, if – if Mr. Hendershott had decided not to investigate Sandra Dowling, he had that authority in 2006?

A.    Yes.

Q.    And he would be able to make that decision, in other words, to not investigate even if the complainant, whoever that was, somehow insisted on there being an investigation; correct?

A.    Yes.

Q.    Complainants don't determine whether or not MCSO conducts criminal investigations; correct?

A.    We determine it.

Q.    Right.  So my statement is correct?

A.    Yes.

(Deposition of Sheriff Joseph Arpaio taken on June 8, 2011 ("Arpaio Dep."), 59:7-15, 60:13-20, 61:6-10, 105:5-14, 105:23-107:2, 107:21-108:9, attached hereto as Ex. 12.)

**DISPUTED:   Plaintiffs dispute DSOF #13 on the grounds that Sheriff Arpaio testified he had no involvement in the Dowling investigation; that he assigned Hendershott to lead it, act as liaison to the Board and gave him free rein to conduct it.  *See* OSSOF 33, 77-78.**

DB04/835989.0002/5045330.1 DD02

RESPECTFULLY SUBMITTED this 11th day of October, 2011.

**STINSON MORRISON HECKER LLP**

By:   s/ Michael C. Manning

Michael C. Manning
Larry J. Wulkan
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of October, 2011, I caused the foregoing document to be filed electronically with the Clerk of Court through ECF; and that ECF will send an e-notice of the electronic filing to:

The following ECF participants:

Jorge Franco, Jr.
Larry J. Crown
JENNINGS, HAUG & CUNNINGHAM, LLP
*Attorneys for Maricopa County Board of Supervisors*
*and Maricopa County*

Lisa S. Wahlin
GRAIF, BARRETT & MATURA, P.C.
*Attorneys for Joseph and Ava Arpaio*

By:   s/ Kathleen Kaupke

24

DB04/835989.0002/5045330.1 DD02