1  Michael C. Manning (#016255)
   Larry J. Wulkan (#021404)
2  **STINSON MORRISON HECKER** LLP
   1850 North Central Avenue, Suite 2100
3  Phoenix, Arizona 85004-4584
   Tel: (602) 279-1600
4  Fax: (602) 240-6925
   Email:  mmanning@stinson.com
5          lwulkan@stinson.com
   Attorneys for Plaintiffs
6

7               **UNITED STATES DISTRICT COURT**

8                   **DISTRICT OF ARIZONA**

9  Sandra Dowling and Dennis Dowling,      No. CV 09-1401-PHX-JAT
   husband and wife,
10                                          **CONTROVERTING STATEMENT**
                   Plaintiffs,              **OF FACTS IN SUPPORT OF**
11                                          **PLAINTIFFS' OPPOSITION TO**
   v.                                       **ARPAIO DEFENDANTS' MOTION**
12                                          **FOR SUMMARY JUDGMENT**
   Sheriff Joseph Arpaio and Ava Arpaio,
13 husband and wife; Maricopa County        **MOTION TO STRIKE 232**
   Board of Supervisors; Maricopa          **STATEMENTS OF FACT NOT**
14 County, a Municipal entity; et al.,      **USED TO SUPPORT MATERIAL**
                                            **FACTS IN ARPAIO'S MOTION**
15                 Defendants.              **FOR SUMMARY JUDGMENT**

16                                          (Oral Argument Requested)

17         PURSUANT TO Local Rule of Civil Procedure 56, Plaintiffs, Sandra Dowling

18 and Dennis Dowling (collectively "Plaintiffs"), through their undersigned counsel,

19 submit this Separate Controverting Statement of Facts in Support of their Opposition to

20 Arpaio Defendants' Motion for Summary Judgment ("CSOF").

21         For ease of reference, Plaintiffs have replicated Defendants' Statement of Facts

22 ("DSOF") and then provided Plaintiffs' controverted facts in bold type.  Plaintiffs have

23 filed a single Omnibus Separate Statement of Facts in support of their Responses to

24 Arpaio Defendants and the Board/County Defendants' Motions for Summary Judgment

25 ("OSSOF").  At times, Plaintiffs controvert a fact by referencing to their OSSOF.  That

26 reference includes all exhibits to that fact.

27         **PRELIMINARY OBJECTION:**  Defendants Arpaio have listed 477 statements

28 of fact in their separately filed Statement of Facts.  Of those, they specifically reference

only 245 of the statements in the body of their Motion.  The other 232 statements of fact are not mentioned in the Motion, are not used to support any statement made in the Motion and their inclusion violates Local Rule 56.1.  This rule provides that the separately filed Statement of Facts include each "material fact on which the party relies in support of the motion" and "only those facts the Court needs to decide the motion." Here, the Court clearly does not need the 232 "facts" not relied on by Defendants as support for their Motion, nor can any of the "facts" not used to support the Motion be considered material.  For that reason, Plaintiffs have objected to those facts, moves to strike them, and will only address them substantively if the Court determines any of them are necessary to decide the motion.

## I.  THE MARICOPA COUNTY REGIONAL SCHOOL DISTRICT

1.     Sandra Dowling was the Maricopa County Superintendent of Schools, which is an elected office, for 20 years. She left that position in December 2008. (August 16, 2010 Deposition of Sandra Dowling, attached as Ex. 1, at 9-10, 20, 389-390).

**UNDISPUTED.**

2.     The Maricopa County Superintendent of Schools provided fiscal services to 41 Maricopa County school districts, one of which was the Maricopa County Regional School District ("MCRSD"). (Affidavit of Beverly Owens, attached as Ex. 2, at ¶ 6).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

3.     The Maricopa County Regional School District ("MCRSD") is also sometimes referred to as District 509 or the Accommodation District. (November 23, 2010 Deposition of Brian Hushek, attached as Ex. 3, at 28; March 21, 2011 Deposition of Carol Lynn Wood, attached as Ex. 4, at 9).

1  **DISPUTED:  This statement is not cited in the Motion as support for any**
2  **material fact.**

3      4.      In 2006, MCRSD operated 12 schools with a combined enrollment of
4  1500- 1600 students. (Owens Affidavit, Ex. 2, at ¶ 5)

5      **DISPUTED:  This statement is not cited in the Motion as support for any**
6  **material fact.**

7      5.      As the Superintendent of Schools, Sandra Dowling automatically served
8  as the Governing Board for MCRSD. Dr. Dowling was the sole member of the
9  Governing Board of MCRSD. (Dowling Depo., Ex. 1, at 10; Wood Depo., Ex. 4, at
10  19).

11     **UNDISPUTED and additionally Dr. Dowling, as the Superintendent of**
12  **Schools, served as the sole member of the Governing Board of the MCRSD**
13  **pursuant to state statute.  A.R.S. § 15-301, Exhibit 75.**

14     6.      Sandra Dowling was the Board. She was in charge. (April 13, 2011
15  Deposition of Sherry Ferguson, attached as Ex.5, at 43).

16     **DISPUTED:  This statement is not cited in the Motion as support for any**
17  **material fact.**

18     7.      Dr. Carol "Kit" Wood was the Superintendent of MCRSD from May
19  2002 to June 2005. As Superintendent, Dr. Wood reported to the Governing Board,
20  which was Sandra Dowling. (Wood Depo., Ex. 4, at 9, 15).

21     **UNDISPUTED.**

22     8.      Dr. Wood had a financial staff that reported to her as MCRSD
23  Superintendent. Marc Frazier was the director of finance. (Wood Depo., Ex. 4, at 24).

24     **DISPUTED:  This statement is not cited in the Motion as support for any**
25  **material fact.**

26     9.      Sherry Ferguson was the Superintendent of District 512, which was an
27  educational services agency under MCRSD. She worked for Sandra Dowling in that

28

3

position from the fall of 2000 until July 2004. Previously, she had been the Superintendent of Schools for Pinal County for 16 years. (Ferguson Depo., Ex. 5, at 13-14, 16-17, 19, 30, 60).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

10.     Sandra Dowling hired Marc Frazier to work in the Superintendent of Schools' office in 1991. In 1996 Mr. Frazier became the Chief Deputy Superintendent of Schools. Then in 1999 he moved from the Superintendent of Schools' office to MCRSD as the Director of Finance, and Ben Arredondo replaced him as Chief Deputy in the Superintendent of Schools' office. (June 1, 2011 Deposition of Marc Frazier, attached as Ex. 6, at 23, 2 8-29).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

11.     Mr. Frazier also functioned as Dr. Wood's Assistant Superintendent and oversaw the operation of MCRSD. (Frazier Depo., Ex. 6, at 30-31).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

12.     The Governing Board approves the budget for MCRSD. Generally, MCRSD's budget was around $12 million. (Wood Depo., Ex. 4, at 30, 33; Frazier Depo., Ex. 6, at 33).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

13.     Most school districts get additional funding for transportation costs from taxes. MCRSD does not get that tax funding. (Wood Depo., Ex. 4, at 63).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

14.     But transportation costs were not the cause of MCRSD's deficit. The

4

deficit was the result of spending that was over and above the budget limit, and spending on items that were not contemplated when the budget was being developed. (Wood Depo., Ex. 4, at 64-65).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

15.    If a school district is not supported by tax levies, then it cannot legally go into a deficit. (Ferguson Depo., Ex. 5, at 57-58).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

16.    One of Sandra Dowling's frequent statements was, "I'm about deniability." (Wood Depo., Ex. 4, at 131; Frazier Depo., Ex. 6 at 147).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

17.    One of the ways Sandra Dowling operated was to give direction or get people going in a direction and then distance herself so that she had "deniability." Then she couldn't be held responsible if it all fell apart or something was called into question. (Wood Depo., Ex. 4, at 133).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

18.    Marc Frazier told MCSO detectives that, "[Sandra Dowling] is very careful. Her favorite word in the world is deniability. I think she eats it, sleeps it. and drinks it; that's what she wants, to be able to deny anything and everything." "She doesn't like to take responsibility or accountability for anything." "Deniability is her number one theory in life. If she could push the blame to anyone else for anything, she tries." (Frazier Depo., Ex. 6, at 147-148).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

DB04/835989.0002/5045150.1DD02

19.     Sherry Ferguson told MCSO detectives that "Sandra Dowling would have had any document that she could have had signed by anybody else [if] she could have gotten by with it, including her board minutes . . ." She did that because "if anything came up or anything became – anything happened that was wrong or improper or illegal that [sic] she wouldn't be blamed for it." (Ferguson Depo., Ex. 5, at 94).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

20.     If there was something on the board agenda that was controversial, tough, or politically damaging, Sandra Dowling would avoid the board meeting and have someone else, the chief deputy, preside over the meeting. (Frazier Depo., Ex. 6, at 148-149).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

21.     There were times when Marc Frazier worked at the Superintendent of Schools' office that Sandra Dowling had him act in her place as the MCRSD Governing Board. (Frazier Depo., Ex. 6, at 148; Ferguson Depo., Ex. 5, at 54-55).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

22.     There were also times that Sandra Dowling had Ben Arredondo act in her place as the MCRSD Governing Board. (Frazier Depo., Ex. 6, at 148; Ferguson Depo., Ex. 5, at 54-55).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

23.     When Ben Arredondo was acting as the Governing Board in Sandra Dowling's stead, any decision he made was with Sandra Dowling's knowledge and approval. Even though he was acting on her behalf, Sandra Dowling was still in

6

1  control of MCRSD in every aspect. (February 18, 2011, Deposition of Ben
2  Arredondo, attached as Ex. 7, at 150).

3     **DISPUTED:  This statement is not cited in the Motion as support for any**
4     **material fact.**

5     24.     So if Sandra Dowling didn't want to be accountable for something that
6  was on the MCRSD board agenda, she would have someone else run the meeting.
7  (Frazier Depo., Ex. 6, at 149).

8     **DISPUTED:  This statement is not cited in the Motion as support for any**
9     **material fact.**

10    25.     At Sherry Ferguson's urging Dr. Dowling requested a legal opinion and
11  was told that she could not delegate her authority to act as MCRSD's Governing
12  Board. She had to go back and ratify everything that had been done. (Ferguson Depo.,
13  Ex. 5, at 54-55; Frazier Depo., Ex. 6 at 149, 153; December 3, 2003 Board Agenda
14  Item, attached as Ex. 8).

15    **DISPUTED:  This statement is not cited in the Motion as support for any**
16    **material fact.**

17    26.     Sandra Dowling also didn't like to receive things in writing. Sometimes
18  she would refuse to take them. Other times she would claim she never saw something.
19  (Frazier Depo., Ex. 6, at 149).

20    **DISPUTED:  This statement is not cited in the Motion as support for any**
21    **material fact.**

22    27.     It was a struggle to not do something that Sandra Dowling wanted.
23  (Wood Depo., Ex. 4, at 222).

24    **DISPUTED:  This statement is not cited in the Motion as support for any**
25    **material fact.**

26  **II.    THE INVESTIGATION**
27    **A.     The Complainant – Brian Hushek**

28

7

28.     MCSO identified Brian Hushek as the initial complainant on the investigative report. (December 1, 2010 Deposition of Bruce Tucker, attached as Ex. 9, at 34, 142).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

29.     Brian Hushek is a deputy budget director for Maricopa County and works in the Office of Management and Budget ("OMB"). He has been in that position since approximately 2004. Mr. Hushek reports to Sandi Wilson, who is the Maricopa County Deputy County Manager. (Hushek Depo., Ex. 3, at 11-12).

**UNDISPUTED.**

30.     As a deputy budget manager, Mr. Hushek oversees a number of elected officials' budgets and budgets of appointed departments, including the Superintendent of Schools. (Hushek Depo., Ex. 3, at 13).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

31.     Mr. Hushek first became aware that MCRSD was in a deficit position in May or June of 2005. That information came from Ben Arredondo. (Hushek Depo., Ex. 3, at 36).

**DISPUTED:  Plaintiffs dispute DSOF #31 on the grounds that the District deficit was reported every year by the County Treasurer in the Green Bar report and was reflected in the independent audit of the District done annually, which was a public document provided to County officials and management.  OSSOF 15-17.**

32.     Ben Arredondo was the Chief Deputy Superintendent of Schools. (Hushek Depo., Ex. 3, at 37).

**UNDISPUTED.**

33.     Ben Arredondo learned in late 2004 that MCRSD was operating in a

1    financial deficit. (Arredondo Depo., Ex. 7, at 151).

2          **DISPUTED:   Plaintiffs dispute DSOF #33 on the grounds that Mr.**

3    **Arredondo was aware of the deficit before this.  Mr. Frazier spoke to him**

4    **about the deficit many times.  *See* Exhibit 12, Frazier Depo. at 161:7-14,**

5    **162:15-163:10.**

6          34.    Ben Arredondo called Mr. Hushek and asked to speak with Mr. Hushek

7    and Sandi Wilson about an issue. Ms. Wilson wasn't available, so only Mr.

8    Arredondo and Mr. Hushek met. (Hushek Depo., Ex. 3, at 36-37).

9          **DISPUTED:   Plaintiffs dispute this DSOF on the grounds that Mr.**

10   **Arredondo does not say anything about Ms. Wilson's availability.   A**

11   **meeting did occur between Hushek and Arredondo.**

12         35.    Before Ben Arredondo called Mr. Hushek, Marc Frazier met with Ben

13   Arredondo and told him about the financial issues at MCRSD and that Mr. Arredondo

14   needed to visit with OMB. (Frazier Depo., Ex. 6, at 161-162).

15         **DISPUTED:  Plaintiffs dispute DSOF #35 on the grounds that Mr. Frazier**

16   **went to Mr. Arredondo to encourage him to meet with the Board to help the**

17   **District resolve the deficit since Mr. Arredondo always said he could "make**

18   **things happen" with the Board.  *See* Exhibit 12, Frazier Depo. at 161:7-14.**

19   **Mr. Arredondo was aware of the financial issues at MCRSD before this**

20   **meeting. *See* Plaintiffs' response to DSOF #33.**

21         36.    During the meeting with Mr. Hushek, among other things, Ben

22   Arredondo discussed the MCRSD deficit. (Arredondo Depo., Ex. 7, at 151-152).

23         **UNDISPUTED.**

24         37.    Mr. Arredondo told Mr. Hushek that there was approximately a $3

25   million deficit in MCRSD's Maintenance and Operation ("M & O") account. (Hushek

26   Depo., Ex. 3, at 40, 43, 54-55).

27

28

1    **DISPUTED.  Mr. Arredondo said that Mr. Hushek brought up the Deficit.**
2    ***See* Exhibit 53, Arredondo Depo. at 151:24-152:14; 170:16-171:6.**

3    38.    Mr. Arredondo met a few more times with Mr. Hushek, and Mr.
4    Arredondo brought financial staff members with him – the deputy finance director
5    and one of the accountants. (Hushek Depo., Ex. 3, at 41).

6    **DISPUTED:  Mr. Arredondo did not mention subsequent meetings in his**
7    **deposition.**

8    39.    Mr. Arrendondo approached Mr. Hushek because Sandra Dowling was
9    concerned about the deficit, she had a potential leadership position with the Bush
10   administration, and she was interested in possibly doing something with property
11   taxes in the upcoming tax setting session in August 2005. (Hushek Depo., Ex. 3, at 42,
12   65).

13   **DISPUTED:  This statement is not cited in the Motion as support for any**
14   **material fact.**

15   40.    Mr. Hushek discussed MCRSD's deficit issues with Sandi Wilson and in
16   executive session with the Board of Supervisors. (Hushek Depo., Ex. 3, at 30-31, 42).

17   **DISPUTED:  This statement is not cited in the Motion as support for any**
18   **material fact.**

19   41.    Mr. Hushek asked Mr. Arredondo to provide information and documents
20   regarding the deficit because the OMB did not have access to the Treasurer's
21   information system to be able to see the deficit. (Hushek Depo., Ex. 3, at 42-43).

22   **DISPUTED:  This statement is not cited in the Motion as support for any**
23   **material fact.**

24   42.    Mr. Hushek ultimately determined that the deficit had originated during
25   fiscal year 1999-2000. (Hushek Depo., Ex. 3, at 65).

26   **DISPUTED:  This statement is not cited in the Motion as support for any**
27   **material fact.**

28

DB04/835989.0002/5045150.1DD02

43.     On either January 10 or 11, 2006, Brian Hushek and Sandi Wilson called Maricopa County Sheriff's Office ("MCSO") Chief Deputy David Hendershott. (Hushek Depo., Ex. 3, at 76-77; March 1, 2011 Deposition of David Hendershott, attached as Ex. 10, at 72-73).

**DISPUTED.  Plaintiffs dispute DSOF #43 on the grounds that such a call could not have taken place on January 11, 2006, since by 8:18 a.m. the Task Force had been formed and the criminal investigation launched.  *See* Exhibit 78, Tucker Supplemental Report re: Initial Advisement of Investigation and Response.**

44.     The call occurred in the afternoon, after lunch. Mr. Hushek and Ms. Wilson had been talking about issues relating to MCRSD over lunch and Ms. Wilson suggested that they call Chief Deputy Hendershott because there could be something criminal involved and they should let MCSO know to take a look into it. (Hushek Depo., Ex. 3, at 77-78).

**DISPUTED:  *See* Plaintiffs' Response to DSOF #43.**

45.     There was no discussion between Chief Hendershott and the Board of Supervisors about initiating an investigation into Sandra Dowling or MCRSD. Although the initial departmental report reflects that on January 11, 2006 Chief Deputy Hendershott was in a meeting with the Board of Supervisors, that statement is incorrect. Hendershott did not meet with anyone from the Board of Supervisors. (Hendershott Depo., Ex. 10, at 82).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

46.     There are no minutes reflecting that a Board of Supervisors' session occurred on January 11, 2006. A special executive session of the Board of Supervisors occurred on January 10, 2006, but no one from the MCSO, including Chief Hendershott, is listed as an attendee or reflected in the minutes of that special

executive session. (Minutes from January 10, 2006 Special Executive Session, attached as Ex. 11).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

47.    Sandi Wilson was the one who made the decision to call Chief Hendershott. (Hushek Depo., Ex. 3, at 78, 101).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

48.    MCSO was not involved in the Sandra Dowling matter prior to that phone call to Chief Hendershott. (Hushek Depo., Ex. 3, at 78-79).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

49.    During the phone call Ms. Wilson and Mr. Hushek discussed the deficit, and the fact that it had started back in fiscal year 1999-2000. They discussed how they felt there might be some misuse of funds, and they asked Chief Hendershott to take a look into it. (Hushek Depo., Ex. 3, at 87-88).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

50.    Mr. Hushek was not specifically aware of any misuse of funds but he could not understand how the deficit had accumulated to close to $4 million. (Hushek Depo., Ex. 3, at 88-89).

**UNDISPUTED that this was Mr. Hushek's testimony.**

51.    Mr. Hushek and Ms. Wilson also told Chief Hendershott that there were other possible allegations of misconduct against Dr. Dowling, such as double or overpayment of Sandra Dowling or family members, excessive travel, and procurement issues. All of those allegations had been relayed to OMB staff by Superintendent of Schools' office staff. (Hushek Depo., Ex. 3, at 97).

1    **UNDISPUTED that this was Mr. Hushek's testimony.**

2    52.    The purpose of the phone call to Deputy Chief Hendershott was to have

3    him consider whether a criminal investigation was warranted. (Hushek Depo., Ex. 3,

4    at 115).

5    **DISPUTED:  Plaintiffs dispute this DSOF on the grounds that the Board**

6    **instigated the criminal investigation of Dr. Dowling.  *See* OSSOF 31, 169.**

7    53.    Chief Hendershott indicated that he would assign someone to look into it

8    and that OMB would be hearing back from MCSO. (Hushek Depo., Ex. 3, at 89).

9    **DISPUTED:  This statement is not cited in the Motion as support for any**

10   **material fact.**

11   54.    Chief Hendershott asked Mr. Hushek to attend an interview with MCSO,

12   which occurred on January 11, 2006. Someone from MCSO called Mr. Hushek to set

13   it up. (Hushek Depo., Ex. 3, at 30, 138).

14   **DISPUTED:  This statement is not cited in the Motion as support for any**

15   **material fact.**

16   55.    Mr. Hushek knew that he would be the designated person from the

17   County to talk to MCSO investigators because he had most of the firsthand knowledge

18   provided by the personnel from the Superintendent of Schools' office. (Hushek Depo.,

19   Ex. 3, at 138).

20   **DISPUTED:  This statement is not cited in the Motion as support for any**

21   **material fact.**

22   56.    Mr. Hushek brought a stack of documents with him to the January 11,

23   2006 interview. It was information that had been provided by Ben Arredondo, Diane

24   Goke, and Casey Haley from the Superintendent of Schools' Office, and documents

25   OMB had received from the Department of Finance, as well as information from the

26   Department of Education regarding budgeting for school districts and their financial

27   policies manual. (Hushek Depo., Ex. 3, at 134).

28

13

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

57.    After the interview, Mr. Hushek told MCSO that when he got additional information he would forward it to MCSO, and he continued to compile documents and other information and provide it to MCSO. (Hushek Depo., Ex. 3, at 15 1-152).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

58.    In January 2006, Mr. Hushek didn't know whether there would actually be anything criminal. MCSO could have investigated and found out there was nothing. (Hushek Depo., Ex. 3, at 133).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

59.    During his January 2006 interview, Mr. Hushek did not believe that Loretta Barkell and Sergeant Seagraves were trying to "get" Sandra Dowling; rather, they merely asked follow-up questions and their questioning was done in a conversation-like atmosphere. (Hushek Depo., Ex. 3, at 155-156).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

60.    The interview was merely an information gathering process. (Hushek Depo., Ex. 3, at 191).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

61.    Jim Hippel, who retired in 2000 after being the Director of Finance for the Superintendent of Schools' office for ten years, and then worked part-time as a financial analyst for MCRSD until January 2006, was also concerned about issues at MCRSD. On January 16, 2006, just five days after the investigation began, Mr. Hippel wrote a letter with several enclosures to David Smith, the County Manager. (January 16,

14

1  2006 letter from Jim Hippel, attached as Ex. 12).

2      **DISPUTED:  This statement is not cited in the Motion as support for any**

3      **material fact.**

4      62.    Mr. Hippel's letter outlined allegations of nepotism and mismanagement.

5  (January 16, 2006 Hippel letter, Ex. 12).

6      **DISPUTED:  This statement is not cited in the Motion as support for any**

7      **material fact.**

8      **B.      Beginning of the Investigation**

9      63.    Chief Deputy Hendershott held an initial meeting regarding the

10  investigation at about 1:00 p.m. on January 11, 2006 in Chief Deputy Hendershott's

11  office. Lieutenant Bruce Tucker was assigned as the lead case agent. (Tucker Depo., Ex.

12  9, at 26, 29, 40).

13      **UNDISPUTED.**

14      64.    Including Lt. Tucker, eleven people attended the meeting. (Tucker

15  Depo., Ex. 9, at 34).

16      **UNDISPUTED that Lt. Tucker testified that the people listed attended and**

17      **that he would have listed others if they were present.  *See* Tucker Depo.,**

18      **Defendants' Ex. 9, at 34.**

19      65.    During the meeting, Chief Hendershott expressed that there were

20  allegations of misconduct made against Sandra Dowling and that MCSO would be

21  conducting an investigation. He stated that MCRSD was significantly over budget by

22  $4 million or so, and there were possible allegations of double or overpayment of

23  Sandra Dowling or family members, frivolous spending, abuse of the travel budget,

24  nepotism, and improper purchases from vendors. (Tucker Depo., Ex. 9, at 29, 35-36, 44)

25      **DISPUTED:  Plaintiffs dispute this DSOF to the extent that Lt. Tucker**

26      **testified that Chief Hendershott learned of these allegations of misconduct**

27

28

15

DB04/835989.0002/5045150.1DD02

1   **from the Board – and further that Tucker had testified to this at the Grand**

2   **Jury.  *See* Tucker Depo., Defendants' Ex. 9, at 29.**

3       66.     During the meeting Chief Hendershott also identified Ben Arredondo as

4   possibly having significant information relating to the allegations regarding potential

5   misconduct of Sandra Dowling and other employees at MCRSD. (Tucker Depo., Ex. 9,

6   at 43-44).

7       **DISPUTED.  Plaintiffs dispute this DSOF on the grounds that Lt. Tucker**

8       **only assumed that the information about Mr. Arredondo came from Chief**

9       **Hendershott.  *See* Tucker Depo., Defendants' Ex. 9, at 43-44.**

10      67.     As lead case agent, Lt. Tucker's role included tracking the activities of the

11  investigators involved, identifying what needed to be done, identifying who had been

12  interviewed and keeping track of evidence. (Tucker Depo., Ex. 9, at 42).

13      **DISPUTED:  This statement is not cited in the Motion as support for any**

14      **material fact.**

15      68.     Sergeant Kimberly Seagraves was also assigned to work on the

16  investigation. Detectives from the MCSO Threats Unit were assigned to the

17  investigation as additional manpower to help do interviews, serve subpoenas, or assist

18  with whatever Lt. Tucker needed to have done. (Tucker Depo., Ex. 9, at 37, 41).

19      **UNDISPUTED that this is what Lt. Tucker testified regarding others**

20      **assigned to the criminal investigation.**

21      69.     Sgt. Seagraves only worked on the investigation until June 30, 2006.

22  (March 30, 2011 Deposition of Beverly Owens, attached as Ex. 13, at 179).

23      **DISPUTED:  This statement is not cited in the Motion as support for any**

24      **material fact.**

25      70.     Dr. Beverly Owens was asked to work on the Dowling investigation as a

26  financial analyst and assist Lt. Tucker and Sgt. Seagraves. She had previously assisted

27  Lt. Tucker with several small cases. (Owens Depo., Ex. 13, at 12).

28

1    **UNDISPUTED.**

2    71.    Dr. Owens did all of the financial analysis in the investigation. (Owens

3    depo, Ex. 13, at 14).

4    **DISPUTED:  This statement is not cited in the Motion as support for any**

5    **material fact.**

6    72.    The number of people who worked on the investigation was based on

7    staffing availability at MCSO. There was never a decision that they were going to

8    have 20 people work on it and hold that same number until the investigation closed. It

9    was a fluctuating amount of individuals that Lt. Tucker could use as resources. When

10   MCSO did the search warrant, there were a great number of people working on it.

11   After the search warrants, when it was strictly interviews, Lt. Tucker didn't need that

12   number of people, so the detectives that were assisting went back to their regular

13   assignments. During the course of the investigation, people would transfer in and

14   transfer out. (Tucker Depo., Ex. 9, at 202-203).

15   **DISPUTED:  This statement is not cited in the Motion as support for any**

16   **material fact.**

17   73.    "Task force," in law enforcement jargon, is a vague term. It can refer to

18   a group of six or four or two guys focusing on a project, or to a cooperative effort

19   between more than one agency. There was no "task force" related to the Dowling

20   investigation. (Tucker Depo., Ex. 9, at 203-204).

21   **DISPUTED:  This statement is not cited in the Motion as support for any**

22   **material fact.**

23   74.    The investigation was not initiated because of Sandra Dowling's refusal

24   to provide financial records for an audit. The investigation was initiated because of

25   allegations of misconduct, including misuse of public funds. (Tucker Depo., Ex. 9, at

26   120- 121, 205; Owens Depo., Ex. 13, at 20).

27

28

1        **DISPUTED:  This statement is not cited in the Motion as support for any**

2  **material fact.**

3        75.     Although MCRSD's deficit may have brought attention to the issues, in

4  Lt. Tucker's conduct of the investigation, the deficit was a separate issue from the

5  allegations of misconduct involving misuse of public funds. Just because the deficit

6  existed didn't necessarily mean that funds were misused or abused. (Tucker Depo.,

7  Ex. 9, at 174-175).

8        **DISPUTED:  This statement is not cited in the Motion as support for any**

9  **material fact.**

10       76.     On January 11, 2006 when he was assigned the investigation, Lieutenant

11 Tucker made no assumption that it would end in a criminal prosecution. He didn't

12 make any decisions regarding the prosecution. He didn't conclude it would end up in a

13 criminal prosecution until he was told he was it was going before the grand jury.

14 (Tucker Depo., Ex. 9, at 23).

15       **DISPUTED:  This statement is not cited in the Motion as support for any**

16 **material fact.**

17       77.     Investigations are not always based on a crime for which the investigator

18 must identify a perpetrator. Sometimes allegations are brought forward that a

19 particular person has done a particular act. Neither is more common than the other; it

20 varies. (Tucker Depo., Ex. 9, at 213-214; May 11, 2011 Deposition of Kimberly

21 Seagraves attached as Ex. 14, at 92-93).

22       **DISPUTED:  This statement is not cited in the Motion as support for any**

23 **material fact.**

24       78.     The Dowling investigation involved allegations that Sandra Dowling had

25 done something wrong, and so Lt. Tucker was asked to interview Mr. Hushek, Mr.

26 Arredondo, and Dr. Kit Wood to determine whether there was merit to the allegations.

27 (Tucker Depo., Ex. 9, at 214).

28

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that by the time of the initial meeting, and before any interviews had taken place, a "Task Force" had already been gathered due to the "size and complexity" of the investigation into Dr. Dowling – indications that a decision had already been made that there was merit to the allegations.  *See* Exhibit 78, Tucker Supplemental Report re: Initial Advisement of Investigation and Response.**

79.    Ted Noyes from the Arizona Attorney General's Office became involved very early in the investigation, even before the search warrants that were served on January 25, 2006. (Tucker Depo., Ex. 9, at 2 1-22).

**DISPUTED that this was Tucker's testimony.  Mr. Noyes was not deposed.**

80.    In Lt. Tucker's experience, it is wise to involve a prosecutor early in an investigation, especially in a case as complex as the Sandra Dowling investigation. That way, investigators can work with the prosecutor through the course of the investigation, and the prosecutor can offer guidance, advice, expertise, and assistance with subpoenas. Then, if probable cause does develop, and the case is submitted for the prosecutor's review and consideration, the prosecutor is aware of what has transpired, and you haven't had an investigator trying to deal with a case without legal guidance. (Tucker Depo., Ex. 9, at 24-25).

**UNDISPUTED that this was Lt. Tucker's testimony.**

C.    Background on Lead Investigators

81.    Lt. Tucker worked for MCSO for over 18 years as a deputy sheriff. During the course of that time, Lt. Tucker worked in patrol, including lake patrol. He then worked in investigations for several years before transferring to the homicide unit. Lt. Tucker worked as a homicide detective for 3 years. Lt. Tucker also did investigations as a sergeant and lieutenant in Internal Affairs. (Tucker Depo., Ex. 9, at 50-52).

DB04/835989.0002/5045150.1DD02

1    **UNDISPUTED that this is what Lt. Tucker testified to regarding his**
2    **background.**

3    82.    Lt. Tucker has conducted between 150 and 175 investigations in his
4    career. Lt. Tucker served as lead case agent on investigations from 1997 until he
5    retired from MCSO on December 30, 2009. (Tucker Depo., Ex. 9, at 99, 20 1-202).

6    **UNDISPUTED that this is what Lt. Tucker testified to regarding his**
7    **background.**

8    83.    At the time he began the Dowling investigation, Lt. Tucker had received
9    more than 450 hours of training relating to conducting investigations. (Tucker Depo.,
10   Ex. 9, at 279).

11   **UNDISPUTED that this is what Lt. Tucker testified to regarding his**
12   **background.**

13   84**.**    Generally, Lt. Tucker does not make a quick judgment on the merit of an
14   allegation before he determines whether or not to investigate it. Even if information is
15   a rumor, that rumor may be fruitful. (Tucker Depo., Ex. 9, at 281-282).

16   **DISPUTED:  This statement is not cited in the Motion as support for any**
17   **material fact.**

18   85.    Dr. Beverly Owens obtained a Bachelor of Science degree in accounting
19   in 1978, a master degree in public administration in 1995, and a Ph.D. in public
20   administration in 2004. She is a Certified Public Accountant in New Mexico. (Owens
21   Depo., Ex. 13, at 7-8).

22   **UNDISPUTED that this is what Dr. Owens' Affidavit reflects regarding her**
23   **background.**

24   86.    Over the course of her career, Dr. Owens has worked in financial
25   management and has been an auditor in both the private and public sectors. (Owens
26   Affidavit, Ex. 2, at ¶ 3).

27
28

20

1   **UNDISPUTED that this is what Dr. Owens testified to regarding her**
2   **background.**

3       87.     Dr. Owens has worked for MCSO since 2004 as an internal auditor.
4   (Owens depo, Ex. 13, at 10).

5       **UNDISPUTED that this is what Dr. Owens testified to regarding: her**
6       **background.**

7       88.     Sgt. Kimberly Seagraves has worked for MCSO since 1993. (Seagraves
8   Depo., Ex. 14, at 32.

9       **UNDISPUTED that this is what Sgt. Seagraves testified to regarding her**
10      **employment.**

11      89.     Sgt. Seagraves worked in patrol until 1996 when she moved to the
12  General Investigations Division. (Seagraves Depo., Ex. 14, at 33).

13      **UNDISPUTED that this is what Sgt. Seagraves testified to regarding her**
14      **background.**

15      90.     Prior to becoming involved in the Dowling investigation, Sgt. Seagraves
16  spent eight years as a detective doing investigations in a multitude of areas, including
17  jail crimes, homicide, and sex crimes. She had been involved in more than 100
18  investigations. (Seagraves Depo., Ex. 14, at 34-35, 95).

19      **UNDISPUTED that this is what Sgt. Seagraves testified to regarding her**
20      **background.**

21       D.    **The Search Warrants**

22      91.     Search warrants were served on January 25, 2006, approximately two
23  weeks after the investigation began. Search warrants were served on the Pappas
24  school, the MCRSD offices, a warehouse, and Sandra Dowling's residence. (Tucker
25  Depo., Ex. 9, at 156).

26  **UNDISPUTED.**

27      92.     The warrants were written by Lieutenant Bill Knight with information

28

21

provided by Lt. Tucker, Dr. Beverly Owens, Sgt. Seagraves, and perhaps MCSO's Chief Financial Officer Loretta Barkell. (Tucker depo, Ex. 9, at 158; Owens Depo., Ex. 13, at 35; Affidavit for Search Warrant SW2006-002011, attached as Ex. 15; Affidavit for Search Warrant SW2006-000272, attached as Ex. 16).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

93.    Search warrant SW2006-00201 1 was for searches of the MCRSD main office on 5th Avenue, and a secondary office for Sandra Dowling within the County Administration building at 301 W. Jefferson. (Affidavit for Search Warrant SW2006-002011, Ex. 15).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

94.    Search warrant SW2006-000272 was for searches of the Thomas J. Pappas Middle School on 6th Avenue including the warehouse and the Regional Education Center. Affidavit for Search Warrant SW2006-000272, Ex. 16).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

95.    Prosecutor Ted Noyes was also involved in drafting the search warrants. (Tucker Depo., Ex. 9, at 223-224).

**UNDISPUTED that Lt. Tucker testified to this effect.  Mr. Noyes deposition was not taken.**

96.    Chief David Trombi was asked to provide some additional deputies for the search warrant served at the Thomas J. Pappas School. Chief Trombi was the commander of MCSO's SWAT team. Because the SWAT division doesn't have daily assigned duties, Chief Trombi was able to provide deputies for the search at the Pappas school to assist. (July 21, 2010 Deposition of David Trombi, attached as Ex. 17, at 15, 16).

DB04/835989.0002/5045150.1DD02

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

97.    The SWAT team members were dressed in jeans and t-shirts or polo shirts. (Trombi Depo., Ex. 17, at 49).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

98.    Search and rescue personnel were also used to assist in executing the search warrant at the school. (Trombi Depo., Ex. 17, at 17).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

99.    Dr. Owens attended the execution of the search warrant at the MCRSD office to help identify records. (Owens Depo., Ex. 13, at 33).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

100.   When the MCSO investigators came over to the Superintendent of Schools' office, they were very professional. They were very careful. Whatever they touched, they put back in place. (Arredondo Depo., attached as Ex. 7, at 97, 167).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Mr. Frazier likened the service of the search warrant on the offices as a "raid." *See* OSSOF 55.**

101.   During the search of the Pappas School, MCSO investigators ghosted the Thomas J. Pappas computer server. One of the MCSO computer technicians was seated next to a MCRSD IT employee. The MCRSD employee told the MSCO computer technician that Sandra Dowling had asked him to go to her home and remove the hard drive from her office computer because she feared that MCSO would be serving a warrant on her residence. (Trombi Depo., attached as Ex. 17, at 11-12).

23

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

102    Chief Trombi participated in the search warrant at Sandra Dowling's residence. No other members of the SWAT team were involved in the execution of the search warrant at the Dowling residence. (Trombi Depo., Ex. 17, at 15).

**DISPUTED Plaintiffs dispute this DSOF on the grounds that neighbors of the Dowlings report large numbers of officers present at the service of the warrant at the residence, a helicopter overhead and so many vehicles lining the street that neighbors had difficulty getting to their homes.  *See* OSSOF 56-57.**

103.   The search warrant at Sandra Dowling's residence was served by Captain Miller, Chief Trombi, Beverly Owens, and some computer crimes personnel. (Trombi Depo., Ex. 17, at 17-18).

**DISPUTED:  *See* Plaintiffs' response to DSOF #102.**

104.   The residence was unoccupied. There was a north facing window that was unsecured and they were able to pry it open. Chief Trombi entered the residence through the window and unlocked the front door. (Trombi Depo., Ex. 17, at 18).

**UNDISPUTED that this is what Trombi testified to regarding entrance to the home.**

105.   Chief Trombi was not wearing a uniform but did have a windbreaker that said "Sheriff" in yellow letters. (Trombi Depo., Ex. 17, at 18-19).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

106.   Initially there were only four to six people at the Dowling residence executing the warrant. Later, two to three patrol deputies arrived for scene security. (Trombi Depo., Ex. 17, at 28).

**DISPUTED:  *See* Plaintiffs' response to DSOF #102.**

24

107.   Chief Trombi was only at the Dowling residence for a brief period of time at the beginning and left shortly after they gained entry. He was there for less than an hour. (Trombi Depo., Ex. 17, at 43).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

108.   There were no MCSO helicopters involved in the execution of the search warrant on the Dowling residence. Chief Trombi had the MCSO aviation unit check their records and MCSO did not fly any missions in the area of the Dowling residence on the date MCSO executed the search warrant. (Trombi Depo., Ex. 17, at 51-52).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

109.   Three helicopters were flying overhead, but Sandra Dowling does not know whether they were MCSO helicopters or media helicopters. (Dowling Depo., Ex. 17, at 158).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

110.   Many of the documents that were seized were not on record anywhere else and included evidence that supported the allegations that were presented to Mr. Noyes and that he eventually took to the grand jury. (Tucker Depo., Ex. 9, at 161).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that in Lt. Tucker's deposition excerpt he does not detail what documents were not on record elsewhere nor what documents may have supported the allegations that eventually went to the Grand Jury.**

**E.    The Course of the Investigation**

111.   In conducting the investigation, Lt. Tucker was more interested in the factual basis of what was alleged than he was in opinions. In evaluating evidence, Lt. Tucker considers biases or motivations that witnesses may have. (Tucker Depo., Ex. 9,

DB04/835989.0002/5045150.1DD02

at 33).

> **DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

112.   Lt. Tucker did not base the investigation simply upon what Mr. Hushek said. (Tucker Depo., Ex. 9, at 33).

> **DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

113.   Lt. Tucker believes it is very important to look at an investigation with an unbiased opinion and just put together the facts. Lt. Tucker tried to do that in the Dowling investigation, which is why he recorded all of the witness interviews that were done during the investigation. He didn't try to assume what someone said; he made a recording of their statement. (Tucker Depo., Ex. 9, at 210).

> **DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

114.   As an investigator, Lt. Tucker may sometimes have a theory about how things occurred, and may seek evidence to support that theory. But Lt. Tucker does not use an investigation to manufacture evidence to support his theory. (Tucker Depo., Ex. 9, at 211).

> **DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

115.   Dr. Owens did not start the investigation with any theory about what happened. She did not analyze the documents with any preconceived outcome. (Owens Depo., Ex. 13, at 188).

> **DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

116.   Dr. Owens didn't just look for evidence to substantiate the allegations that witnesses had made during interviews. She looked for any evidence that might

substantiate, or not substantiate, the allegations or that might implicate some other issue. (Owens Depo., Ex. 13, at 192).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

117.   No one ever told Dr. Owens that she needed to find criminal charges against Sandra Dowling. Dr. Owens never felt any pressure to find criminal charges against Sandra Dowling. (Owens Depo., Ex. 13, at 189).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

118.   Although there was a desire within MCSO to have the case resolved, Lt. Tucker never felt pressured to fabricate anything. He was never pressured to falsify anything or exaggerate anything. (Tucker Depo., Ex. 9, at 111).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

119.   When conflicting evidence develops during an investigation, Lt. Tucker provides it to the prosecutorial body and lets them decide how to proceed. Lt. Tucker did not withhold any evidence from prosecutor Ted Noyes. Lt. Tucker provided Mr. Noyes with the recorded interviews and transcripts. (Tucker Depo., Ex. 9, at 211).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

120.   The Dowling investigation was the first time Lt. Tucker did an investigation of such a magnitude involving statutes outside of the criminal statutes in Title 13. The issues in the Dowling investigation related to education, procurement, and the Auditor General's rules, so Lt. Tucker leaned more heavily on the prosecutor than he ordinarily would. (Tucker Depo., Ex. 9, at 45-46).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

DB04/835989.0002/5045150.1DD02

121.   Lt Tucker and prosecutor Ted Noyes discussed the case and the large number of allegations that had been made. Mr. Noyes and Lt. Tucker selected particular key issues – key allegations – that Mr. Noyes felt were worthy of pursuit and investigation, and those became the key issues addressed in the investigative report. (Tucker Depo., Ex. 9, at 27).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Lt. Tucker prepared Issue Summaries and recommended that certain charges be brought against Dr. Dowling and others.  *See* OSSOF 140.**

122.   So although Lt. Tucker preliminarily investigated the merits of many of the allegations, Mr. Noyes decided which specific allegations Lt. Tucker should focus the investigation on. (Tucker Depo., Ex. 9, at 249, Owens Depo., Ex. 13 at 152).

**DISPUTED:  *See* Plaintiffs' response to DSOF #121.**

123.   Dr. Owens, Lt. Tucker, and Sgt. Seagraves had several meetings with Mr. Noyes to discuss what they were finding in the investigation and what Mr. Noyes thought would be viable charges. (Owens Depo., Ex. 13, at 150).

**UNDISPUTED that Dr. Owens testified to several meetings, but see Plaintiffs' response to DSOF #121.**

124.   There was frequent communication between Lt. Tucker and Ted Noyes, which began less than a month into the investigation. (Affidavit of Bruce Tucker, attached as Ex. 18, at ¶ 6; Email communications between Ted Noyes and Bruce Tucker ("Noyes/Tucker emails"), attached as Ex. 19).

**UNDISPUTED that there was contact between Lt. Tucker and Ted Noyes as reflected in the email exhibits.**

125.   On February 3, 2006, Ted Noyes asked Captain Miller to forward an email to Lt. Tucker regarding the requirement for public agencies to keep a conflict of interest file. (Noyes/Tucker emails, Ex. 19, at 30421).

**UNDISPUTED:  The email speaks for itself.**

DB04/835989.0002/5045150.1DD02

126.    Ted Noyes kept Lt. Tucker informed about communications he received from Sandra Dowling's criminal lawyer, Craig Mehrens. (Noyes/Tucker emails, Ex. 19, at 30422, 30546, 31621-31624, 31628-31629, and 30761).

**DISPUTED:  While Mr. Noyes may have kept Lt. Tucker informed about the communications referenced in Defendants Ex. 19, Craig Mehrens wrote Mr. Noyes a number of letters substantively addressing Dr. Dowling's position and offering to provide evidence for the Grand Jury.  *See* OSSOF Owens Depo. Ex. 208.  There is no evidence that these letters were provided to Lt. Tucker or that he was informed of them.  *See* Exhibit 80, Mehrens correspondence to Noyes.**

127.    Ted Noyes suggested that MCSO and the AG's Office prepare a coordinated response to Craig Mehrens' public records response. (Noyes/Tucker emails, Ex. 19, at 31622-31624).

**UNDISPUTED: The emails speak for themselves.**

128.    Ted Noyes included Lt. Tucker on an email to another detective addressing Chief Hendershott's suggestion to issue grand jury subpoenas to every bank in Arizona, and indicated he would discuss whether additional bank subpoenas were necessary. (Noyes/Tucker emails, Ex. 19, at 30658).

**UNDISPUTED:  The email speaks for itself but Mr. Noyes clearly rejected Chief Hendershott's suggestion that Grand Jury subpoenas be issued to every bank in Arizona.**

129.    Via email, Ted Noyes and Lt. Tucker addressed the status of the investigation, potential witnesses, grand jury subpoenas, including the status of objections  and responses and other issues related to grand jury subpoenas, and coordinated review of the materials subpoenaed. (Noyes/Tucker emails, Ex. 19, at 30446, 30448, 30500, 30543, 30580, 30599, 30615, 30626, 30628-30629, 30667-30669, 30754-30755, 30999, 31102, and 31106).

29

1      **UNDISPUTED:  The emails speak for themselves.**

2      130.   Ted Noyes also provided Lt. Tucker with information regarding the

3   results of Mr. Noyes' research and legal analysis of the issues. (Noyes/Tucker emails,

4   Ex. 19, at 30540-3054 1, 30578, and 30748).

5      **UNDISPUTED: The emails speak for themselves to the extent that Mr.**

6      **Noyes shared his research and legal analysis with Lt. Tucker.**

7      131.   Ted Noyes also expressed interest in attending a meeting with Lt. Tucker

8   and Dr. Owens and the County's internal auditor, Ross Tate. (Noyes/Tucker emails, Ex.

9   19, at 30771-30773).

10     **UNDISPUTED:  The emails speak for themselves.**

11     132.   Ted Noyes also shared information with Lt. Tucker regarding the

12  indictment and grand jury proceedings. (Noyes/Tucker emails, Ex. 19, at 31149-31150,

13  and 31173).

14     **DISPUTED:   The emails only reflect that Mr. Noyes had changed the**

15     **language of the second paragraph of Count 1 and wanted Dr. Owens to**

16     **review it and that the arraignment was held and the judge assigned.**

17     133.   During the course of the investigation, various grand jury subpoenas were

18  served. To obtain these subpoenas, Lt. Tucker or another detective would contact Mr.

19  Noyes and articulate what was being requested, and from whom. Mr. Noyes would in

20  turn say yes or no. If he said yes, Mr. Noyes would have the subpoena issued, and Lt.

21  Tucker would send someone to pick it up and serve it. Upon its service, a return would

22  be provided to the grand jury. (Tucker Depo., Ex. 9, at 170-17 1, 173).

23     **DISPUTED:  This statement is not cited in the Motion as support for any**

24     **material fact.**

25     134.   Lt. Tucker never met with Supervisor Stapley or any of his staff members.

26  And he never met with any other member of the Board of Supervisors during the course

27  of the investigation and prosecution. (Tucker Depo., Ex. 9, at 31).

28

1    **DISPUTED:  This statement is not cited in the Motion as support for any**
2    **material fact.**

3    135.    No one from the Board of Supervisors instructed Lt. Tucker with respect
4  to the investigation. He has no reason to believe anyone was involved in directing the
5  investigation other than Captain Miller, Ted Noyes, Chief Hendershott and himself.
6  (Tucker Depo., Ex. 9, at 265).

7    **DISPUTED:  This statement is not cited in the Motion as support for any**
8    **material fact.**

9    136.    Lt. Tucker met with other individuals from the County to get documents,
10  and to seek guidance regarding Maricopa County's procurement policies because the
11  policies dictate the practices within Maricopa County. Some of the meetings with
12  County personnel were more about Lt. Tucker's learning curve than factual
13  investigation. (Tucker Depo., Ex. 9, at 24 1-243).

14    **DISPUTED:  This statement is not cited in the Motion as support for any**
15    **material fact.**

16    137.    Dr. Owens never had any discussions about the criminal investigation
17  with Supervisor Stapley, any member of the Board of Supervisors, or any staff member
18  of any of the Supervisors. (Owens Depo., Ex. 13, at 149-150).

19    **DISPUTED:  This statement is not cited in the Motion as support for any**
20    **material fact.**

21    138.    Dr. Owens received information from people in OMB but they did not tell
22  Dr. Owens what to do with it or how to analyze it. (Owens Depo., Ex. 13, at 184).

23    **DISPUTED:  This statement is not cited in the Motion as support for any**
24    **material fact.**

25    139.    At one point Sgt. Seagraves met with Don Stapley regarding the imminent
26  sale of some land that might be involved in procurement fraud. The meeting was not
27  Chief Hendershott's idea but, before she went to Supervisor Stapley's office, Sgt.

28

DB04/835989.0002/5045150.1DD02

1   Seagraves sought permission from Chief Hendershott. (Seagraves Depo., Ex. 14, at 144,
2   145, 149).

3       **DISPUTED:  This statement is not cited in the Motion as support for any**
4       **material fact.**

5       140.   During MCSO's interviews, various topics were brought up by people
6   involved with MCRSD, including issues related to lobbying services, landscaping, the
7   Schoolhouse Foundation, a real estate contract, the indirect cost fund, travel, and
8   nepotism. (Owens Depo., Ex. 13, at 29-30).

9       **UNDISPUTED though Dr. Owens also testified in this excerpt that some of**
10      **the topics brought up "never went anywhere."**

11      141.   Once topics were identified, then documents would be obtained on those
12  topics and Dr. Owens would look at the documents. She was tasked with determining if
13  there had been financial improprieties. (Owens Depo., Ex. 13, at 31).

14      **UNDISPUTED that this is what Dr. Owens testified regarding her role in**
15      **the investigation.**

16      142.   During the course of the investigation, Lt. Tucker and Sgt. Seagraves
17  asked Dr. Owens to look into certain issues and analyze them. (Owens Depo., Ex. 13, at
18  47).

19      **DISPUTED:  This statement is not cited in the Motion as support for any**
20      **material fact.**

21      143.   Within the first 15 days of the investigation Dr. Owens reviewed
22  documents that showed MCRSD's expenditures. Then, also based on some interviews,
23  she was able to identify several expenditures that looked unusual or that MCSO needed
24  further information on. These expenditures included an $89,000 check that was cut
25  from MCRSD to the Schoolhouse Foundation, checks to Grassroots landscaping
26  company, which was owned by Sandra Dowling's son, large expenditures to Diner's
27  Club, and unusual travel. (Owens Depo., Ex. 13, at 36, 40-41).

28

1

**DISPUTED:  This statement is not cited in the Motion as support for any**

2

**material fact.**

3

144.    The issues that were investigated were primarily identified through the

4

witness interviews. (Owens Depo., Ex. 13, at 49).

5

**DISPUTED:  This statement is not cited in the Motion as support for any**

6

**material fact.**

7

145.    As an investigative technique to keep the witness talking during the

8

witness interviews, Sgt. Seagraves would occasionally agree with a witness for the

9

purpose of obtaining additional information. Her agreement didn't necessarily mean

10

that she believed or agreed with what the witness said. (Seagraves Depo., Ex. 14, at

11

120).

12

**DISPUTED:  This statement is not cited in the Motion as support for any**

13

**material fact.**

14

146.    Nepotism was one of the issues brought up during interviews. Prior to the

15

indictment, Dr. Owens knew that Dr. Dowling had hired her daughters while they were

16

still living with her. (Owens Depo., Ex. 13, at 44-45).

17

**DISPUTED:  This statement is not cited in the Motion as support for any**

18

**material fact.**

19

147.    Ben Arredondo had questioned the legality of Sandra Dowling's

20

employment of her children. When he approached Dowling about it, she "told [him]

21

basically to take a hike." (Arredondo Depo., Ex. 7, at 154-155).

22

**DISPUTED:  This statement is not cited in the Motion as support for any**

23

**material fact.**

24

148.    Although the initial allegations included nepotism, during the course of

25

the investigation Ted Noyes advised Lt. Tucker that it did not apply to Sandra Dowling

26

under the facts of the case. (Tucker Depo., Ex. 9, at 46, 206-207).

27

**UNDISPUTED.**

28

33

149.   During the course of the investigation, MCSO detectives conducted over 150 interviews of more than 100 witnesses. Some key witnesses were interviewed multiple times. To preserve the integrity of the investigation and to ensure accuracy in gathering witness statements, most, if not all, of the interviews were audio recorded, and sometimes both audio and video recorded. (Tucker Affidavit, Ex. 18, ¶ 3).

**UNDISPUTED as to the number of witnesses interviewed and most recorded, and that Tucker testified to the reason they were recorded.**

150.   Before the indictment issued in the fall of 2006, there was a point at which the investigators, including Dr. Owens, were told to stop the investigation. (Owens Depo., Ex. 13, at 197).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

151.   The investigation was officially closed in October 2006. At that point the detectives had exhausted the investigation and it was pending a decision by the Attorney General. (Tucker Depo., Ex. 9, at 101).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

F.   <u>**Chief Deputy Hendershott's Involvement**</u>

152.   Chief Deputy Hendershott was the principal point of contact with OMB when the investigation started. He received a phone call from Sandi Wilson who gave him a 10-minute overview and went through a list of things that Wilson and Hushek were concerned about, such as monies being paid twice, and monies being moved to other accounts. She did not relay rumors; she provided him with specific facts. (Hendershott Depo., Ex. 10, at 72-73, 86, 89).

**DISPUTED to the extent that the MCSO investigators frequently asked questions about rumors during their interviews.  *See* OSSOF 40.**

153.   Chief Deputy Hendershott told Ms. Wilson that he would get some

34

1   detectives to interview people and see if there was any merit to the allegations.

2   (Hendershott Depo., Ex. 10, at 72-73, 86).

3        **DISPUTED to the extent that within hours of this alleged phone call, Arpaio**

4        **and Hendershott had begun a criminal investigation with a "Task Force"**

5        **due to the "size and complexity" of the investigation.** *See* **Exhibit 78,**

6        **Tucker Supplemental Report re: Initial Advisement of Investigation and**

7        **Response.**

8        154.   During the investigation Chief Deputy Hendershott would get calls from

9   Sandi Wilson or Brian Hushek about information they had received, and he would

10  pass that along to his investigators. But he never met with them. (Hendershott Depo.,

11  Ex. 10, at 40-41, 71-72).

12       **DISPUTED:  This statement is not cited in the Motion as support for any**

13       **material fact.**

14       155.   Chief Deputy Hendershott did not micromanage the investigation.

15  (Hendershott Depo., Ex. 10, at 144-145).

16       **DISPUTED:  This statement is not cited in the Motion as support for any**

17       **material fact.**

18       156.   Chief Deputy Hendershott's involvement in the investigation was very

19  limited. The detectives were experienced, good investigators, and they didn't need a lot of

20  direction. (Hendershott Depo., Ex. 10, at 40, 108).

21       **DISPUTED:  This statement is not cited in the Motion as support for any**

22       **material fact.**

23       157.   Chief Deputy Hendershott didn't help prepare the search warrants or

24  participate in the search warrants. (Hendershott Depo., Ex. 10, at 116).

25       **DISPUTED:  This statement is not cited in the Motion as support for any**

26       **material fact.**

27       158.   Chief Deputy Hendershott never read any of the witness interviews.

28

1   (Hendershott Depo., Ex. 10, at 152).

2       **DISPUTED:  This statement is not cited in the Motion as support for any**
3       **material fact.**

4       159.   Chief Deputy Hendershott received briefings, usually from Captain Miller,
5   which could last from 30 seconds in the hallway to five minutes in his office.
6   (Hendershott Depo., Ex. 10, at 40-41; 73).

7       **DISPUTED:  This statement is not cited in the Motion as support for any**
8       **material fact.**

9       160.   Lt. Tucker did not have much direct contact with Chief Deputy Hendershott
10  during the investigation. (Tucker Depo., Ex. 9, at 114).

11      **DISPUTED:  This statement is not cited in the Motion as support for any**
12      **material fact.**

13      161.   The contact Lt. Tucker had with Chief Deputy Hendershott was typically
14  related to following up on a lead that Hendershott provided him. During the investigation
15  Chief Deputy Hendershott would give Lt. Tucker recommendations on what he wanted
16  to have occur next in the investigation. (Tucker Depo., Ex. 9, at 14, 114).

17      **DISPUTED:  This statement is not cited in the Motion as support for any**
18      **material fact.**

19      162.   Sergeant Seagraves' experience in working on the Dowling investigation
20  was different from what she read in the Babeu report regarding later investigations
21  done by the MACE Unit, in that Chief Deputy Hendershott was less involved in the
22  Dowling investigation than he appeared to be in later investigations. (Seagraves
23  Depo., Ex. 14, at 19).

24      **DISPUTED:  This statement is not cited in the Motion as support for any**
25      **material fact.**

26      163.   It was not unusual that the initial briefing involved Chief Deputy
27  Hendershott because information does sometimes come through command staff.

28

(Seagraves Depo., Ex. 14, at 27).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

164.   Chief Deputy Hendershott had one meeting with Ted Noyes to get briefed on the case just before the indictment came out. (Hendershott Depo., Ex. 10, at 103).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

165.   After the U.S. Attorney's Office took over the prosecution, Chief Deputy Hendershott met with the line attorney handling the case. They discussed the U.S. Attorney's Office position on a possible plea agreement and the attorney advised Hendershott that if Sandra Dowling agreed to plead to a felony, the U.S. Attorney's Office would be willing to make a deal. Hendershott thought that was reasonable, and the prosecutor indicated they would either settle for a felony or go to trial. (Hendershott Depo., Ex. 10, at 18-19, 20).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

166.   Chief Deputy Hendershott had a later meeting with Diane Humetewa, the U.S. Attorney, and members of the U.S. Attorney's Office. They discussed having Sandra Dowling plead to a class 2 misdemeanor. (Hendershott Depo., Ex. 10, at 23, 25).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

167.   Chief Deputy Hendershott never read the indictment. (Hendershott Depo., Ex. 10, at 50).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

168.   Chief Deputy Hendershott only saw two pieces of evidence from the

37

1   investigation: an email and a "washed" check. (Hendershott Depo., Ex. 10, at 43, 45,

2   62, 132).

3       **DISPUTED:  This statement is not cited in the Motion as support for any**

4       **material fact.**

5       169.   Chief Deputy Hendershott did not meet with any members of the Board of

6   Supervisors regarding the Dowling investigations. (Hendershott Depo., Ex. 10, at 71).

7       **DISPUTED:   Chairman Stapley testified that Hendershott met regularly**

8       **and individually with the Supervisors throughout the investigation.   *See***

9       **OSSOF 34.   Arpaio appointed Hendershott to act as liaison to the Board in**

10      **the Dowling investigation.   *See* OSSOF 33,**

11      170.   At the time the investigation was initiated, Chief Deputy Hendershott

12  did not have any personal animosity toward Sandra Dowling. (Hendershott Depo., Ex.

13  10, at 200).

14      **DISPUTED:  This statement is not cited in the Motion as support for any**

15      **material fact.**

16      **G.    Sheriff Arpaio's Involvement and Relationship with Sandra Dowling**

17      171.   During the 2006-200 8 time period, Chief Deputy Hendershott ran MCSO

18  on a day-to-day basis but would collaborate with Sheriff Arpaio on things he thought

19  should be brought to the Sheriff's attention. (June 8, 2011 Deposition of Joseph

20  Arpaio, attached as Ex. 20, at 16).

21      **DISPUTED:  This statement is not cited in the Motion as support for any**

22      **material fact.**

23      172.   Sheriff Arpaio is responsible for 15,000 employees so he delegates to his

24  chief deputy. It was Chief Deputy Hendershott's job to get things done and use whatever

25  resources he thought was needed. (Arpaio Depo., Ex. 20, at 31, 33).

26      **DISPUTED:  This statement is not cited in the Motion as support for any**

27      **material fact.**

28

DB04/835989.0002/5045150.1DD02

173.    Sheriff Arpaio delegated the day-to-day operations, which included criminal investigations, to Chief Deputy Hendershott. (Arpaio Depo., Ex. 20, at 40-4 1).

**UNDISPUTED.**

174.    In the 2006-2008 time frame, Sheriff Arpaio had no reason to believe that Chief Deputy Hendershott was "running amuck." Hendershott had 31 years experience in the Sheriff's Office. Sheriff Arpaio had made him chief deputy many years before the Dowling investigation. It was Hendershott's job to do the investigation as well as many other things. Sheriff Arpaio had no reason to have any reservations about Hendershott doing his job. (Arpaio Depo., Ex. 20, at 42-43).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

175.    Sheriff Arpaio did not review reports on high profile investigations like the Dowling investigation. (Arpaio Depo., Ex. 20, at 9).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

176.    Sheriff Arpaio was aware that the Dowling investigation was being initiated. He did not speak with any members of the Board of Supervisors about the investigation. (Arpaio Depo., Ex. 20, at 17-18).

**UNDISPUTED that Arpaio testified he did not speak with members of the Board.**

177.    Chief Deputy Hendershott advised Sheriff Arpaio that MCSO had received a complaint, that it had to do with fraud, and that he was going to initiate an investigation, but he didn't go into details. (Arpaio Depo., Ex. 20, at 38, 40).

**DISPUTED:  Sheriff Arpaio assigned 35-40 of his "best detectives" to the investigation and publicly accused Dr. Dowling of stealing money from homeless children and other misdeeds, reflecting detailed knowledge of the investigation.  *See* OSSOF 33, 59.  Also the deposition excerpt reflects that**

1   **Sheriff Arpaio claims to have little recall of the conversations with**
2   **Hendershott.**

3   178.   Sheriff Arpaio doesn't know who asked for the investigation. (Arpaio
4   Depo., Ex. 20, at 68).

5   **DISPUTED:   Plaintiffs dispute this DSOF on the grounds that Sheriff**
6   **Arpaio said the Board prompted the investigation.  *See* OSSOF 31, 169.**

7   179.   Sheriff Arpaio had no reason to ask about the basis for the Dowling
8   investigation. It was no different from any other case. MCSO does many, many
9   investigations. There was no reason to question Hendershott just because the investigation
10  involved Sandra Dowling. Hendershott had received the information, he was going to
11  ask the criminal investigators to investigate. (Arpaio Depo., Ex. 20, at 45, 56).

12  **DISPUTED:   Plaintiffs dispute this DSOF on the grounds that Sheriff**
13  **Arpaio learned from some source the basis for the Dowling investigation –**
14  ***see* Plaintiffs' response to DSOF #177 – and it's likely that source was Chief**
15  **Hendershott, who Sheriff Arpaio had put in charge of the investigation.**

16  180.   Sheriff Arpaio could have countered Chief Deputy Hendershott's
17  decision, but he had confidence in Hendershott to do his job. (Arpaio Depo., Ex. 20, at
18  56).

19  **DISPUTED:  This statement is not cited in the Motion as support for any**
20  **material fact.**

21  181.   MCSO did not initiate the investigation on its own. MCSO acted on a
22  complaint; the agency received information and developed the information. (Arpaio
23  Depo., Ex. 20, at 28-29).

24  **DISPUTED:  This statement is not cited in the Motion as support for any**
25  **material fact.**

26  182.   Chief Deputy Hendershott kept Sheriff Arpaio generally apprised as to the
27  status of the investigation and notified Sheriff Arpaio if there were any major events,

28

but he did not tell Sheriff Arpaio about the day-to-day aspects of the investigation (Arpaio Depo., Ex. 20, at 38, 46; Hendershott Depo., Ex. 10, at 159-160).

**DISPUTED: Plaintiffs dispute this DSOF on the grounds discussed in Plaintiffs' response to DSOF #177.**

183.   Lt. Tucker met only once with Sheriff Arpaio in Arpaio's office regarding the status of the investigation. There were other occasions where he ran into Sheriff Arpaio in the hallway or entering or leaving the building, and Arpaio would ask about the status of the investigation. (Tucker Depo., Ex. 9, at 115).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

184.   The subject of the Dowling criminal investigation did not come up during MCSO senior staff meetings. (Trombi Depo., Ex. 17, at 53).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

185.   The meeting Lt. Tucker had with Sheriff Arpaio occurred sometime between January 2006 and the indictment of Sandra Dowling. (Tucker Depo., Ex. 9, at 277).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

186.   Sheriff Arpaio never provided direction to Lt. Tucker regarding the investigation. (Tucker Depo., Ex. 9, at 277-278).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

187.   Sheriff Arpaio was not personally or actively involved in the criminal investigation regarding Sandra Dowling. (Arpaio Depo., Ex. 20, at 105).

**DISPUTED:   Plaintiffs dispute this DSOF on the grounds discussed in Plaintiffs' response to DSOF #177.**

DB04/835989.0002/5045150.1DD02

188.    When Sheriff Arpaio was informed about the decision to remand portions of the case to the grand jury he didn't question it or have a reaction. MCSO does the probable cause. The prosecutor decides to indict, and the judges have their role. So it didn't cause Sheriff Arpaio to review anything. The Sheriff does his job and lets the system take its course. (Arpaio Depo., Ex. 20, at 45, 47).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

189.    Sheriff Arpaio attended a meeting with U.S. Attorney Diane Humetewa to discuss the case. Sheriff Arpaio did not ask for the meeting. They discussed the case, and the U.S. Attorney's decision regarding how to resolve it. Sheriff Arpaio had no objection to the decision to dismiss the counts; that's the way the system works. (Arpaio Depo., Ex. 20, at 85-86; Hendershott Depo., Ex.10, at 34).

**DISPUTED:  Arpaio was upset with the decision.  _See_ OSSOF 71.**

190.    Sheriff Arpaio was disappointed when the U.S. Attorney's Office dismissed the counts, but that is the way the system works. His disappointment was because there was a lot of work put into the case by the Attorney General and 25 indictments were returned. The Attorney General said that MCSO had done a great job and then the case was handed over to the U.S. Attorney's Office. (Arpaio Depo., Ex. 20, at 75-76).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

191.    Sheriff Arpaio would have liked to have seen the case continue with the prosecutor who worked closely with MCSO and had confidence in the case as evidenced by the indictment. (Arpaio Depo., Ex. 20, at 79).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

192.    It was only after the investigation was ongoing, and after she had filed

her first Notice of Claim on July 10, 2006, that Sandra Dowling sent a letter to Sheriff Arpaio regarding Hard Knocks High, the school in the jail. The issue of who should run that school had been an ongoing issue for several years. (Dowling Depo., Ex. 1, at 8 8-90; July 31, 2006 letter from Sandra Dowling to Sheriff Arpaio, attached as Ex. 21).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

193.   Sandra Dowling had previously given direction to her staff to bring the Hard Knocks program under Dowling because of a previous issue where the state Department of Education under Lisa Keegan had inappropriately sent funds to the Sheriff over Sandra Dowling's objections. (Dowling Depo., Ex. 1, at 91).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

194.   In the 2001-2002 time frame, Sheriff Arpaio asked Dowling if she could apply for federal funds for him to fund Hard Knocks High. There were several different federal title programs that could supply funding but the application had to come from a local education agency. Dowling applied for the money and then was informed that Sheriff Arpaio did not want Dowling to operate the program; he only wanted Dowling to apply for the money. (Dowling Depo., Ex. 1, at 97-98).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

195.   Dowling then complained to the U.S. Department of Education that the funds were being illegally allocated and that Arpaio didn't have the trained personnel to operate the program accordingly. (Dowling Depo., Ex. 1, at 99, 110).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

196.   Sheriff Arpaio tried to get Sandra Dowling to change her mind and apply for the funding for him, and Dowling refused. (Dowling Depo., Ex. 1, at 102).

43

**DISPUTED:   This statement is not cited in the Motion as support for any material fact.**

197.   Sandra Dowling believes that Sheriff Arpaio had ill will toward her because of the County budget process. Sandra Dowling, Sheriff Arpaio and other county officials fought over budget issues and who was going to get what money. But Dr. Dowling cannot cite anything specific that Sheriff Arpaio did to affect Dr. Dowling's budget, nor does she know of anything that she did to affect Sheriff Arpaio's budget. (Dowling Depo., Ex. 1, at 46, 138-139).

**DISPUTED:   Plaintiffs dispute this DSOF on the grounds that Dr. Dowling believes that in addition to the ill will on Arpaio's part generated by the County budget process, that there was bad blood between them as a result of a scuffle over who would run the jail schools.  *See* OSSOF 142.**

198.   In addition, Sandra Dowling felt that as the County School Superintendent she should be running the school inside the jail. Sheriff Arpaio didn't want that to happen, so that was an issue between them. Other than the school issue, Marc Frazier didn't know of any other issues between Dowling and Arpaio. (Frazier Depo., Ex. 6, at 151).

**DISPUTED:   This statement is not cited in the Motion as support for any material fact.**

199.   Early on, Marc Frazier thought Sandra Dowling and Sheriff Arpaio were friends. They even helped each other gather signatures from time to time. But as things developed later, she hoped he would endorse her in her last election and he chose not to. And from that point forward, their relationship soured. (Frazier Depo., Ex. 6, at 151).

**DISPUTED:   This statement is not cited in the Motion as support for any material fact.**

200.   Sandra Dowling told Sherry Ferguson that she hated Sheriff Arpaio.

1  (Ferguson Depo., Ex. 5, at 90).

2     **DISPUTED:  This statement is not cited in the Motion as support for any**
3     **material fact.**

4     201.   Sheriff Arpaio wasn't disappointed by the case itself or Sandra Dowling.
5  He was disappointed that the case didn't continue with the Attorney General who did a
6  good job and obtained the indictments. (Arpaio Depo., Ex. 20, at 77).

7     **DISPUTED:  This statement is not cited in the Motion as support for any**
8     **material fact.**

9     202.   Sheriff Arpaio did not strike out against Sandra Dowling. He has known
10 Sandra Dowling for many years. He believes she was a good school Superintendent.
11 They had a great relationship. He doesn't strike out or go after people, but he has to do
12 his job when he gets allegations. He has to take action, which he did, by
13 delegating the investigation to the chief deputy. (Arpaio Depo., Ex. 20, at 54).

14    **DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Dr. Dowling**
15    **did not have a "great relationship" with Arpaio.  *See* OSSOF 142.  Arpaio**
16    **has indeed been found to "go after people: Judge Leonardo concluded that**
17    **Sheriff Arpaio had "misuse[d] the power of his office to target members of**
18    **the MCBS for criminal investigation." *See* OSSOF 7.**

19    203.   In fact, Sheriff Arpaio was invited to Sandra Dowling's daughter's
20 wedding, which was in October 2004. (Dowling Depo., Ex. 1, at 257, 296).

21    **DISPUTED:  This statement is not cited in the Motion as support for any**
22    **material fact.**

23    204.   And Sheriff Arpaio approached Sandra Dowling at an event after
24 the dismissal, and said, "You know, I was only trying to do my job." (Dowling Depo.,
25 Ex. 1, at 258).

26    **DISPUTED:  This statement is not cited in the Motion as support for any**
27    **material fact.**

28 **III.   PROBABLE CAUSE FOR THE CHARGES**

**A.     Indirect Cost Fund Transfers**

205.    The indirect cost fund is known as fund or account 795. (Hushek Depo., Ex. 3, at 28).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

206.    The indirect cost fund is monies held by the Superintendent of Schools Office. (Tucker Depo., Ex. 9, at 274; Wood Depo., Ex. 4, at 66).

**UNDISPUTED.**

207.    The Superintendent of Schools' office administers grants for small schools. A portion of the grants awarded to the small schools goes to the Superintendent of Schools' office to cover the costs of administering the grants. And that money is what makes up the indirect cost fund. (Tucker Depo., Ex. 9, at 274; Wood Depo., Ex. 4, at 66).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that a portion of all grants received goes to the Superintendent of Schools' office and those funds make up the indirect cost fund.  *See* Exhibit 21, Declaration of Sandra Dowling 2, ¶¶ 6, 7, 8.**

208.    The Superintendent of Schools' indirect cost fund derives from monies received from school districts related to the administration of federal grants. The Superintendent of Schools' office handles the administration of the grants for small school districts that do not participate in the accounting responsibility program, and thus don't take care of their own accounting. (Grand Jury transcript, attached as Ex. 22, at 82-83).

**DISPUTED:   Plaintiffs dispute this DSOF for the reasons discussed in Plaintiffs' response to DSOF #207. (ask Sandra is it only federal grants)**

209.    The Superintendent of Schools does the small school districts' accounting and payroll and "keeps all of their books." The Superintendent of Schools also handles the small school districts' federal grant funds and charges the districts a percentage of

46

the grant funds that are received based on a rate developed and approved by the Arizona Department of Education. (Grand Jury transcript, Ex. 22, at 83).

**DISPUTED:   Plaintiffs dispute this DSOF for the reasons discussed in Plaintiffs' response to DSOF #207.**

210.   MCRSD also had an indirect cost fund associated with each of its grants. But the transfers at issue were not from MCRSD's indirect cost fund, they were from the Superintendent of School's indirect cost fund. (Wood Depo., Ex. 4, at 68-69).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

211.   According to Maricopa County policy, the funds are supposed to be accounted for and budgeted as revenue sources, and they are supposed to be used before allocating General Fund resources for the indirect costs. (Grand jury transcript, Ex. 22, at 84).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that the policy makes no mention of the Indirect Cost Funds.  *See* OSSOF 94.**

212.   The funds in the indirect cost account must be reported to the Board of Supervisors through OMB. And the Board of Supervisors must approve the expenditure of the funds either through the normal budget process, or through a separate action taken by the Board – a Board agenda item – where they would approve special expenditures of these funds. (Grand jury transcript, Ex. 22, at 84).

**DISPUTED:   Plaintiffs dispute this DSOF on the grounds that this testimony reflects that the Treasurer set this account up like a trust account so that it was not under the purview of the OMB.  *See* OSSOF 14. Furthermore, the policy the Board relies on makes no mention of ICF.  *See* OSSOF 94; there is no statute and no rule requiring Board approval of the expenditure of ICF monies (*id*.); most other Superintendants of Schools do not require Board approval to spend these funds.   *See* OSSOF 89;**

47

1   **Superintendant Wood and Deputy Superintendant Arredondo believed**
2   **these funds could be spent without Board approval.** *See* **OSSOF 85.**

3   213.   The indirect cost monies are to be used to assist the Superintendent of
4   Schools' office in doing those duties the federal government required for the districts.
5   Those monies should not be transferred from the Superintendent of Schools' office to
6   an accommodation district; they can only be used for the office that provides the service
7   for the federal government in monitoring the grant monies. (Ferguson Depo., Ex. 5, at
8   64).

9   **DISPUTED:   Plaintiffs dispute this DSOF on the grounds that Ms.**
10  **Ferguson based her opinion on her claim that there was "an opinion out**
11  **there" to this effect, but could give no details about that purported**
12  **"opinion."** *See* **Exhibit 81, Sherry Ferguson Depo., at 108:8-109:23.   The**
13  **basis of the counts against Dr. Dowling for the use of these funds was that**
14  **she transferred them without the Board's approval, not that the transfer to**
15  **the Accommodation District was prohibited.** *See* **Exhibit 45, Indictment,**
16  **Counts 1-10.   Others in management in the District including Ms. Ferguson**
17  **believed that the money could be transferred without Board approval, as**
18  **did most other Superintendants of Schools in other counties.** *See* **Exhibit**
19  **81, Sherry Ferguson Depo., at 103:18-104:16.**

20  214.   Sherry Ferguson told MCSO investigators that there was a federal opinion
21  on the issue that indirect cost fund monies could only be used for the Superintendent of
22  Schools' office. (Ferguson Depo., Ex. 5, at 64).

23  **DISPUTED:   This statement is not cited in the Motion as support for any**
24  **material fact.**

25  215.   One of the ways that Sandra Dowling tried to bring the budget into
26  balance was by transferring money from the indirect cost fund to MCRSD. (Wood
27  Depo., Ex. 4, at 65).

28

48

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Dr. Dowling transferred money to the District to fund programs for the children of Pappas.  *See* Exhibit 21, Declaration of Sandra Dowling 2, at ¶¶ 8-9; *see* Exhibit 12, Frazier Depo at 46:1-21.**

216.   Occasionally when MCRSD needed money, Sandra Dowling would say, "Oh, I'll send you the money over," referring to a transfer from the indirect cost fund. (Wood Depo., Ex. 4, at 70-7 1).

**DISPUTED:  Dr. Dowling denies making this statement.  *See* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 10.**

217.   For example, when the contract with the lobbying firm Strategic Impact was signed, there were meetings where Dr. Wood, Marc Frazier, Ben Arredondo, and Sandra Dowling were present. It was agreed that MCRSD could not handle the $100,000- $ 120,000 annual cost for that contract. Because Dr. Dowling felt it was an important service, Dr. Dowling determined that it would be funded out of the indirect cost fund. (Wood Depo., Ex. 4, at 67-68).

**DISPUTED: Dr. Dowling denies making the lobbyists were paid for with indirect cost funds.  *See* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 11.**

218.   Sandra Dowling made the decisions to transfer money out of the indirect cost fund. (Arredondo Depo., Ex. 7, at 164).

**DISPUTED:   Plaintiffs dispute this DSOF on the grounds that Ben Arredondo, the Deputy Superintendant, signed all nine transfers from the ICF that made up Counts 2-10 of the Indictment.  *See* OSSOF 84.  Mr. Arredondo had the authority to approve indirect cost fund transfers and frequently did so.  *See* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 13.**

219.   Sandra Dowling needed Board of Supervisors' approval to transfer the indirect cost funds from a county fund to MCRSD. They were meant for one purpose and used for another. The indirect cost funds were intended to support the

administration of grants under the Superintendent of Schools office. And there is a Board policy that references a statute related to expenditures of money and appropriations and requires the Board to authorize them. (Tucker Depo., Ex. 9, at 72-73; Owens Depo., Ex. 13, at 107).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Dr. Dowling did not need Board approval to transfer the ICF money.  *See* OSSOF 84, 85; *see* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 14. Nothing in the policy mentions ICF money or transfers.  *See* OSSOF 94.  Brian Hushek of the OMB was unable to give the MCSO a reason why the County "no longer believed" Dr. Dowling could transfer these funds without Board approval.  *See* OSSOF 92.**

220.   Ben Arredondo asked Sandra Dowling several times about how the transfers were being made and she assured him that it was being done properly. (Arredondo Depo., Ex. 7, at 99).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

221.   When Ben Arredondo signed the indirect cost fund transfers he was doing what Sandra Dowling instructed him to do. (Arredondo Depo., Ex. 7, at 101; Hushek Depo., Ex. 3, at 166).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Mr. Arredondo was the Deputy Superintendant, it was his obligation to seek the Board's approval, *see* OSSOF 86, and he had the authority to sign the transfers, which he did.  *See* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 13.**

222.   As part of the criminal investigation, Dr. Owens prepared a spreadsheet that accurately reflects the transfers made from the Superintendent of Schools' indirect cost fund to MCRSD for the years 1994 through 2007. (Owens Affidavit, Ex. 2, at ¶ 7;

1   Indirect cost fund spreadsheet, attached as Ex. 23).

2           **DISPUTED:  This statement is not cited in the Motion as support for any**

3   **material fact.**

4           223.    Between 2002 and 2005, approximately $1.9 million was transferred from

5   the indirect cost fund to MCRSD without Board of Supervisors' authorization. (Grand

6   jury transcript, Ex. 22, at 86-87; Indirect cost fund spreadsheet, Ex.23; Treasurer

7   Transfer sheets, attached as Ex. 24).

8           **DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Board of**

9   **Supervisors approval is not needed to transfer the money from the ICF.  *See***

10  **OSSOF 94; *see* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 14.**

11          224.    The transfers from the indirect cost fund to MCRSD were as follows: (1)

12  $87,000 in October 2001; (2) $175,000 in March 2002; (3) $85,000 in June 2002; (4)

13  $212,000 in November 2002; (5) $210,000 in May 2003; (6) $50,000 in October 2003;

14  (7) $225,000 in January 2004; (8) $475,000 in April 2004; and (9) $340,000 in June

15  2005. (Grand jury transcript, Ex. 22, at 99-100; Treasurer Transfer sheets, Ex. 24).

16          **DISPUTED:  Plaintiffs dispute this DSOF on the grounds that they have**

17  **never seen the transfers requests for four of these transfers despite**

18  **requesting them repeatedly.  *See* Defendants' Ex. 24.**

19          225.    The amount of the transfers from the indirect cost fund to MCRSD began

20  significantly increasing in amount after 2000. (Indirect cost fund spreadsheet, Ex. 23).

21          **DISPUTED:  This statement is not cited in the Motion as support for any**

22  **material fact.**

23          226.    One of the transfers from the indirect cost fund to MCRSD was $212,000

24  was to help with MCRSD's operating expenses. The documentation attached to

25  MCRSD's request for the funds suggested that the funds were intended for Sherry

26  Ferguson and Dick Bryce's salaries, William Lee and Connie Mattix, and for a truck.

27  But other writing on the documents suggested that it was really for Sagamore

28

DB04/835989.0002/5045150.1DD02

Associates. (Grand jury transcript, Ex. 22, at 96; November 6, 2002 Memorandum from Marc Frazier to Ben Arredondo, attached as Ex. 25).

> **DISPUTED:   Plaintiffs dispute this DSOF on the grounds that the Memorandum was addressed to Ben Arredondo, asking his help for the District and he signed the transfer request; and the identity of the person who wrote on page 2 that the money was for Sagamore is unknown, making it impossible to verify.**

227.   And still other documents indicate that the $212,000 was used to cover a portion of Sherry Ferguson and Dick Bryce's salaries, some District 512 costs, and payment of $120,000 to federal lobbyists. (Grand jury transcript, Ex. 22, at 96-97; MCRSD Operating Funds from MCSS, attached as Ex. 26).

> **DISPUTED:  Plaintiffs dispute this DSOF on the grounds that the source of information is the MCSO investigator who is offering testimony to the Grand Jury.  Ex. 26 does not reflect its author or how the information was obtained, making its verification impossible.  The request for the transfer was made to and approved by Mr. Arredondo and it appears the monies were properly used for County budgeted items.  *See* Grand Jury transcript, Defendants' Ex. 22, at 98-99.**

228.   Dr. Owens determined, through a review of policy and discussions with persons from OMB, that the transfers from the indirect cost fund to MCRSD were a violation of County policy. (Owens Affidavit, Ex. 2, at ¶ 8).

> **DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

229.   Specifically, Maricopa County Policy B 1001 provided that, pursuant to state statute, the County may not incur expenditures in excess of the amounts appropriated by the Board of Supervisors in the annual budget. (Owens Affidavit, Ex. 2, at ¶ 9; Maricopa County Policy B 1001– Budgeting for Results Accountability Policy,

DB04/835989.0002/5045150.1DD02

attached as Ex. 27, at 1).

> **DISPUTED: Plaintiffs dispute this DSOF on the grounds that this policy is inapplicable to this situation. The District received only a small amount of its annual budgeted amount from the Board appropriation. The other sources of revenue included the State, donations and grants – the District had an annual budget of approximately $10-12 million. It was always going to be in violation of this policy since the amount appropriated by the Board to the District was approximately $650,000 per year. *See* OSSOF 95. Nothing in the policy mentions anything about indirect cost funds or the need to have the Board approve transfers/expenditures of those funds. *See* OSSOF 94.**

230. Policy B 1001 also provides that appropriations shall be changed during the fiscal year only with Board of Supervisors approval. (Owens Affidavit, Ex. 2, at ¶ 10; Maricopa County Policy B 1001, Ex. 27, at 1).

> **UNDISPUTED that the policy provides this.**

231. When Marc Frazier was chief deputy at the Superintendent of Schools' office, there was a procedure in place to access money from the indirect cost fund which involved getting approval from the County and the Board of Supervisors. (Frazier Depo., Ex. 6, at 229).

> **DISPUTED: This statement is not cited in the Motion as support for any material fact.**

232. On previous occasions Sandra Dowling had sought Board of Supervisor approval to make appropriations from Fund 795 to MCRSD, but the transfers listed in the Indictment were not done through a Board of Supervisor's action. (Hushek Depo., Ex. 3, at 170, 219).

> **DISPUTED: Plaintiffs dispute this DSOF on the grounds that Dr. Dowling did not seek Board approval in the past. Mr. Frazier sought its approval on**

one occasion and Mr. Arredondo on another occasion.  *See* **Exhibit 12, Frazier Depo. at 50:18-53:3.  It was Mr. Arredondo's responsibility, as Deputy Superintendant, to obtain Board approval of transfers if he thought that necessary.** *See* **OSSOF 86.**

233.   There were instances when MCRSD had sought Board of Supervisors approval before using monies from the indirect cost fund. In 1996 MCRSD sought Board of Supervisor's approval to transfer $600,000 from the Superintendent of Schools' indirect cost fund for use in constructing the T.J. Pappas School. (Frazier Depo., Ex. 6, at 50, 51, 52; Maricopa County Agenda Information Form approved July 3, 1996, attached as Ex. 28).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

234.   MCRSD also made a request to the Board of Supervisors for money from the indirect cost fund in 2000 to remodel and update furniture and equipment for the Superintendent of Schools' offices. (Frazier Depo., Ex. 6, at 52; Maricopa County Agenda Information Form approved March 1, 2000, attached as Ex. 29).

**UNDISPUTED with the caveat that the request was made by Mr. Arredondo.** *See* **Plaintiffs' Response to DSOF #232.**

235.   Sherry Ferguson noticed the indirect cost fund and commented on it. Sandra Dowling told Ms. Ferguson, "Sherry, it's taken me three or four years to generate this revenue and you found it in three or four seconds," as if it had been hidden. Dr. Dowling also told Ms. Ferguson that she had plans for the money. They took it off the books after than conversation; Ms. Ferguson could not find it where she had found it before. (Ferguson Depo., Ex. 5, at 105-106).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

236.   Ted Noyes made the decision to charge Counts 1-10 related to the indirect

DB04/835989.0002/5045150.1DD02

cost fund. (Tucker Depo., Ex. 9, at 73, 77, 89).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

237.   In Coconino County, monies from the indirect cost fund are used to offset the Superintendent of Schools' expenses. But in Maricopa County, they were not used to offset the Superintendent of Schools' expenses; they were converted to another fund and used for expenses incurred by the MCRSD. (Tucker Depo., Ex. 9, at 274).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

238.   In Cochise County, the indirect costs revenue are deposited into the general fund for the County. And any expenditure in excess of $1000 must be approved by the Board of Supervisors. (Tucker Depo., Ex. 9, at 275-276).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

**B.       Federal Lobbyist Bid – Strategic Impact**

239.   It was Sandra Dowling's idea to hire a lobbyist. Dr. Wood did not believe MCRSD needed a lobbyist, or that there was money available to hire a lobbyist. (Wood Depo., Ex. 4, at 73).

**UNDISPUTED that Dr. Dowling believed that a lobbyist was needed to raise the national profile of Pappas and find sources of revenue in the form of federal grants for the District.   *See* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 15 .Maricopa County at that time was the fifth largest school district in the country and it was not unusual for large districts to employ lobbyists.  *See*, Exhibit 62, Talley Depo. at 180:12-16; *see* Exhibit 63, Hunter Depo. at 116:9-25.**

240.   Marc Frazier believed MCRSD did not have the money to hire a lobbyist. In his opinion, the lobbyists gave Sandra Dowling a more visible presence in

1    Washington D.C. (Frazier Depo., Ex. 6 at 66-67).

2         **DISPUTED: Plaintiffs dispute this DSOF on the grounds set forth in their**

3    **response to DSOF #239.** *See* **also OSSOF lobbyists denials they were**

4    **helping her.**

5         241.   Lobbyists had been meeting with Sandra Dowling for several years before

6    MCRSD hired a lobbying firm, and introducing Dowling to people in Washington D.C.

7    They were also lobbying Sandra Dowling to give them a contract with MCRSD.

8    (Frazier Depo., Ex. 6, at 67; 2001 and 2002 letters and November 2002 Memorandum

9    from Sagamore Associates and Strategic Impact, attached as Ex. 30).

10        **UNDISPUTED that Mitchell and Talley had worked tirelessly for the**

11   **District for two years on a pro bono basis to raise awareness of Pappas and**

12   **obtain the exemption from the McKenney-Vento Act and told Dr. Dowling**

13   **they could no longer work for free.** *See* **OSSOF 98-101.**

14        242.   One of the lobbyists told Marc Frazier that they could not afford to

15   continue to take Sandra Dowling around Washington D.C. unless she was a client, and

16   their recommendation was for MCRSD to go through the process necessary to make

17   sure MCRSD had representation. (Frazier Depo., Ex. 6, at 67-68).

18        **UNDISPUTED and see Plaintiffs' response to DSOF #241.**

19        243.   In the fall of 2002 some individuals from lobbyist firm Sagamore

20   Associates, including Kevin Talley and Patrick Mitchell, came to Phoenix to meet with

21   Dr. Wood and others from MCRSD. (Wood Depo., Ex. 4, at 83-84).

22        **DISPUTED: This statement is not cited in the Motion as support for any**

23   **material fact.**

24        244.   During that meeting, they discussed MCRSD's need for a grant writer.

25   And the lobbyists made it clear they were not grant writers. (Wood Depo., Ex. 4, at 85-

26   86).

27

28

56

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

245.    In her various positions with the Deer Valley school district, including as a regional director, Dr. Wood had brought in grants and was familiar with the resources needed to locate and obtain grant funding. (Wood Depo., Ex. 4, at 10, 86).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

246.    Marc Frazier was aware that Kevin Talley and Patrick Mitchell were the lobbyists that Sandra Dowling wanted to hire. (Frazier Depo., Ex. 6, at 73-74).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

247.    Sometime after November 18, 2002 a decision was made to do a Request for Proposal for lobbyist services. (Frazier Depo., Ex. 6, at 78).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

248    MCRSD did a Request for Proposals for lobbyist services in December 2002 or January 2003 at the direction of Sandra Dowling. (Wood Depo., Ex. 4, at 74, 82, 95; Request for Proposal #03-02, attached as Ex. 31).

**UNDISPUTED and see Plaintiffs' response to DSOF #241.**

249.    At MCRSD, during the procurement process a committee would be formed to evaluate proposals and the committee would come to a joint recommendation. Then the Governing Board would make the ultimate decision to approve or not approve the recommendation. (Wood Depo., Ex. 4, at 99-100; Frazier Depo., Ex. 6, at 81).

**UNDISPUTED.**

250.    There was a committee formed at MCRSD to evaluate the bids. The bid committee was comprised of Carol Wood, Marc Frazier, Linda Hoyer, and Dave

1  McCarroll. (Wood Depo., Ex. 4, at 98, 99).

2  **UNDISPUTED.**

3  251.   Marc Frazier was in charge of the bid evaluation committee. (Frazier

4  Depo., Ex. 6, at 79).

5  **UNDISPUTED and Mr. Frazier determined its members.   *See* Frazer**

6  **Depo., Defendants' Ex. 6, at 79.**

7  252.   There were three responses to the RFP: one from Strategic Impact, one

8  from Sagamore Associates, and one from a small company. (Wood Depo., Ex. 4, at 95;

9  Sagamore Associates' Response to Request for Proposal #03-02, attached as Ex. 32;

10  Strategic Impact's Response to Request for Proposal #03-02, attached as Ex. 33).

11  **UNDISPUTED.**

12  253.   Dr. Wood was surprised to see separate responses from Strategic Impact

13  and Sagamore Associates because up until then whenever she had seen lobbyists from

14  those two companies, the lobbyists had been working together. (Wood Depo., Ex. 4, at

15  95).

16  **DISPUTED:   This statement is not cited in the Motion as support for any**

17  **material fact.**

18  254.   The committee graded the bids and decided to recommend Sagamore

19  Associates. (Wood Depo., Ex. 4, at 100; Frazier Depo., Ex. 6, at 86; Bid evaluation

20  sheets for RFP #03-02, attached as Ex. 34).

21  **UNDISPUTED but the committee believed, because Kevin Talley had been**

22  **with Sagamore and he had been doing work for Pappas for two years, that**

23  **this was the preferred vendor.   *See* Exhibit. 57, Kit Wood Depo. at 228:18-**

24  **229:2.   Talley left Sagamore during the proposal process.   *See* OSSOF 102. .**

25  255.   The recommendation was presented at a Governing Board meeting.

26  (Wood Depo., Ex. 4, at 100).

27  **UNDISPUTED.**

28

256.   In response to the recommendation, Sandra Dowling tabled the item. (Wood Depo., Ex. 4, at 100; February 26, 2003 Board Agenda Item, attached as Ex. 35).

**UNDISPUTED.**

257.   After the Governing Board meeting, Sandra Dowling was very unhappy and angry. Dr. Wood and Dr. Dowling had a telephone conversation, and Dr. Dowling expressed her annoyance at the recommendation. (Wood Depo., Ex. 4, at 10 1-102; Frazier Depo., Ex. 6, at 86).

**UNDISPUTED.**

258.   Marc Frazier told MCSO detectives that the bid committee's recommendation was not heeded and that Sandra Dowling was furious. "She screamed at me over this, she was furious that we chose Sagamore and I said, well, Sandra, first of all, they gave the best presentation, and, second of all, I thought that's who you wanted because the group – this is the group you had been meeting with." Sandra Dowling told Mr. Frazier that the group had split. Mr. Frazier responded that he didn't know they had split. (Frazier Depo., Ex. 6 at 88).

**UNDISPUTED.**

259.   It was not unusual for Sandra Dowling to yell or scream when she was displeased. She could be verbally abusive at times. (Frazier Depo., Ex. 6, at 88).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

260.   Sandra Dowling told Marc Frazier that she wanted a best and final offer done. As the Governing Board, Sandra Dowling was the one with the authority to make that decision. (Frazier Depo., Ex. 6, at 89).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

261.   After the meeting, Sherry Ferguson was in Dr. Dowling's office. Dr.

59

1     Dowling either received or made a phone call and became livid. Dr. Dowling then

2     stated, "The bitch fucked up. She gave the bid to the wrong company after I had told her

3     not to." (Ferguson Depo., Ex. 5, at 87-88).

4         **UNDISPUTED that this is what Ms. Ferguson testified to.**

5         262.    Dr. Dowling then made a phone call to her attorney, Mike King, and told

6     Mr. King, "[Dr. Wood] awarded the contract to wrong company and I need it fixed.

7     There's something we've got to be able to do about it." (Ferguson Depo., Ex. 5, at 89).

8         **UNDISPUTED that this is what Ms. Ferguson testified to and that Dr.**

9         **Dowling did contact the District's attorney, Mr. King about the situation.**

10        ***See* OSSOF 103.**

11        263.    Ms. Ferguson couldn't hear Mr. King's side of the conversation, but when

12    Sandra Dowling got off of the phone she said, "Mike is going to do a proprietary bid on

13    this and fix it." (Ferguson Depo., Ex. 5, at 89).

14         **DISPUTED:  This statement is not cited in the Motion as support for any**

15         **material fact.**

16        264.    Sandra Dowling knew who she wanted and that's who it was going to be,

17    regardless of what it took. (Frazier Depo., Ex. 6, at 89).

18         **DISPUTED:  This statement is not cited in the Motion as support for any**

19         **material fact.**

20        265.    Dr. Wood did not believe the bid committee needed clarification of

21    Strategic Impact and Sagamore Associates' qualifications. (Wood Depo., Ex. 4, at 115).

22         **DISPUTED:  This statement is not cited in the Motion as support for any**

23         **material fact.**

24        266.    Mike King recommended that MCRSD conduct interviews with the

25    lobbying firms and request clarification of staffing and other qualifications before doing

26    a best and final offer. (Frazier Depo., Ex. 6, at 92; February 27, 2003 Memo from Mike

27    King to Sandra Dowling, attached as Ex. 36).

28

DB04/835989.0002/5045150.1DD02

1    **UNDISPUTED.**

2    267.   On February 27, 2003, Sandra Dowling approved an agenda item

3    recommending that interviews be conducted with the two qualified offerors to ask for

4    revised proposals and best and final offers. (Wood Depo., Ex. 4, at 113-114; February

5    27, 2003 Board Agenda Item, attached as Ex. 37).

6    **UNDISPUTED.**

7    268.   Mike King wrote a request for best and final offer and sent it out to

8    Strategic Impact and Sagamore & Associates. It required the companies to include more

9    specificity and more information. (Wood Depo., Ex. 4, at 105-106; Notice Requesting

10   Clarification of Qualifications RFP #03-02, attached as Ex. 38).

11   **DISPUTED:  This statement is not cited in the Motion as support for any**

12   **material fact.**

13   269.   Dr. Wood did not believe it was necessary to request a best and final offer.

14   She did not have any input in drafting the request. (Wood Depo., Ex. 4, at 106).

15   **DISPUTED:  This statement is not cited in the Motion as support for any**

16   **material fact.**

17   270.   Sagamore Associates and Strategic Impact provided best and final offers.

18   (Sagamore Associates' Best and Final Offer, attached as Ex. 39; Strategic Impact's Best

19   & Final Offer, attached as Ex. 40).

20   **DISPUTED:  This statement is not cited in the Motion as support for any**

21   **material fact.**

22   271.   After the best and final offer process, the committee recommended that

23   the Governing Board approve Strategic Impact as the consultant for MCRSD's

24   lobbying services contact. (Wood Depo., Ex. 4, at 115; Frazier Depo., Ex. 6, at 99)

25   **UNDISPUTED.**

26   272.   On March 28, 2003, Sandra Dowling, as the MCRSD Governing Board,

27   approved the selection of Strategic Impact. There was no disclosure in MCRSD's

28

61

1  official records that Sandra Dowling had a substantial interest in the contract. (March
2  28, 2003 Board Agenda Item, attached as Ex. 41; Grand jury transcript, Ex. 22, at
3  35065).

4          **DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Dr. Dowling**
5          **had no duty to disclose since she had no interest, substantial or otherwise, in**
6          **the contract.** *See* **OSSOF 109.**

7          273.   Marc Frazier told MCSO investigators that he believed Strategic Impact
8  submitted the better best and final offer, but even if it hadn't been better he probably
9  would have picked them because he knew that's what Sandra Dowling wanted. Sandra
10  Dowling had told him that she wanted Strategic Impact. (Frazier Depo., Ex. 6, at 99-
11  100, 101).

12         **DISPUTED:** *See* **OSSOF 107, and** *also* **Plaintiffs' response to DSOF #241**
13         **and 254.**

14         274.   Dr. Wood did not think the bid process was clean from the beginning
15  because before the bid process even began the lobbyists had provided MCRSD with a
16  letter that outlined specifications and scope of work. (Wood Depo., Ex. 4, at 241; 2001
17  and 2002 letters and November 2002 Memorandum from Sagamore Associates and
18  Strategic Impact, Ex. 30).

19         **DISPUTED:  This statement is not cited in the Motion as support for any**
20         **material fact.**

21         275.   Over the course of MCRSD's contract with Strategic Impact, from April
22  2003 to early 2005, MCRSD paid them $207,000. (Frazier Depo., Ex. 6, at 98; January
23  31, 2006 Memorandum outlining payments from MCRSD, attached as Ex. 42).

24         **DISPUTED:  This statement is not cited in the Motion as support for any**
25         **material fact.**

26         276.   Marc Frazier believed that Sandra Dowling hired the lobbyist firm under the
27  guise of finding grant money for MCRSD but the real reason was so that they could be

28

her paid political consultants. He believed that Sandra Dowling got the benefit of their services, not MCRSD. (Frazier Depo., Ex. 6, at 101, 107).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that the lobbyists had worked tirelessly on behalf of Pappas for over two years.  *See* OSSOF 100.  The lobbyist denied acting to advance Dr. Dowling's political aspirations.  *See* OSSOF 109.  Dr. Dowling believed a lobbyist was needed to raise awareness of homeless education and obtain federal grant money for the District.  (Board Agenda Item dated 2/27/2003, Defendants' Ex. 37).**

277.    In fact, Sandra Dowling told Marc Frazier that she didn't really care how much benefit MCRSD got from Strategic Impact's services because a lot of doors were opening for her in D.C. (Frazier Depo., Ex. 6, at 107).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Dr. Dowling denies making this statement.   *See* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 12.**

278.    Sandra Dowling was up for a cabinet post. (Dowling Depo., Ex. 1, at 120).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that their citation to the record does not support it.  Dr. Dowling was not up for a cabinet post. *See* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 17.**

279.    Sandra Dowling was focused on getting an appointment with the Bush administration. (Ferguson Depo., Ex. 5, at 78; Frazier Depo., Ex. 6, at 58-59).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Dr. Dowling, was not "focused" on getting an appointment with the Bush administration. *See* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 18.**

280.    Dowling wanted to be appointed the U.S. Secretary of Education. (Ferguson Depo., Ex. 5, at 81).

63

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Dr. Dowling never expected to be appointed U.S. Secretary of Education.  *See* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 19.**

281.   Marc Frazier told detectives that for months he heard Sandra Dowling talk about how she was going to get an appointment, resign from her job in Maricopa County and move to Washington D.C. (Frazier Depo., Ex. 6, at 59).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that the cited excerpt indicates that Mr. Frazier overheard a "few conversations" between Dr. Dowling and Dick Bryce in which an appointment in Washington was discussed.  (Defendants' Ex. 6, at 59).**

282.   Sandra Dowling made a trip to Washington for the purpose of meeting with Margaret Spellings in the hope of getting a political appointment after Spellings became the new education chief. (Wood Depo., Ex. 4, at 121).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

283.   Sherry Ferguson believed that the lobbyist contract was related to furthering Sandra Dowling's political aspirations in Washington. Dick Bryce, Sandra Dowling's assistant, told her that with the contract they would be able to put Sandra Dowling in a position where she would be able to get a position in D.C. (Ferguson Depo., Ex. 5, at 90).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that the lobbyists deny they were hired to further Dr. Dowling's political aspirations.  *See* OSSOF 109.   Ms. Ferguson's opinion is based on hearsay and is inadmissible.**

284.   It was not uncommon for Sandra Dowling to indicate that she wanted MCRSD to hire a particular vendor. At times Dr. Wood felt pressured to purchase from specific vendors, generally people that Dr. Dowling knew or companies she knew of.

DB04/835989.0002/5045150.1DD02

(Wood Depo., Ex. 4, at 104).

**UNDISPUTED that this was Dr. Wood's testimony but Dr. Dowling denies that she pressured anyone to hire particular vendors.   *See* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 20.**

285.   Because MCRSD was $1.2 million over budget in 2004, Dr. Wood and Marc Frazier recommended that MCRSD discontinue their contract with Strategic Impact, but Dr. Dowling directed them to renew the contract. (Wood Depo., Ex. 4, at 56-57; February 10, 2004 Board Agenda Item, attached as Ex. 43).

**UNDISPUTED.**

286.   In August 2004 when Marc Frazier asked Sandra Dowling if he could stop paying Strategic Impact because he didn't feel they were worth the money, Sandra Dowling told him that they may not have brought in much money but they had opened several doors for her in Washington D.C. and until the election in November was over he needed to keep paying them.[1] (Frazier Depo., Ex. 6, at 109; Frazier handwritten memo, attached as Ex. 44).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Dr. Dowling denies she said that to Mr. Frazier.  Dr. Dowling never made this statement.  *See* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 12.  Furthermore, the lobbyists brought in at least $500,000 to the District during their contract period.  *See* OSSOF 110.**

**C.     Landscape Services Contract – GrassRoots Outdoor Solutions**

287.   Marc Frazier was in charge of maintenance and facilities at MCRSD. Joe Lopez was the maintenance supervisor, and he reported to Mr. Frazier. (Frazier Depo., Ex. 6, at 140; June 2, 2011 Deposition of Joe Lopez, attached as Ex. 45, at 20, 21).

**UNDISPUTED.**

288.   When Mr. Lopez did bids for services, he would send the package out to people. Sometimes he would make phone calls. He knew he needed a minimum of

---

[1] In November 2004, George W. Bush was elected as President.

65

three bids, so he would try to get at least six people involved because he didn't always get a response from everyone. (Lopez Depo., Ex. 45, at 28).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

289.   When reviewing bids, Mr. Lopez would generally look at price and go with the lowest bid unless the bidder didn't meet the bid requirements. (Lopez Depo., Ex. 45, at 30).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

290.   Once the decision was made to go with a particular vendor, Mr. Lopez would then submit a purchase order to Marc Frazier for his signature. Once Mr. Lopez got the purchase order, he would proceed with hiring the vendor. (Lopez Depo., Ex. 45, at 31).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

291.   As MCRSD started growing, Marc Frazier made the decision to bid out the landscaping services for MCRSD. (Lopez Depo., Ex. 45, at 25).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

292.   Joe Lopez, Marc Frazier, and Lopez's assistant, Dave Brown, put together a package explaining the type of services they were seeking. (Lopez Depo., Ex. 45, at 26-27).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

293.   As part of the investigation, Dr. Owens reviewed documents seized from Joe Lopez's office at MCRSD, as well as financial records relating to the landscaping contracts given to Dennis Dowling. (Owens Affidavit, Ex. 2, at ¶ 13).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

294.   Dennis Dowling is Sandra Dowling's son. He had a landscaping company called GrassRoots Outdoor Solutions ("GrassRoots"). (Lopez Depo., Ex. 45, at 43-44.)

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

295.   MCRSD went out to bid in 2002 on landscaping for the Williams campus. (Lopez Depo., Ex. 45, at 32, 36-37; Bid proposals for Williams campus landscaping, attached as Ex. 46).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

296.   Also in August and September of 2002, MCRSD solicited and received bids for landscaping services for the Pappas elementary school and MCRSD District office. (Lopez Depo., Ex. 45, at 39-40, 41; Bid proposals for landscaping at Pappas elementary and District office, attached as Ex. 47).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

297.   MCRSD received written bids from four companies between August 15, 2002 and September 3, 2002. Copies of most, but not all, of these bids were retained by Joe Lopez in a folder in his office. (Owens Affidavit, Ex. 2, at ¶ 14).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that there is no foundation for Dr. Owens' testimony.**

298.   Contracts were awarded to the two lowest bidders, which were two different companies. (Owens Affidavit, Ex. 2, at ¶ 15).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that the statement does not reflect what campus or campuses these bids were solicited for, making it impossible to admit or deny.**

67

299.   The bid for the Williams campus was awarded to Avalawn, who had bid $800 per month. (Owens Affidavit, Ex. 2, at ¶ 16).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

300.   The bid for landscaping for the downtown campus and the District office was awarded to David's Family Lawn Service at $1350 per month. (Owens Affidavit, Ex. 2, at ¶ 17; Lopez Depo., Ex. 45, at 42).

**UNDISPUTED.**

301.   Avalawn's contract was terminated only eight days after the purchase order was issued. But the contract was not awarded to any of the other companies who had participated in the August bid process. (Owens Affidavit, Ex. 2, at ¶ 18).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

302.   Dennis Dowling's company, GrassRoots, did not submit a bid until October 26, 2002. (Owens Affidavit, Ex. 2, at ¶ 19).

**UNDISPUTED.**

303.   Kathryn Lindenberger, who was an administrative technician in facilities, told investigators that David's Family Lawn Service was not doing a good job on the Pappas school landscape maintenance. Around that same time frame, she was on the phone with Sandra Dowling, and Dr. Dowling told her that Dennis Dowling, her son, did landscaping and he could do it. After that Marc Frazier told Ms. Lindenberger that Dennis Dowling would be doing the landscaping going forward. (Tucker Affidavit, Ex. 18, at ¶ 10).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that it is based on inadmissible hearsay, Mr. Frazier denies he ever said that Dennis Dowling would be doing the landscaping.  *See* OSSOF 1`20.**

304.   Marc Frazier told Joe Lopez to call Dennis Dowling and ask him to bid.

68

Marc Frazier told him to make sure that Dowling submitted a bid. Mr. Frazier provided Mr. Lopez with Dennis Dowling's phone number. (Lopez Depo., Ex. 45, at 47-48, 52, 54).

> **DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Mr. Lopez also testified that it was typical of Mr. Frazier to have this kind of involvement as he was Mr. Lopez' supervisor and while defense counsel asked Mr. Lopez the same question a number of times, the gist of the exchange was simply that Mr. Frazier told him to have Dennis bid on the contract and gave him Dennis' phone number.  *See* Lopez Depo., Defendants' Ex. 45 at 47-48; 52; 54.**

305.   Mr. Lopez told detectives that he knew that Marc Frazier was being pressured as well and that Frazier's orders were coming from above Frazier. (Lopez Depo., Ex. 45, at 53).

> **DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Mr. Frazier denied being pressured by Dr. Dowling about this contract, as he never spoke to her about her son being awarded the landscaping contracts.  *See* OSSOF 119.**

306.   Ms. Lindenberger told investigators that Marc Frazier called over to facilities and said to hire Dennis Dowling. If they didn't follow that direction, they could be fired. (Tucker Affidavit, Ex. 18, ¶ 11).

> **DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

307.   MCRSD did a bid process for some of the landscaping work but not for other parts. Some schools went through a bid process and, with other schools, the contract was just given to Dennis Dowling. (Frazier Depo., Ex. 6, at 143).

> **DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

DB04/835989.0002/5045150.1DD02

308.   In October 2002 Joe Lopez had nothing to put out to bid, because the bid package had gone out in August. So Joe Lopez took David's Family Lawn Service's bid and provided it to Dennis Dowling. (Lopez Depo., Ex. 45, at 64, 65-66, 67).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Mr. Lopez provided a redacted copy of the bid so that Dennis knew the scope of the work to bid on.  *See* OSSOF 115, 117.**

309.   After Joe Lopez sent Dennis Dowling a copy of David's Family Lawn Service's bid, Mr. Lopez received a bid from GrassRoots. GrassRoots' bids were strikingly similar to David's Family Lawn Service's bids. (Lopez Depo., Ex. 45, at 70; David's Family Lawn Service and GrassRoots' bids, Exs. 46, 47, 48, 50).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that the scope of the work bid on was, of course, similar since the scope was taken from David's bid.  *See* Plaintiffs' response to DSOF #308.**

310.   Joe Lopez received a bid from GrassRoots Outdoor Solutions ("GrassRoots") for landscaping services at the Williams campus dated October 26, 2002. Grassroots was owned by Dennis Dowling, Sandra Dowling's son. (Lopez Depo., Ex. 45, at 43-44; GrassRoots' bid for Williams campus, attached as Ex. 48).

**UNDISPUTED.**

311.   After Dennis Dowling submitted a bid on October 26, 2002, GrassRoots was given a contract for landscaping at the Williams campus at $1450 a month, even though Groundskeeper's August bid was lower at $270 per week, or approximately $1170 per month. (Owens Affidavit, Ex. 2, at ¶ 20).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

312.   The monthly landscaping service at the Williams campus was then switched to Dennis Dowling's company in November 2002. (Lopez Depo., Ex. 45, at 56-57; GrassRoots' invoice for November 2002, attached as Ex. 49).

1

2

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

3    313.   Mr. Lopez received a proposal from GrassRoots for landscaping services

4   at the Pappas elementary school and the District office, also dated October 26, 2002.

5   (Lopez Depo., Ex. 45, at 44-45; GrassRoots' bids for Pappas elementary school and

6   MCRSD office, attached as Ex. 50).

7    **UNDISPUTED.**

8    314.   Joe Lopez told MCSO detectives that he and Dennis Dowling had a

9   conversation in which Mr. Lopez told Dowling that he would be sending some

10   documents to Dowling. After Dennis Dowling responded with a bid for $1600, Joe

11   Lopez called Dennis Dowling and told him that his bid was too high and that he needed

12   to be lower than David's Family Lawn Service's bid. Joe Lopez provided Dennis

13   Dowling with the amount of $1350. (Lopez Depo., Ex. 45, at 74,75, 76; GrassRoots'

14   bids for Pappas elementary school and MCRSD office, Ex. 50).

15    **DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Dennis**

16    **Dowling denies that Mr. Lopez ever provided him with information on**

17    **pricing and the price went down because it reflected multiple campuses.**

18    ***See* Exhibit 82, Dennis S. Dowling Depo., at 35:16-38:1.  Later in the excerpt**

19    **of Mr. Lopez' deposition cited by Defendants he said that he felt he was**

20    **under a "lot of pressure" from the MCSO investigators when he told them**

21    **that.  *See* Lopez Depo., Defendants' Ex. 45 at 76.**

22    315.   Based on that conversation, Dennis Dowling then sent Joe Lopez another

23   bid with the same date but without the GrassRoots logo, and lowered the cost. (Lopez

24   Depo., Ex. 45, at 76; GrassRoots' bids for Pappas elementary school and MCRSD

25   District office, Ex. 50).

26    **DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Dennis**

27    **Dowling denies lowering his price due to anything Mr. Lopez said.  Instead,**

28

71

1  it was lowered because additional campuses were added. *See* **Plaintiffs'**

2  **response to DSOF #314.**

3  316.  David Tonstad, Jr., from David's Family Lawn Service, told investigators

4  that Joe Lopez called him and told him that his bid was too high for the downtown

5  campus. David's Family Lawn Service lowered its bid by $450 a month and got the job.

6  (Tucker Affidavit, Ex. 18, ¶ 12).

7  **DISPUTED:  This statement is not cited in the Motion as support for any**

8  **material fact.**

9  317.  David's Family Lawn Service continued to service the Pappas elementary

10  school and District office after October 2002. (Lopez Depo., Ex. 45, at 58-59).

11  **UNDISPUTED though it is unclear how long after that date they continued**

12  **at Pappas.**

13  318.  Joe Lopez sent David's Family Lawn Service a letter dated May 12, 2003

14  advising them that their services to MCRSD would be terminated as of June 13, 2003.

15  (Lopez Depo., Ex. 45, at 78; May 12, 2003 letter to David's Family Lawn Service,

16  attached as Ex. 51).

17  **UNDISPUTED.**

18  319.  After David's Family Lawn Service was terminated in June 2003, Dennis

19  Dowling took over the landscaping at the Pappas elementary and the District office.

20  Dennis Dowling was awarded that contract for $1400 per month. (Lopez Depo., Ex. 45,

21  at 78; Owens Affidavit, Ex. 2, at ¶ 21).

22  **DISPUTED.  Dr. Owens' testimony lacks foundation.  Undisputed that**

23  **Dennis did take over the landscaping at Pappas and the District office.**

24  320.  As time went by, more and more job sites were added to Dennis

25  Dowling's job list. Those jobs were not put out for bid; they were just given to Dennis

26  Dowling. (Lopez Depo., Ex. 45, at 81).

27  **UNDISPUTED that Dennis was given additional jobs over time.**

28

72

321.   In July 2003, Dennis Dowling was awarded a landscaping contract for the Tempe campus of Thomas J. Pappas for $350 per month. (Owens Affidavit, Ex. 21, at ¶ 22).

**DISPUTED.   Plaintiffs object to the lack of foundation for Dr. Owens' opinion, but do not dispute that Dennis was awarded the Tempe campus contract.**

322.   Dennis Dowling lost the landscaping contract for the Williams campus in November of 2004. (Lopez Depo., Ex. 45, at 91).

**UNDISPUTED.**

323.   When Dennis Dowling lost the Williams campus landscaping job, Marc Frazier told Joe Lopez to give Dennis Dowling the contracts for the Guadalupe and Lone Cactus campuses to make up the difference. (Lopez Depo., Ex. 45, at 91-92).

**UNDISPUTED.**

324.   In January 2005, Dennis Dowling was awarded a contract for landscaping maintenance at the Guadalupe, Lone Cactus, and Thomas J. Pappas middle school campuses for $1200 per month. (Owens Affidavit, Ex. 2, at ¶ 23).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that there is no foundation for Dr. Owens' testimony.**

325.   Joe Lopez believed the new locations should have been bid. (Lopez Depo., Ex. 45, at 82-83).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that while Mr. Lopez testified he may have believed that at the time, in his interview with the MCSO he denied ever saying that to Mr. Frazier.  *See* Lopez Depo., Defendants' Ex. 45, at 82.**

326.   MCRSD's Bidding and Purchasing Policy required that purchasing, contracting and competitive bidding be done in accordance with Arizona procurement rules. (Owens Affidavit, Ex. 2, at ¶ 11).

DB04/835989.0002/5045150.1DD02

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Dr. Owens' testimony lacks foundation.**

327.   By law, a bid process is required when the value of the work exceeds a certain threshold amount. In the 2002 – 2003 time frame, the bid threshold was $32,700. (Frazier Depo., Ex. 6, at 143).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Mr. Frazier testified it was "somewhere in that neighborhood."  *See* Frazier Depo., Defendants Ex. 6, at 143.**

328.   The Uniform System of Financial Reporting, state law, and MCRSD policy specified the dollar thresholds to be observed when procuring goods and services. For services with a value of $5000 or less, choice of a vendor was within the MCRSD Superintendent's discretion. For services with a value between $5000 and $15,000, MCRSD was required to obtain three or more verbal quotes. For goods and services valued between $15,000 and $32,700, MCRSD was required to obtain three or more written quotes. And, for goods and services valued in excess of $32,700, MCRSD was required to undergo a sealed bid process. (Owens Affidavit, Ex. 2, at ¶ 12).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that  Dr. Owens' testimony lacks foundation.  Furthermore, Dr. Dowling had nothing to do the award of the landscaping contract(s) to her son so whether the appropriate requirements were followed in awarding those contracts to Dennis is immaterial.  *See* OSSOF 112.**

329.   The total landscaping services provided to MCRSD exceeded the $32,700 procurement threshold. A single bid for landscaping services for MCRSD should have been done, as opposed to entering separate contracts for the various locations. (Owens Affidavit, Ex. 2, at ¶ 24).

**DISPUTED:  *See* Plaintiffs' response to DSOF #328.**

330.   MCRSD paid over $99,000 to Dennis Dowling for the landscaping

services he provided to MCRSD between November 2002 and October 2005. (Owens Affidavit, Ex. 2, at ¶ 25).

**DISPUTED:  See Plaintiffs' response to DSOF #328.**

331.   The work performed by GrassRoots was split into multiple purchase orders in what appeared to be an attempt to avoid the procurement threshold. (Owens Affidavit, Ex. 2, at ¶ 26).

**DISPUTED:  See Plaintiffs' response to DSOF #328.**

332.   When a vendor is hired at MCRSD, the Governing Board gives the final approval. The Governing Board approves all hiring and firing decisions. (Frazier Depo., Ex. 6, at 145).

**UNDISPUTED but the Governing Board cannot be involved in every hiring and firing decision and so relied on her division heads/management and administrative staff to adhere to any procurement requirements.  *See* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 21.**

333.   There was no disclosure in the MCRSD Governing Board minutes of a conflict of interest, nor was a conflict of interest file maintained. (Owens Affidavit, Ex. 2, at ¶ 27).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

334.   Joe Lopez told MCSO detectives that he was afraid for his job, and that he felt that if he didn't make sure Dennis Dowling got the job, Lopez might not have a job. (Lopez Depo., Ex. 45, at 99).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

335.   Joe Lopez told MCSO detectives that he felt pressure to select Dennis Dowling. (Lopez Depo., Ex. 45, at 102).

75

**DISPUTED:   Plaintiffs dispute this DSOF on the grounds that the alleged pressure Mr. Lopez felt came from a discussion with Mr. Frazier, not from any discussion with or threat from Dr. Dowling.  *See* OSSOF 112, 120.**

336.    Joe Lopez told Marc Frazier that he was afraid for his job. (Frazier Depo., Ex. 6, at 145).

**DISPUTED:   Plaintiffs dispute this DSOF on the grounds that the cited testimony reflects that Mr. Lopez told this to Mr. Frazier after the fact and that Mr. Frazier had no idea during the bidding process for the landscaping contract that Mr. Lopez felt this way.  *See* Frazier Depo., Defendants' Ex. 6, at 145.  *See* also OSSOF 120.**

337.    Sandra Dowling had tried to get rid of Joe Lopez several times. (Frazier Depo., Ex. 6, at 146).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Dr. Dowling denies this. *See* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 22.**

338.    It was common for Sandra Dowling to get rid of people who didn't do what she wanted. Mr. Frazier told MCSO deputies that Sandra Dowling would hire Superintendents and then within a short period of time she would hate them because they didn't do what she wanted. (Frazier Depo., Ex. 6, at 146).

**DISPUTED:   This statement is not cited in the Motion as support for any material fact.**

 **D.    <u>Real Estate Bid – Orangewood Property</u>**

339.    MCRSD acquired some real property in Glendale on Orangewood to build a combination junior high and high school ("Orangewood property"). (Frazier Depo., Ex. 6, at 110).

**UNDISPUTED.**

340.    MCRSD had some issues with getting the proper permitting from the City of Glendale. (Frazier Depo., Ex. 6, at 111).

76

1        **UNDISPUTED.**

2        341.   The decision was ultimately made to sell the Orangewood property.

3   (Frazier Depo., Ex. 6, at 111).

4        **UNDISPUTED.**

5        342.   Hope Ravens assisted in putting together the Request for Proposal to sell

6   the Orangewood property. She also mailed it out to various real estate companies and

7   put it in the newspaper. (March 15, 2011 Deposition of Hope Ravens, attached as Ex.

8   52, at 18).

9        **DISPUTED:  This statement is not cited in the Motion as support for any**

10       **material fact.**

11       343.   Ms. Ravens told investigators that she first got John Dyer's phone number

12  on a sticky note from either Marc Frazier or Steve Zimmerman, who was MCRSD's

13  Superintendent. She was asked to call Mr. Dyer. (Ravens Depo., Ex. 52, at 14, 21).

14       **UNDISPUTED that Ms. Ravens testified to this effect.**

15       344.   Ms. Ravens felt uncomfortable because Dr. Dowling was both a realtor at

16  Dan Schwartz Realty and the MCRSD Governing Board. So if MCRSD used Dan

17  Schwartz realty to sell the Orangewood property, it seemed like a conflict of interest.

18  (Ravens Depo., Ex. 52, at 24-25).

19       **DISPUTED:  This statement is not cited in the Motion as support for any**

20       **material fact.**

21       345.   On November 9, 2005 Hope Ravens emailed Steve Zimmerman to see

22  how she should proceed with the sale of the Orangewood property and whether she

23  should wait until John Dyer was back in the office. (Ravens Depo., Ex. 52, at 26).

24       **UNDISPUTED that Ms. Ravens testified to this.**

25       346.   Mr. Zimmerman responded, "Yes. Dr. Dowling stated that John Dyer

26  WILL sell the property. So wait for him to return." Ms. Ravens received this email at

27  least six weeks before the RFP for the sale of the Orangewood property was published.

28

DB04/835989.0002/5045150.1DD02

1   Ms. Ravens felt that this email was a directive from her supervisor that Mr. Dyer would

2   be selling the Orangewood property. (Ravens Depo., Ex. 52, at 26-28; November 9,

3   2005 emails regarding Orangewood property, attached as Ex. 53).

4        **DISPUTED:  Plaintiffs dispute this DSOF on the grounds that this took**

5        **place before they realized that an RFP was needed.  Once that realization**

6        **occurred, an RFP committee was formed and the matter went out to bid.**

7        *See* **OSSOF 122.  Dr. Dowling had no input in the decision and did not**

8        **influence the process in any way.** *See* **OSSOF 124.**

9        347.    Sometime after this email, Hope Ravens realized that a RFP needed to be

10   done. (Ravens Depo., Ex. 52, at 84).

11        **UNDISPUTED.**

12        348.    Mr. Dyer sent emails to Ms. Ravens inquiring about how the land should

13   be priced and when he could come and get the listing signed. (December 2005 emails

14   from John Dyer to Hope Ravens, attached as Ex. 54).

15        **DISPUTED:  This statement is not cited in the Motion as support for any**

16        **material fact.**

17        349.    Mr. Zimmerman also gave Ms. Ravens a verbal directive that John Dyer

18   was to sell the Orangewood property. (Ravens Depo., Ex. 52, at 29-30).

19        **DISPUTED:  This statement is not cited in the Motion as support for any**

20        **material fact.**

21        350.    Hope Ravens was told to make sure that John Dyer got a copy of the

22   Request for Proposal. (Ravens Depo., Ex. 52, at 37-38; December 20, 2005 email from

23   Steve Zimmerman, attached as Ex. 55).

24        **UNDISPUTED that Mr. Zimmerman told her to send a copy of the RFP to**

25        **Mr. Dyer.**

26        351.    The Request for Proposal for the Orangewood property was published on

27   December 22, 2005 and December 29, 2005. Ms. Ravens sent a copy of the RFP to

28

John Dyer, as directed, and to Todd Sells, the realtor she worked with in purchasing the property. (Ravens Depo., Ex. 52, at 20, 28, 35; Real Estate Services Bid #R-001-06 and Dyer Response, attached as Ex. 56).

**UNDISPUTED.**

352.   John Dyer was the only person that submitted a bid in response to the Request for Proposal. (Ravens Depo., Ex. 52, at 40).

**UNDISPUTED.**

353.   Ms. Ravens was part of the committee that evaluated the bid. (Ravens Depo., Ex. 52, at 4 1-42).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

354.   Ms. Ravens did not believe the bid was very professionally done. (Ravens Depo., Ex. 52, at 40).

**UNDISPUTED that this was Ms. Raven's opinion.**

355.   Ms. Ravens did not believe the bid complied with the Request for Proposal's requirement that the bidder submit references. (Ravens Depo., Ex. 52, at 43).

**UNDISPUTED that this was Ms. Raven's opinion.**

356.   The Request for Proposal also required everything in the bid to be typewritten. Mr. Dyer's bid had handwritten tabs and handwritten information throughout. Ms. Ravens didn't believe the bid complied with the requirement to have everything typewritten. (Ravens Depo., Ex. 52, at 43-44).

**UNDISPUTED that this was Ms. Raven's description of the bid and her opinion.**

357.   Mr. Dyer's bid quoted a 10% commission. Ms. Ravens believed that was high. (Ravens Depo., Ex. 52, at 44; Estate Services Bid #R-001-06 and Dyer Response, Ex. 56).

DB04/835989.0002/5045150.1DD02

**UNDISPUTED that the bid quoted a 10% commission and that Mr. Dyer lowered it to 8% upon the District's request.  *See* Exhibit 68, Hope Ravens Depo., at 49:20-50:9.**

358.   Hope Ravens called some real estate companies and was told that the average commission was either 3 to 6 percent, or 4 to 6 percent. (Ravens Depo., Ex. 52, at 91).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that others said that 8% was an average commission.  *See* Exhibit 67, Steve Zimmerman Interview at p. 40-41.**

359.   Hope Ravens requested that the Request for Proposal be thrown out when they received only one bid and because of concerns that Sandra Dowling had her real estate license at the same real estate office as John Dyer. (Ravens Depo., Ex. 52, at 19).

**UNDISPUTED that Ms. Ravens testified that she told this to the MCSO investigators, but Mr. Zimmerman refused to send the RFP out again despite the fact that only one bidder responded.  *See* Exhibit 67, Steve Zimmerman Interview at p. 10-11.**

360.   The Request for Proposal included a provision regarding conflicts of interest, which Hope Ravens brought to the attention of Mr. Frazier and Mr. Zimmerman. (Ravens Depo., Ex. 52, at 36-37).

**UNDISPUTED that Ms. Ravens testified to this.  Mr. Zimmerman does not recall Ms. Ravens bringing this to their attention.  *See* Exhibit 67, Steve Zimmerman Interview at p. 23-25.**

361.   Ms. Ravens made her opinions known to other members of the bid selection committee but Steve Zimmerman told her they were not going to re-bid it and that they were going to award the bid to Mr. Dyer. The other members of the committee were Steve Zimmerman, Janice Wheeler, Kathy Borland, and Mike Hopper. (Ravens Depo., Ex. 52, at 46, 93-94).

DB04/835989.0002/5045150.1DD02

1    UNDISPUTED.

2    362.   Marc Frazier told MCSO investigators that Sandra Dowling informed

3    MCRSD staff that John Dyer was going to be the realtor to sell the property. (Frazier

4    Depo., Ex. 6, at 112-113, 114).

5    **DISPUTED:   Plaintiffs dispute this DSOF on the grounds that the**

6    **conversation took place before they realized an RFP would be needed.  *See***

7    **OSSOF 122.  Mr. Frazier is the one that told them it was necessary to get**

8    **bid.  *See* Frazier Depo., Defendants' Ex. 6, at 113.**

9    363.   Sandra Dowling, as MCRSD's Governing Board, approved the bid

10   selection. The Board Agenda item noted there was only one response to the bid.

11   (January 18, 2006 Board Agenda Item, attached as Ex. 57).

12   **UNDISPUTED but Dr. Dowling was not a member of the bid committee**

13   **and she never ordered the committee to chose Mr. Dyer.  *See* OSSOF 123,**

14   **124.**

15   364.   The real estate contract was awarded to John Dyer. (Ravens Depo., Ex.

16   52, at 128-129; Exclusive Right to Sell Contract, attached as Ex. 58).

17   **UNDISPUTED.**

18   365.   The Orangewood property did not have to be sold before MCRSD could

19   purchase new property for the proposed school. (Minutes from November 8, 2005

20   Regular Meeting of the Governing Board – District 509, attached as Ex. 59).

21   **DISPUTED:   Plaintiffs dispute this DSOF on the grounds that the bid**

22   **committee members felt there was some urgency in selling this property.**

23   ***See* Exhibit 67, Steve Zimmerman Interview at p. 43-44.**

24   366.   On February 15, 2005 the bid solicitation was cancelled. (Ravens Depo.,

25   Ex. 52, at 57; Notice of Cancellation of Solicitation, attached as Ex. 60).

26   **DISPUTED:  This statement is not cited in the Motion as support for any**

27   **material fact.**

28

367.   Marc Frazier would not have agreed to hire John Dyer because he was the only person to respond to the RFP. With all the real estate agents in town, Dyer was not the sole source for providing that type of service. (Frazier Depo., Ex. 6, at 114).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

368.   Because there was only one proposal, the bid committee could have redone the Request for Proposal or sent it out again, or they could have gone to the County real estate department and had the County real estate department help them sell it. (Frazier Depo., Ex. 6, at 119-120).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that there was no need for them to take these actions.  Mr. Zimmerman made the decision that the RFP would not be sent out again.  *See* Exhibit 67, Steve Zimmerman Interview at p. 10-11.**

369.   Both Sandra Dowling and John Dyer were associated with Dan Schwartz Realty. (Frazier Depo., Ex. 6, at 115).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Dr. Dowling's only association with Dan Schwartz Realty is that her license hung there.  *See* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 23.**

370.   Sandra Dowling and John Dyer were also friends. (Frazier Depo., Ex. 6, at 116).

**UNDISPUTED that they were acquaintances, but Dr. Dowling always told Mr. Dyer that she could have nothing to do with any real estate sales involving District property.  *See* OSSOF 127.**

371.   Marc Frazier believed there was a conflict. Whether or not Sandra Dowling would get a commission, she would still be bringing business into the real estate firm, and he believed there was likely some kind of incentive for bringing business into the firm. (Frazier Depo., Ex. 6, at 117).

DB04/835989.0002/5045150.1DD02

1

2

3

4

5

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Mr. Dyer and Duane Fouts, broker with the real estate firm denied that there was any referral fee agreement or that Dr. Dowling would have shared in the commission had Mr. Dyer sold the property.  *See* OSSOF 126; *.see* Exhibit 21, Declaration of Sandra Dowling 2, ¶ 24.**

6

7

8

372.    Marc Frazier told MCSO detectives that the RFP was just a formalization, a way to make it legal for Sandra Dowling to pick who she wanted. (Frazier Depo., Ex. 6, at 118).

9

10

11

12

13

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that the cited excerpt reflects that Mr. Frazier said an RFP can be used that way and that the RFP looked like it may have been used that way because only one bidder responded.  He offered no testimony that Dr. Dowling took action to "pick who she wanted" in this case.  *See* Frazier Depo., Defendants' Ex. 6, at 118.**

14

15

16

17

373.    Marc Frazier also told MCSO detectives that when Sandra Dowling took the contractor out to look at the property, she told him to support John Dyer because she wanted Dyer to get the commission for purchasing new property. (Frazier Depo., Ex. 6, at 118-119).

18

19

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

20

21

374.    MCRSD did not maintain a bid inventory or a list of interested vendors to document that only one proposal was received. (Owens Affidavit, Ex. 2, at ¶ 28).

22

23

24

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that there is no foundation for Dr. Owens' testimony and this is immaterial to consideration of the issues.**

25

26

27

375.    There was no disclosure in the MCRSD Governing Board minutes of a conflict of interest, nor was a conflict of interest file maintained. (Owens Affidavit, Ex. 2, at ¶ 29).

28

DB04/835989.0002/5045150.1DD02

1  **DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Dr. Dowling**

2  **did not have any interest in the real estate contract and thus no conflict to**

3  **disclose.  *See* OSSOF 126; .*see* Exhibit 21, Declaration of Sandra Dowling 2,**

4  **¶ 24**

5  **E.      Maricopa County Schoolhouse Foundation**

6  376.    The   Maricopa   County   Schoolhouse   Foundation   ("Schoolhouse

7  Foundation") began in March 2005. Sandra Dowling wanted to create it to help with

8  donations coming into MCRSD to mainly support the Pappas Schools but also to

9  support any other schools for which donations might be received. (Frazier Depo., Ex. 6,

10 at 121).

11 **UNDISPUTED.**

12 377.    Marc Frazier was moved from MCRSD to the Schoolhouse Foundation to

13 be one of the main fundraisers. (Frazier Depo., Ex. 6, at 120, 122).

14 **DISPUTED:  This statement is not cited in the Motion as support for any**

15 **material fact.**

16 378.    Sandra Dowling was one of the three board members for the Schoolhouse

17 Foundation. (Frazier Depo., Ex. 6, at 124).

18 **UNDISPUTED.**

19 379.    When a donor makes a donation, they have the ability to designate what

20 those funds are going to be used for. (Frazier Depo., Ex. 6, at 123-124).

21 **UNDISPUTED.**

22 380.    Carol Buczek was the personal representative for Vivian Craig's estate.

23 (March 14, 2011 Deposition of Carol Buczek, attached as Ex. 61, at 16).

24 **DISPUTED:  This statement is not cited in the Motion as support for any**

25 **material fact.**

26 381.    Vivian Craig's last will and testament divided her estate into four shares.

27 One share was to go to the J. Thomas Pappas School. (Buczek Depo., Ex. 61, at 12-13).

28

**UNDISPUTED that Ms. Craig left a bequest to the "J. Thomas Pappas School."**

382.   In accordance with Vivian Craig's will, Ms. Buczek made out a check for $89,000 to the J. Thomas Pappas School on September 7, 2005. (Buczek Depo., Ex. 61, at 18-19; Check dated 9/7/05 to J. Thomas Pappas School, attached as Ex. 62).

**UNDISPUTED.**

383.   The check was sent to J. Thomas Pappas School in Tempe with a cover letter and a receipt and release. The receipt and release was signed by Rexanne Meredith. (Buczek Depo., Ex. 61, at 22-23; September 9, 2005 letter from James F. McGreevy to J. Thomas Pappas School with check and Receipt and Release enclosed, attached as Ex. 63; Receipt and Release dated September 13, 2005 and signed by Rexanne Meredith, attached as Ex. 64).

**UNDISPUTED.**

384.   The check that was made out to J. Thomas Pappas Schools was deposited into an MCRSD account and then reissued to the Maricopa County Schoolhouse Foundation. (Frazier Depo., Ex. 6, at 131).

**UNDISPUTED.**

385.   Ms. Buczek never authorized Rexanne Meredith or Marc Frazier to change Ms. Craig's donation from the J. Thomas Pappas School to the Maricopa County Schoolhouse Foundation. (Buczek Depo., Ex. 61, at 25, 26).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that the principal of the Tempe Pappas School spoke to Ms. Craig's attorney who approved the deposit of the donation into the Foundation's account.  *See* Exhibit 12, Frazier Depo. at 131:10-24.**

386.   Ms. Buczek did not know that an entity called the Maricopa County Schoolhouse Foundation existed. She never spoke with anyone from the J.

Thomas Pappas School or the Maricopa County Schoolhouse Foundation regarding setting up an endowment. (Buczek Depo., Ex. 61, at 29, 30).

**UNDISPUTED that this was Ms. Buczek's testimony.**

387.   Marc Frazier signed a purchase requisition for MCRSD to transfer $89,000 to the Schoolhouse Foundation. It was to be used as part of the endowment for the Schoolhouse Foundation. (Frazier Depo., Ex. 6, at 125, 127; Purchase Requisition dated 9/20/05, attached as Ex. 65).

**UNDISPUTED.**

388.   The idea was to set up an endowment that would have enough money in it that they could use the revenue produced from that fund to take of some of the things that they would have to raise money for every year, such as nursing expenses and other things for the Pappas Schools. (Frazier Depo., Ex. 6, at 126).

**UNDISPUTED.**

389.   The $89,000 amount came as a donation from Vivian Craig's estate. (Frazier Depo., Ex. 6, at 130).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

390.   From the purchase requisition, a purchase order was created. (Frazier Depo., Ex. 6, at 128; 9/26/05 Purchase Order, attached as Ex. 66).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

391.   The purchase order indicates, "Give CK to Marc," which means that the check should be given to Marc Frazier. (Frazier Depo., Ex. 6, at 129, Purchase Order, Ex. 66).

**UNDISPUTED.**

392.   The purchase order also states, "This money will be used as part of the endowment the Foundation is setting up. The check was made out to Pappas instead of

1  the Foundation. Please reissue in the Foundation's name." This same verbiage was on

2  the purchase requisition. (Frazier Depo., Ex. 6, at 129-130; Purchase Requisition, Ex.

3  65; Purchase Order, Ex. 66).

4      **UNDISPUTED.**

5      393.   The deposit receipt from the donation indicates the payor as Vivian Craig

6  Estate, but under comments it indicates, "Should be made out to Maricopa County

7  Schoolhouse Foundation." That language was inserted by Janice Wheeler. (Frazier

8  Depo., Ex. 6, at 130; March 15, 2011 Deposition of Janice Wheeler, attached as Ex. 67,

9  at 45; Depository Receipt no. 06-0 12 dated 9/23/05, attached as Ex. 68).

10      **UNDISPUTED.**

11      394.   Ms. Wheeler believes the information that the check should have been

12  made out differently came from Rexanne Meredith. Ms. Wheeler did not speak with the

13  personal representative of Vivian Craig's estate. (Wheeler Depo., Ex. 67, at 45-46).

14      **DISPUTED:  This statement is not cited in the Motion as support for any**

15      **material fact.**

16      395.   Ms. Wheeler was told that the check should have been made out to the

17  Schoolhouse Foundation but since it was made out to Pappas, she deposited it into the

18  donation fund for Pappas. (Wheeler Depo., Ex. 67, at 46-47).

19      **DISPUTED:  This statement is not cited in the Motion as support for any**

20      **material fact.**

21      396.   It was out of the ordinary for a donation check to be made out to one

22  entity and then the beneficiary switched to a different entity. (Wheeler Depo., Ex. 67,

23  at 47).

24      **DISPUTED:  This statement is not cited in the Motion as support for any**

25      **material fact.**

26      397.   A voucher was generated after the purchase order process that showed

27  that $89,000 would be used as part of the Foundation endowment, and requested that

28

the check to Pappas be reissued in the Foundation's name. (Wheeler Depo., Ex. 67, at 50; Voucher 5118 dated 9/27/05, attached as Ex. 69).

**UNDISPUTED.**

398.   As a result of the purchase requisition and purchase order, on September 27, 2005 a warrant was issued, bearing Sandra Dowling's signature, from MCRSD to the Schoolhouse Foundation in the amount of $89,000. (Frazier Depo., Ex. 6, at 130-131; Warrant 460034239, attached as Ex. 70).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Mr. Frazier testified that Dr. Dowling never saw the warrant.  *See* Exhibit 71, Frazier Interview 3, at p 32-33.**

399.   All purchase orders are placed on the MCRSD board agenda and the Governing Board has to approve them. Sandra Dowling approved voucher 5118, transferring $89,000 from MCRSD to the Schoolhouse Foundation. (Frazier Depo., Ex. 6, at 132; Wheeler Depo., Ex. 67, at 51; Minutes and Board Agenda Item from October 4, 2005 Regular Meeting of the Governing Board – District 509, attached as Ex. 71).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that nothing in Defendants' Ex. 71 contains a recitation of a purchase order in the amount of the Craig bequest, none of them say what they are for, the Craig name is not mentioned and the amount of voucher 5118 is $223,609.55.  Voucher 5118 is a multi-page listing of all the expenses for the District for a period of time.  The entry reflecting the Craig transfer makes no mention of Mrs. Craig or that it was a bequest and is on page 4 of 8 pages that reflect payments for office supplies, bus transportation, telephone service and other typical expenses for the District.  *See* OSSOF 134-135.**

400.   The accounts payable vouchers that authorized the checks from MCRSD to the Schoolhouse Foundation were authorized by Sandra Dowling. (Owens Depo., Ex. 13, at 92).

DB04/835989.0002/5045150.1DD02

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

401.    Neither personal **representative** Carol Buczek nor estate attorney James McGreevy authorized the re-issuance of the check from J. Thomas Pappas Schools to the Maricopa County Schoolhouse Foundation. (Buczek Depo., Ex. 61 at 39).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Mr. Frazier testified that the principal of the Tempe Pappas School spoke to Ms. Craig's attorney who authorized the funds be deposited in the Schoolhouse Foundation.  *See* Exhibit 12, Frazier Depo at 131:10-24.**

402.    If something significant came up during Mr. McGreevy's handling of Vivian Craig's estate, Mr. McGreevy would discuss it with Ms. Buczek. If someone had contacted Mr. McGreevy about changing the intended beneficiary of the $89,000 donation, Mr. McGreevy would definitely have spoken with Ms. Buczek about it. No such conversation ever occurred. (Buczek Depo., Ex. 61 at 43-44).

**DISPUTED:  See Plaintiffs' response to DSOF #401.**

403.    Mr. McGreevy told investigators that he did not authorize the $89,000 intended for the Thomas J. Pappas Schools to be redirected to the Schoolhouse Foundation. (Tucker Affidavit, Ex. 18, at ¶ 13).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Lt. Tucker's affidavit is based on inadmissible hearsay and see Plaintiffs' response to DSOF #401.**

404.    Ms. Buczek did not believe that Vivian Craig's wishes were honored, and she believed what was done was wrong. It wouldn't change her mind if the Schoolhouse Foundation was set up to benefit the homeless children in the Pappas Schools because the check was made out to the J. Thomas Pappas Schools, not the Schoolhouse Foundation. (Buczek Depo., Ex. 61 at 49, 69).

**UNDISPUTED this was Ms. Buczek's opinion.**

405.   Ms. Buczek contends that the beneficiary of the donation was the Thomas J. Pappas School, period. Not the foundation. If she had known about the Schoolhouse Foundation, maybe she would have made the check out differently, but she did not. (Buczek Depo., Ex. 61 at 71).

**UNDISPUTED this was Ms. Buczek's testimony.**

406.   On September 22, 2005, Marc Frazier sent a letter to the personal representative of the Vivian Craig estate, Carol Buczek, acknowledging the gift to Thomas J. Pappas Schools. The letter was on "Thomas J. Pappas Schools" letterhead. The letter did not reference the Maricopa County Schoolhouse Foundation. (Frazier Depo., Ex. 6, at 133; 9/22/05 acknowledgement letter, attached as Ex. 72).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

407.   In contrast to the letter sent to Ms. Buczek, Marc Frazier sent acknowledgement letters to other donors of the Maricopa County Schoolhouse Foundation on different letterhead, and referenced the Schoolhouse Foundation. (11/22/2005 acknowledgement letter to Tina Miller-Steinke, attached as Ex. 73).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

408.   The September 22, 2005 letter to Carol Buczek does not mention the Maricopa County Schoolhouse Foundation. (Frazier Depo., Ex. 6, at 134; 9/22/05 acknowledgement letter, Ex. 72).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

409.   On May 26, 2006, Marc Frazier sent a letter to the attorney for the Vivian Craig estate indicating that the monies were placed in the endowment fund for the Maricopa County Schoolhouse Foundation. (Frazier Depo., Ex. 6, at 134; 5/26/06 Thank you letter, attached as Ex. 74).

1    **DISPUTED:  This statement is not cited in the Motion as support for any**
2    **material fact.**

3    410.   Marc Frazier was indicted relating to the transfer of the $89,000 to the
4    Maricopa County Schoolhouse Foundation. He pled guilty to a misdemeanor count of
5    facilitation of misuse of public monies for depositing public monies into a private
6    account. (Frazier Depo., Ex. 6, at 138).

7    **DISPUTED:  This statement is not cited in the Motion as support for any**
8    **material fact.**

9    **IV.     THE PROSECUTION**
10   **The Indictment**

11   411.   Doing a criminal investigation does not necessarily mean there's going to
12   be a criminal prosecution. That's a decision made by a prosecutorial body. (Tucker
13   Depo., Ex. 9, at 24-25).

14   **DISPUTED:  This statement is not cited in the Motion as support for any**
15   **material fact.**

16   412.   As a result of the investigation, Lt. Tucker generated 29 binders of
17   interview transcripts, a general report that filled several binders, and the key report itself
18   filled several binders. The key report covered those elements of the case that Mr. Noyes
19   recommended to MCSO to investigate fully and submit a case to him for consideration
20   of charging. (Tucker Depo., Ex. 9, at 180).

21   **UNDISPUTED that volumes of documents were generated in the**
22   **investigation and that was Lt. Tucker's testimony regarding Mr. Noyes**
23   **involvement, but Mr. Noyes was never deposed.**

24   413.   Dr. Owens provided Mr. Noyes with all of the result of her financial
25   analysis. (Owens Depo., Ex. 13, at 14).

26   **UNDISPUTED that this was Dr. Owens' testimony.  Mr. Noyes was never**
27   **deposed.**

28
91

DB04/835989.0002/5045150.1DD02

414.   In addition to the numerous interviews, investigators gathered thousands of documents through grand jury subpoenas. (Tucker Affidavit, Ex. 18, at ¶ 4)

**UNDISPUTED though Plaintiffs believe documents were also obtained through the Administrative Subpoena and other search warrants.**

415.   Numerous financial and other documents regarding MCRSD were gathered by search warrant, and through the Maricopa County Office of Management and Budget. (Tucker Affidavit, Ex. 18, at ¶ 5).

**UNDISPUTED.**

416.   Lt. Tucker provided transcripts and/or recordings of the witness interviews, as well as voluminous documentary evidence, to prosecutor Ted Noyes for his review. (Tucker Affidavit, Ex. 18, at ¶ 7).

**UNDISPUTED that this was Lt. Tucker's testimony.  Mr. Noyes was never deposed.**

417.   As early as January 2006 Sandra Dowling's criminal attorney, Craig Mehrens, was corresponding with Mr. Noyes about the case, trying to bring his attention to facts that Sandra Dowling believed were important for him to understand before proceeding to a grand jury. (Dowling Depo., Ex. 1, at 74).

**UNDISPUTED.**

418.   Mr. Mehrens tried to convince Mr. Noyes not to go to a grand jury by providing Mr. Noyes with information as to why MCSO screwed up the investigation, as to why MCSO didn't look into certain things; and as to why MCSO didn't consider information that Dowling felt was important to her innocence. (Dowling Depo., Ex. 1, at 140- 14 1).

**UNDISPUTED that Mr. Mehrens believed the MCSO investigation had overlooked clearly exculpatory evidence, which the judge agreed had happened.  *See* OSSOF 63.**

419.   Mr. Mehrens sent Mr. Noyes at least thirteen letters and/or emails

1  between January 30, 2006 and September 19, 2006. (Correspondence between Mehrens

2  and Noyes, attached as Ex. 75).

3  **UNDISPUTED.**

4  420.   In a February 14, 2006 letter, Mr. Mehrens addressed the allegation that

5  the award of the real estate contact to Dan Schwartz realty was improper.

6  (Mehrens/Noyes correspondence, Ex. 75, at 31581-31583).

7  **UNDISPUTED that this letter sets forth a plethora of information showing**

8  **that Dr. Dowling bore no criminal liability for the award of the real estate**

9  **contract to Mr. Dyer:  she was one of 1800 agents who hung her license**

10  **there; she was an independent contractor; she would not share in any**

11  **commission earned by Mr. Dyer if he had sold the property; every year she**

12  **listed her affiliation with Dan Schwartz reality in her financial disclosure**

13  **she had to file with the County; Mr. Dyer had been involved with the**

14  **District in purchasing property before the bid to sell came out.**

15  421.   In a February 17, 2006 letter, Mr. Mehrens addressed the nepotism

16  allegations. (Mehrens/Noyes correspondence, Ex. 75, at 31585-31586).

17  **UNDISPUTED that this letter advises that the nepotism statutes are not**

18  **applicable to Dr. Dowling with regard to the hiring her adult children,**

19  **based on the wording of the statute and Attorney General Opinions.**

20  422.   In letters dated February 27, 2006 and March 2, 2006, Mr. Mehrens

21  addressed the alleged irregularities in the Schoolhouse Foundation and the $89,000

22  check from the Vivian Craig estate. (Mehrens/Noyes correspondence, Ex. 75, at 31588-

23  31589, 3 53 8 9-3 53 60).

24  **UNDISPUTED that this letter advises that Mr. Mehrens was in**

25  **communication with the attorney for Mrs. Craig and that the IRS**

26  **regulations allow solicitations prior to IRS approval of the 501(c)(3)**

27  **corporation.**

28

423.   In a letter dated March 15, 2006, Mr. Mehrens again addressed the issue of nepotism, and argued that the allegations against Sandra Dowling were "made upon misinformation or by disgruntled former employees without accurate and factual information." (Mehrens/Noyes correspondence, Ex. 75, at 35361-35362).

**UNDISPUTED that this letter so advises.  It also reiterates Mr. Mehrens request that the exculpatory evidence he has provided to the Attorney General be given to the Grand Jury should one be convened.**

424.   On September 12, 2006, Mr. Noyes responded to eleven letters from Mr. Mehrens. Mr. Noyes indicated that if Sandra Dowling was indicted, she would be served by Summons at Mr. Mehrens' office. Mr. Noyes further indicated that he had reviewed and considered Ms. Dowling's response to the internal audit, as well as the material provided in Mr. Mehrens' correspondence. (Mehrens/Noyes correspondence, Ex. 75, at 31664-31665).

**UNDISPUTED that this letter so advises and that it also indicates the Mr. Noyes now agreed that Dr. Dowling was exempt from one of the nepotism statutes and that no facts existed to charge her under the other statute.**

425.   Mr. Mehrens responded to Mr. Noyes on September 18, 2006 and explained why he believed that Sandra Dowling was not subject to the provisions of A.R.S. § 38-501, et. seq., the conflict of interest statutes. (Mehrens/Noyes correspondence, Ex. 75, at 31667-31668).

**UNDISPUTED that the letter advises that Dr. Dowling was not subject to A.R.S. § 38-501 *et. seq*., because the MCRSD was not a political subdivision and more importantly because a 'remote interest' in a contract does not trigger the disclosure requirements and by statute, a school board member who is involved in the award of a contract to a non-dependent child is deemed to have only a 'remote interest' in that contract.   A.R.S. § 38-502(11).**

426.    Also, on March 18, 2006, Joseph Brownlee, attorney for John Dyer, sent Mr. Noyes a letter regarding the propriety of the contract award to Dan Schwartz Realty. (Letter to Noyes from Joseph Brownlee, attached as Ex. 76).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

427.    Lt. Tucker did not specify recommended charges to Mr. Noyes. (Tucker Depo., Ex. 9, at 181).

**DISPUTED:  Plaintiffs dispute this DSOF on the grounds that Lt. Tucker prepared Issue Summaries and in those he recommended charges against Dr. Dowling and others.  *See* OSSOF 140.**

428.    There were discussions with Mr. Noyes about what type of violation a specific act might fall under and MCSO detectives would research those issues, with Mr. Noyes assistance, to determine whether it met the type of crime Mr. Noyes identified. (Tucker Depo., Ex. 9, at 181).

**DISPUTED:  See Plaintiffs' response to DSOF #427.  Mr. Noyes was not deposed in this case.**

429.    The final report might have included a summary statement indicating what charges were legally appropriate but the final decision rested with Mr. Noyes. (Tucker Depo., Ex. 9, at 184).

**DISPUTED:  See Plaintiffs' response to DSOF #427.**

430.    The charging decisions were made by Ted Noyes and the grand jury. (Tucker Depo., Ex. 9, at 95; Owens Depo., Ex. 13 at 100).

**DISPUTED:  See Plaintiffs' response to DSOF #427.  Judge Burke found that the MCSO knew "clearly exculpatory evidence" that it failed to reveal to the Grand Jury and remanded Counts 1-10 and Counts 22-23.  Mr. Noyes was never deposed in this case.**

431.    Ted Noyes presented the case to the grand jury. (Tucker Depo., Ex. 9, at

95

1 | 189).

2 | **UNDISPUTED.**

3 | 432.   Mr. Noyes formed the questions before the grand jury. Mr. Noyes decided
4 | what information would be presented to the grand jury. It wasn't Lt. Tucker's
5 | prerogative to decide whether it was enough or not; he relied on the expertise of Mr.
6 | Noyes who is a former Superior Court judge, and former appellate court judge. (Tucker
7 | Depo., Ex. 9, at 200).

8 | **DISPUTED:  See Plaintiffs' response to DSOF #430.**

9 | 433.   Ted Noyes met with Lt. Tucker and Dr. Owens and decided that they
10 | would be the witnesses to present the case to the grand jury. Mr. Noyes wanted Dr.
11 | Owens to testify about the indirect cost fund transfers and Lt. Tucker to testify about
12 | everything else. (Owens Depo., Ex. 9, at 70).

13 | **UNDISPUTED that this was Dr. Owens' testimony; Mr. Noyes was not**
14 | **deposed in this case.**

15 | 434.   Dr. Owens did not outline anything or give anything to Mr. Noyes
16 | regarding what should be presented to the grand jury. (Owens Depo., Ex. 13, at 192).

17 | **DISPUTED:  See Plaintiffs' response to DSOF #427.**

18 | 435.   Lt. Tucker and Dr. Beverly Owens testified before the grand jury. Lt.
19 | Tucker testified more to the substance of the witness interviews and Dr. Owens testified
20 | about her examination of financial records. (Tucker Depo., Ex. 9, at 96, 189).

21 | **DISPUTED:  This statement is not cited in the Motion as support for any**
22 | **material fact.**

23 | 436.   Mr. Noyes included charges in the indictment that MCSO had not even
24 | contemplated. (Owens Depo., Ex. 13, at 194).

25 | **DISPUTED:  See Plaintiffs' response to DSOF #427.**

26 | 437.   MCSO did the investigation and relayed their findings to Mr. Noyes. Mr.
27 | Noyes fashioned the charges. (Owens Depo., Ex. 13, at 202).

28 |

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

438.    On November 16, 2006, Sandra Dowling was indicted on 25 felony counts in CR2006-012508. (Indictment, attached as Ex. 77).

**UNDISPUTED.**

439.    The charges contained in the Indictment were as follows:

- Count 1: Theft under A.R.S. §§ 13-1801 and 13-1802 for unlawful transfers totaling $1,859,000 from the indirect cost fund to MCRSD.

- Counts 2 -10: Misuse of public monies under A.R.S. §§ 35-30 1 and 35- 302 for each individual transfer of public money from the indirect cost fund to MCRSD listed below.

| Count | Date | Amount |
|-------|------|--------|
| 2 | October 2001 | $87,000 |
| 3 | March 2002 | $175,000 |
| 4 | June 2002 | $85,000 |
| 5 | November 2002 | $212,000 |
| 6 | May 2003 | $210,000 |
| 7 | October 2003 | $50,000 |
| 8 | January 2004 | $225,000 |
| 9 | April 2004 | $475,000 |
| 10 | June 2005 | $340,000 |

- Count 11: Procurement Code Fraud under A.R.S. §§ 41-26 16, 15- 213, and 15-10 1 by awarding a contract for services to Strategic Impact for $9000 a month after avoiding the requirements of the procurement code pursuant to a scheme or artifice.

- Count 12: Conflict of Interest under A.R.S. §§ 38-504(C), 38-502, and 38-5 10 by awarding a contract for services to

97

Strategic Impact for $9000 a month for the purpose of serving her own interests in obtaining an appointment in the Bush Administration.

- Count 13: Conflict of Interest under A.R.S. §§ 38-504(C), 38-502, and 38-5 10 by extending for a second year a contract for services to Strategic Impact for $9000 a month for the purpose of serving her own interests in obtaining an appointment in the Administration of whoever won the 2004 Presidential election.

- Count 14: Conflict of Interest under A.R.S. §§ 38-503(A), 38-502, 38-508, and 38-5 10 by awarding a contract for services to Strategic Impact for $9000 a month and failing to make known in the official records of MCRSD that she had a substantial interest in the contract, to wit: using the lobbying services to further her interests in obtaining an appointment in the Bush Administration.

- Count 15: Conflict of Interest under A.R.S. §§ 38-503(A), 38-502, 38-508, and 38-5 10 by extending for a second year a contract for services to Strategic Impact for $9000 a month and failing to make known in the official records of MCRSD that she had a substantial interest in the contract, to wit: using the lobbying services to further her interests in obtaining an appointment in the Administration of whoever won the 2004 Presidential election.

- Count 16: Violation of Prohibition of Acquisition of Certain Interests by Public Officers under A.R.S. § 3 8-447 by making or being interested in, making, and engaging in the contract described in Count 11 when it was prohibited by the procurement code (A.R.S. § 41-2616).

- Count 17: Violation of Prohibition of Acquisition of

98

Certain Interests by Public Officers under A.R.S. § 3 8-447 by making or being interested in, making, and engaging in the contract described in Count 12 when it was prohibited by the procurement code (A.R.S. § 41-2616).

- Count 18: Violation of Prohibition of Acquisition of Certain Interests by Public Officers under A.R.S. § 3 8-447 by sitting as the MCRSD Governing Board and being interested in, making, and engaging in the contract described in Count 13 when it was prohibited by conflict of interest laws (A.R.S. § 3 8-504).

- Count 19: Procurement Code Fraud under A.R.S. §§ 41-2616, and 15-213 by sitting as MCRSD Governing Board and awarding a real estate contract to Dan Schwartz Realty and John Dyer, authorizing them to sell MCRSD property, when they submitted the sole bid, which was marginal, and when she was also a licensed real estate salesperson whose employing broker was Dan Schwartz Realty.

- Count 20: Conflict of Interest under A.R.S. §§ 38-503(A), 38-502, 38-508, and 38-510 by sitting as MCRSD Governing Board while having a substantial interest in the contract awarded to Dan Schwartz Realty and John Dyer and knowingly failing to make it known in the official records of MCRSD.

- Count 21: Violation of Prohibition of Acquisition of Certain Interests by Public Officers under A.R.S. § 3 8-447 by sitting as the MCRSD Governing Board and being interested in, making, and engaging in the contract described in Counts 19 and 20 when it was prohibited by conflict of interest laws (A.R.S. § 3 8-504) and the procurement code (A.R.S. § 41-26 16).

- Count 22: Procurement Code Fraud under A.R.S. §§ 41-2616,

15- 213, and 15-10 1 by awarding a landscaping maintenance contract for Williams Community School to her son, Dennis Dowling, as part of a scheme or artifice to avoid the requirements of the procurement code.

- Count 23: Procurement Code Fraud under A.R.S. §§ 41-2616, 15- 213, and 15-10 1 by awarding a landscaping maintenance contract for Thomas J. Pappas Phoenix and the District campus to her son, Dennis Dowling, as part of a scheme or artifice to avoid the requirements of the procurement code.

- Count 26: Misuse of Public Monies under A.R.S. §§ 35-301 and 35- 302 by sitting as the MCRSD Governing Board and directing $74,300 of public money to a private foundation to pay the salary of Marc Frazier.

- Count 27: Theft under A.R.S. §§ 13-1801 and 13-1802 by converting for an unauthorized use a donation of $89,000, which was intended for the Pappas School, by transferring the donation to a private foundation.

**UNDISPUTED.**

440.   After Sandra Dowling was indicted, a Summons was served on her attorney Craig Mehrens, commanding her appear before the court and answer the Indictment. The Summons further indicated that before the arraignment, she was required to be photographed and fingerprinted at the Records and Identification Division of the MCSO, located at 201 W. Jefferson in the Maricopa County Superior Court courthouse. (Summons and Officer's Return, attached as Ex. 78).

**UNDISPUTED.**

**B.     The Course of the Prosecution**

441.   The County Attorney's Office was not involved in the prosecution because its civil division had provided counsel to Sandra Dowling in her role as the Superintendent of Schools and there was a conflict. (Tucker Depo., Ex. 9, at 19; Owens

100

1   Depo., Ex. 13, at 160).

2       **DISPUTED:  This statement is not cited in the Motion as support for any**

3       **material fact.**

4       442.   After the indictment, Sandra Dowling was not physically apprehended,

5   placed in handcuffs, and booked into a facility as most people would consider an arrest

6   to be. (Tucker Depo., Ex. 9, at 177).

7       **DISPUTED:  This statement is not cited in the Motion as support for any**

8       **material fact.**

9       443.   Counts 1-10 and 22 and 23 against Sandra Dowling were remanded on

10  May 4, 2007. (Under Advisement Ruling in CR2006-0 12508, attached as Ex. 79).

11      **UNDISPUTED that Counts 1-10 were remanded because the court found**

12      **that the MCSO failed to present clearly exculpatory evidence to the Grand**

13      **Jury and that Counts 22-23 were remanded for its failure to tell the Grand**

14      **Jury about the confrontation call between Mr. Lopez and Dennis Dowling.**

15      ***See* OSSOF 63.**

16      444.   After October 2006, detectives were not actively conducting an

17  investigation. But if information came to light, or someone called and wanted to discuss

18  the issue, Lt. Tucker would follow up on it. Certainly if there was something Lt. Tucker

19  deemed important, it needed to be documented, and if there was exculpatory

20  information discovered it needed to be recorded. (Tucker Depo., Ex. 9, at 103).

21      **DISPUTED:  This statement is not cited in the Motion as support for any**

22      **material fact.**

23      445.   Although the investigation was closed in October 2006, after some of the

24  counts were remanded, Ted Noyes asked Lt. Tucker to conduct some follow-up

25  activities. One of the activities, unrelated to Sandra Dowling, involved identifying the

26  details regarding a traffic citation issued to Sandra Dowling's son. (Tucker Depo., Ex.

27  9, at 55, 57, 58).

28

DB04/835989.0002/5045150.1DD02

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

446.   Another follow-up activity involved asking other Superintendent of Schools offices and budget offices throughout the state about their use of indirect cost funds. Lt. Tucker had suggested to Mr. Noyes that they do this inquiry before the indictment, but Mr. Noyes didn't believe it was necessary because there was documentation from the County that all funds that were revenues coming into Maricopa County should be managed through the County's administrative offices, such as the Board of Supervisors, Finance and OMB. Because Sandra Dowling's criminal defense attorney argued that there were different practices in other counties, Mr. Noyes tasked Lt. Tucker to find out if that were true. (Tucker Depo., Ex. 9, at 6 1-63).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

447.   Lt. Tucker provided Mr. Noyes with copies of the transcripts of the interviews of the individuals from other counties that he interviewed regarding the use of indirect cost funds. (Tucker Depo., Ex. 9, at 226).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

448.   Prosecutor Noyes also kept Lt. Tucker informed about the status of the prosecution. (Noyes/Tucker emails, Ex. 19, at 31321-31322, 30979, 31366, 31390-31392, and 31412-31413).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

449.   Mr. Noyes informed Lt. Tucker when one of the defendants was sentenced in February 2007. (Noyes/Tucker emails, Ex. 19, at 31321).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

DB04/835989.0002/5045150.1DD02

450**.**   Mr. Noyes asked Lt. Tucker to set up a meeting with Carol "Kit" Wood. (Noyes/Tucker emails, Ex. 19, at 31322).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

451.   Mr. Noyes asked Lt. Tucker to locate documents requested by Sandra Dowling's attorney. (Noyes/Tucker emails, Ex. 19, at 30979).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

452.   Mr. Noyes copied Lt. Tucker on an email between the criminal attorneys and the criminal judge wherein they discussed setting a January 22, 2008 start date for trial. (Noyes/Tucker emails, Ex. 19, at 31366).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

453.   Mr. Noyes also provided Lt. Tucker with copies of the grand jury transcripts and Sandra Dowling's Motion to Remand and reassured him that the motion contained many misstatements and it was merely partisan advocacy. (Noyes/Tucker emails, Ex. 19, at 31390-31392; 31412-31413).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

454.   Although the Attorney General's Office was the original prosecuting agency, the handling of the prosecution changes to the U.S. Attorney's Office because of a conflict with the Attorney General. (Tucker Depo., Ex. 9, at 104-105; Owens Depo., Ex. 13, at 160).

**UNDISPUTED that the prosecution was moved when Sheriff Arpaio began a criminal investigation of Attorney General Terry Goddard.  *See* Tucker Depo., Defendants' Ex. 9, at 104-105.**

455.   In June 2007, the case was transferred to the U.S. Attorney's Office for

103

prosecution. (Dowling Transfer Memo to Howard Sukenic, attached as Ex. 80).

**UNDISPUTED.**

456.   At the time of the transfer, prosecutor Ted Noyes and Sandra Dowling's attorney, Craig Mehrens, had agreed that each side would file a Petition for Special Action in the Court of Appeals on Monday June 18, 2007 challenging the ruling remanding some of the charges against Sandra Dowling. (Transfer Memo, Ex. 80).

**UNDISPUTED but no Petitions for Special Action were filed.**

457.   The transfer memo informed the U.S. Attorney's Office that MCSO had interviewed about 160 witnesses and that the transcripts of those interviews were in the file. Mr. Noyes was also transferring six boxes of documents. (Transfer Memo, Ex. 80).

**UNDISPUTED:  The transfer memo also indicates that Mr. Noyes had far less than that on his computer.**

458.   Lt. Tucker attended only one hearing during the course of the prosecution that occurred soon after the U.S. Attorney's Office was appointed on the case. The hearing was to discuss the change from the Attorney General to the U.S. Attorney's Office as the prosecutorial body. (Tucker Depo., Ex. 9, at 104).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

459.   Lt. Tucker met with prosecutor Mark Brnovich at a coffee shop to discuss the U.S. Attorney's proposed resolution of the case. Lt. Tucker was not pleased with the plea proposed by the U.S. Attorney's Office. He felt that the charges were significant and should be presented to a jury. Mr. Brnovich's explanation for the proposed resolution was related to jury appeal and the Pappas school children. (Tucker Depo., Ex. 9, at 106-108, 166).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

460.   Lt. Tucker didn't probe Mr. Brnovich further regarding the reasons for the

104

1   proposed resolution because that wasn't his place. It was Lt. Tucker's place to submit a

2   case to a prosecutor for review. (Tucker Depo., Ex. 9, at 166).

3   **DISPUTED:  This statement is not cited in the Motion as support for any**

4   **material fact.**

5   461.   Dr. Owens and Lt. Tucker met with attorneys from the U.S. Attorney's

6   Office to go over the issues in the indictment and make sure the documents that were

7   provided to them were the same documents MCSO provided to the Attorney General's

8   Office to make sure nothing was lost. (Owens Depo., Ex. 13, at 16 1-162).

9   **DISPUTED:  This statement is not cited in the Motion as support for any**

10   **material fact.**

11   462.   Dr. Owens met with attorneys from the U.S. Attorney's Office on two

12   occasions. (Owens Depo., Ex. 13, at 163).

13   **DISPUTED:  This statement is not cited in the Motion as support for any**

14   **material fact.**

15   463.   During one of the meetings, the attorneys from the U.S. Attorney's Office

16   talked about being uncomfortable with going to state court because federal court has

17   different rules and that it was a little bit harder for them to prosecute in state court. They

18   also mentioned that their ability to successfully prosecute was very important because

19   that was part of how their performance was evaluated. (Owens Depo., Ex. 13, at 162-

20   163, 164).

21   **DISPUTED:  This statement is not cited in the Motion as support for any**

22   **material fact.**

23   464.   In the second meeting, one of the attorneys from the U.S. Attorney's

24   Office said that the case wasn't sexy enough, and that because the investigation didn't

25   show that Dr. Dowling had personal gain, the case didn't have jury appeal. (Owens

26   Depo., Ex. 13, at 166).

27

28

DB04/835989.0002/5045150.1DD02

1
2

**DISPUTED:   This statement is not cited in the Motion as support for any material fact.**

3
4
5

465.   Lt. Tucker also attended the meeting with Mr. Brnovich and Chief Hendershott at the U.S. Attorney's Office. There were at least two other members of the U.S. Attorney's Office present. (Tucker Depo., Ex. 9, at 169-170).

6
7

**DISPUTED:   This statement is not cited in the Motion as support for any material fact.**

8
9
10
11

466.   It was a very short meeting wherein the attorneys from the U.S. Attorney's Office complimented Lt. Tucker's work, and expressed their decision as to how they were going to resolve the case. The meeting was over very quickly. (Tucker Depo., Ex. 9, at 170- 17 1).

12
13

**DISPUTED:   This statement is not cited in the Motion as support for any material fact.**

14
15
16

467.   As part of the plea agreement, Sandra Dowling agreed to plead guilty to an offense in return for the dismissal of certain charges. It was a compromise agreement. (Dowling Depo., Ex. 1, at 184).

17
18

**DISPUTED:   This statement is not cited in the Motion as support for any material fact.**

19
20

468.   On July 11, 2008, Sandra Dowling signed a plea agreement. (Plea Agreement in CR2008-007 162, attached as Ex. 81).

21
22

**UNDISPUTED that Dr. Dowling signed a plea agreement in the misdemeanor case, CR2008-007162.  *See* OSSOF 67.**

23
24

469.   The plea agreement provides that Sandra Dowling agrees to plead guilty to Employment of a Relative, a class 2 misdemeanor. (Plea agreement, Ex. 81).

25
26
27

**UNDISPUTED and Dr. Dowling had to waive the statute of limitations to allow the State to charge her with that misdemeanor.  *See* OSSOF 67 and Exhibit 50, Mehrens Declaration, at ¶ 8.**

28

106

470.   The plea agreement further provides that, "At the time of sentencing, Counts 1-10 that were previously dismissed on August 20, 2007, and the remaining Counts in CR2006-0 12508 (Counts 11-23 and 26-27) will be dismissed with prejudice." It also states, "All counts for which the Defendant is charged in CR2006-0 12508 will be dismissed with prejudice at the time of sentencing." (Plea agreement, Ex. 81, at ¶¶ 2(d), 3).

**UNDISPUTED and the agreement also provides that it does not "in any way compromise or abrogate any civil actions, …"** *See* **Plea agreement, Defendants' Ex. 81, at ¶ 9.**

471.   Notably, the plea agreement further states, "If the plea is rejected by the court or withdrawn by either party, or if the conviction is subsequently reversed, the original charges and any charges that are dismissed by reason of this plea agreement are automatically reinstated." (Plea agreement, Ex. 8, at ¶ 4).

**UNDISPUTED and see Plaintiffs' response to DSOF #470.**

472.   On August 26, 2008, Sandra Dowling was sentenced and, pursuant to the plea agreement, the charges in CR2006-0 12508 were dismissed with prejudice. (Sentencing minute entry in CR2008-007 162, attached as Ex. 82).

**DISPUTED:   This statement is not cited in the Motion as support for any material fact.**

473.   Lt. Tucker did not attend the plea agreement proceedings or the sentencing hearing. (Tucker Affidavit, Ex. 18, ¶ 8).

**DISPUTED:   This statement is not cited in the Motion as support for any material fact.**

## V.   DISCOVERY

474.   Sandra Dowling believes that Sheriff Arpaio retaliated against her and agreed to criminally investigate her for three reasons: in retaliation for their disagreement about Hard Knocks High; because Sheriff Arpaio was promised no fights from the Board of Supervisors over his budget; and because of his relationship with Ben

DB04/835989.0002/5045150.1DD02

Arredondo. (Plaintiff's First Supplemental Response to Arpaio Defendants' First Set of Non-Uniform Interrogatories to Sandra Dowling ("Answers to NUIs"), attached as Ex. 83, at 4-6).

**UNDISPUTED.**

475.    Sandra Dowling believes that Sheriff Arpaio was envious of the national publicity that she and her programs received. (Answers to NUIs, Ex. 83, at 7).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

476.    Sandra Dowling claims Sheriff Arpaio violated her rights under the privileges and immunities clause. She claims she was denied her fundamental right to practice her profession and earn a living in her chosen field due to the criminal investigation, and public accusations of misuse of public funds. She claims that her professional reputation was tainted, making it impossible for her to secure employment in her field. She also claims that these actions denied her right to enjoyment of life and liberty. (Answers to NUIs, Ex. 83, at 15).

**UNDISPUTED.**

477.    Sandra Dowling claims that her equal protection rights were violated because the allegations against her were not reviewed by the State Board of Education. She claims that other superintendents of school districts received a hearing before the State Board of Education before they were placed into receivership. She further claims that there was no rational basis on which to launch a criminal investigation of her rather than apply the statutory process under A.R.S. § 15-103. (Answers to NUIs, Ex. 83, at 16).

**DISPUTED:  This statement is not cited in the Motion as support for any material fact.**

DB04/835989.0002/5045150.1DD02

RESPECTFULLY SUBMITTED this 11th day of October, 2011.

STINSON MORRISON HECKER LLP

By:   s/ Michael C. Manning
      Michael C. Manning
      Larry J. Wulkan
      1850 North Central Avenue, Suite 2100
      Phoenix, Arizona 85004-4584
      Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of October, 2011, I caused the foregoing document to be filed electronically with the Clerk of Court through ECF; and that ECF will send an e-notice of the electronic filing to:

The following ECF participants:

Jorge Franco, Jr.
Larry J. Crown
JENNINGS, HAUG & CUNNINGHAM, LLP
*Attorneys for Maricopa County Board of Supervisors
 and Maricopa County*

Lisa S. Wahlin
GRAIF, BARRETT & MATURA, P.C.
*Attorneys for Joseph and Ava Arpaio*

By:   s/ Kathleen Kaupke

109