Michael C. Manning (#016255)
Larry J. Wulkan (#021404)
**STINSON MORRISON HECKER LLP**
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
Email: mmanning@stinson.com
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Sandra Dowling and Dennis Dowling, husband and wife,<br><br>Plaintiffs,<br><br>v.<br><br>Sheriff Joseph Arpaio and Ava Arpaio, husband and wife; Maricopa County Board of Supervisors; Maricopa County, a Municipal entity; et al.,<br><br>Defendants. | No. CV 09-1401-PHX-JAT<br><br>**PLAINTIFFS' OMNIBUS STATEMENT OF FACTS IN SUPPORT OF THEIR OPPOSITION TO DEFENDANTS MARICOPA COUNTY BOARD OF SUPERVISORS AND MARICOPA COUNTY'S MOTION FOR SUMMARY JUDGMENT AND ARPAIO DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT**<br><br>(Oral Argument Requested) |

PURSUANT TO Local Rule of Civil Procedure 56, Plaintiffs, Sandra Dowling and Dennis Dowling (collectively "Plaintiffs"), through their undersigned counsel, submit this Omnibus Statement of Facts in Support of their Responses in Opposition to Defendants Maricopa County Board of Supervisors and Maricopa County's Second Motion for Summary Judgment and Arpaio Defendants' Motion for Summary Judgment ("SOF")

## PLAINTIFFS' SUPPLEMENTAL STATEMENT OF FACTS

1. "It's gonna, a screeching halt (sic), exactly and so Sandra's gonna (sic) need to come begging to the Board to bail her out and that's what we really want to have happen… We want Sandra to come begging on her hands and knees, please,

please, please help me out."[1]  *See* MCSO interview of Brian Hushek dated January 6, 2008 ("Hushek interview 1"), at p. 75-76, attached hereto as **Exhibit 1**.

2.       "She knows that she is not liked on the 10th floor and, I think it's mutual. I mean she doesn't like the Board and the Board doesn't like her, …" [2]  *See* **Exhibit 1**, Hushek interview 1 at p. 34.

3.       Chairman Stapley believed some potentially criminal activities have already been uncovered through the investigations and advised, 'We need to get a good criminal lawyer involved with the sheriff's investigation and the audit.'"[3]   *See* Executive Session meeting minutes dated January 17, 2006, at ESM00015, filed separately under seal as **Exhibit 2**.

4.       "Sandra Dowling knowingly put herself as the sole authority over large sums of public and private money and proceeded to misuse that money for her personal and professional gain, Arpaio said.  She was supposed to help homeless and troubled children.  Instead she was helping herself."[4]  *See* News Release dated November 20, 2006, at p. 2, attached hereto as **Exhibit 3**.

5.       "There is no restitution issue in this case that I'm aware of, not a dime disappeared, nothing was taken from the school district."[5]  *See* Reporter's Transcript of Proceedings (Sentencing) dated August 26, 2008 ("Reporter's Transcript August 26, 2008"), at p. 47:9-11, attached hereto as **Exhibit 4**.

---

[1]  Brian Hushek, County Office of Management and Budget and County Complainant in the criminal investigation, as told to the MCSO investigators in the ***first*** interview conducted in the Dowling criminal investigation.

[2]  Brian Hushek as told to the MCSO investigators.

[3]  E-session minutes, January 17, 2006 – less than six days after the investigation began.

[4]  Sheriff Arpaio quoted in a joint news release by the Maricopa County Sheriff's Office and the Office of the Attorney General, dated November 20, 2006.

[5]  Judge Edward Burke, Sentencing Hearing, *State of Arizona v. Dowling*, CR 2008-007162.

6.     "In order to avoid any ambiguity in this sentencing, which I've done before, the Court of Appeal's has told me, all counts which the defendant has been charged with in this case, 2006-012508, are and have been dismissed with prejudice."[6] *See* **Exhibit 4,** Reporter's Transcript August 26, 2008, at p. 50:14-18.

7.     The citizens of the County learned that their Sheriff "used the power of his office to target political opponents…"   *See* Ruling by Hon. John Leonardo dated February 24, 2010, at p. 5, attached hereto as **Exhibit 5**.

8.     County management learned that the Sheriff  has kept a set of shadow books for eight years, misusing and/or misspending nearly $100 million.  *See* Donald Stapley deposition dated May 12, 2011 ("Stapley deposition"), at 36:1-37:6, filed separately under seal as **Exhibit 6**.

9.     Dr. Dowling was, by statute, the sole governing board member of the Accommodation District also known as the MCRSD.   *See* A.R.S. § 15-101(11), attached hereto as **Exhibits 7;** A.R.S. § 15-308, attached hereto as **Exhibit 8**; Declaration of Sandra Dowling dated October 6, 2010 ("Dowling Declaration 1"), at ¶ 8, attached hereto as **Exhibit 9.**

10.     Dr. Dowling was the duly elected County Superintendant of Schools.  *See* **Exhibit 9**, Dowling Declaration 1 at ¶ 2.

11.     By 2006, the MCRSD contained 12 schools which included 800 students attending three campuses that made up the Thomas J. Pappas Schools for Homeless Children.  See **Exhibit 9**, Dowling Declaration 1 at ¶ 4.

12.     As an accommodation district, the MCRSD differs from other school districts in two significant ways:  it is county-wide, so that its buses cover far more territory than other districts, at far greater cost; and it is unable to levy a property tax,

---

[6] *Id.*

DB04/835989.0002/5045404.1DD02

creating a chronic imbalance between its revenue sources and its expenditures.  *See* **Exhibit 9**, Dowling Declaration 1 at ¶ 11; Department of Education, V. Salazar letter dated November 14, 2005 ("Salazar letter"), attached hereto as **Exhibit 10**; Ariz. Op. Atty. Gen. No. I98-006, attached hereto as **Exhibit 11**.

13.     For many years, the County and/or the Board's failure to fully fund the MCRSD caused a significant deficit.  See **Exhibit 9**, Dowling Declaration 1 at ¶ 12; **Exhibit 1,** Hushek interview 1 at p. 30, 42-43, 73-74, 79, 93-95.

14.     MCRSD's account had been set up over 30 years before Dr. Dowling took office, and was similar to those of other school districts that had taxing authority and thus could generate revenue to cover any deficit situation.  **Exhibit 1,** Hushek interview 1 at p. 42-43, 73-74.

15.     In every year in which a cash deficit occurred in the District, the County Treasurer would pay the deficit with County funds and report its actions to the Board. *See* **Exhibit 9**, Dowling Declaration 1 at ¶ 12; **Exhibit 1**, Hushek interview 1 at p. 30, 42-43, 73-74, 79, 93-95.

16.     This practice went on with the knowledge and acquiesence of all involved from at least 1999 until August 2005.  *See Id.*

17.     The District underwent a mandatory annual audit, which reflected its deficit.  These audits are public documents that were provided to the OMB and County Finance Department.   See Marc Frazier deposition dated June 1, 2011 ("Frazier deposition"), at 165-166, attached hereto as **Exhibit 12**.

18.     In 2005, Dr. Dowling's Deputy Superintendant of Schools and liaison to the Board, Ben Arredondo, approached the County to discuss resolving the District's approximately $3.2 million deficit.  *See* **Exhibit 1,** Hushek interview 1 at p. 3-4, 6-7.

4

19.     The Board professed surprise at the existence of the deficit, though it had been reported annually by the Treasurer and the independent auditor.[7]   *See* Brian Hushek deposition dated November 23, 2010 ("Hushek deposition"), at 35:4–36:11, 45:20-46:13, 52:23–53:19, attached hereto as **Exhibit 13**.

20.     In June 2005, Dr. Dowling asked the Maricopa County Attorney for an opinion on whether and to what extent the County and/or the Board had a duty to fund the MCRSD.   *See* **Exhibit 9**, Dowling Declaration 1 at ¶ 13; S. Dowling letter dated June 5, 2006, attached hereto as **Exhibit 14**.

21.     He concluded the Board had such a duty.   *See* **Exhibit 9**, Dowling Declaration 1 at ¶ 14.

22.     Hoping for a different answer, the Board then asked the State Superintendent of Public Instruction for a financial analysis of the issue.   *See* M. Wilson letter dated October 19, 2005, attached hereto as **Exhibit 15**.

23.     His conclusion was even more unsatisfactory to the Board:  the cause of the chronic deficits of the MCRSD were the higher than normal school bus costs and the District's inability to levy taxes.   *See* **Exhibit 10**, Salazar letter.

24.     He also determined that the County and/or the Board had failed to pay the MCRSD's deficits of approximately $3.5 million over an approximate seven year period.   *See* **Exhibit 10**, Salazar letter.

25.     Not long after this, the Board ordered County Auditor to review the financial condition of the District.   *See* **Exhibit 13**, Hushek deposition at 90:24–92:10; Mary Rose Wilcox deposition dated April 21, 2011 ("Wilcox deposition"), at 79:9–80:4, filed separately under seal as **Exhibit 16**.

---

[7] Tellingly, the Sheriff never interviewed County Treasurer, David Schweikert during the investigation, who would have testified to this.

DB04/835989.0002/5045404.1DD02

26.     Dr. Dowling retained counsel to represent the District in this audit, who then attempted to work with County counsel in fashioning the parameters by which the auditors would be given access to the requested documents.  *See* D. Cantelme letter dated December 21, 2005, attached hereto as **Exhibit 17.**

27.     The Board, unhappy with Dr. Dowling's insistence on protocol and unwilling to allow the attorneys to sort out the issue, issued an Administrative Subpoena for the District's documents on January 10, 2006.  *See* D. Cantelme letter dated January 10, 2006 and M. King letter dated January 11, 2006, attached hereto collectively as **Exhibit 18**; Subpoena Duces Tecum dated January 10, 2006, attached hereto as **Exhibit 19.**

28.     The subpoena was issued after Supervisor Stapley had a 15 minute telephone conversation with Dr. Dowling in which he screamed and swore at her, threatening that he would make sure she never held public office again and that she needed to come to the Board, "begging on her hands and knees" for their help— language nearly identical to that used by Brian Hushek to tell MCSO what the Board "really wanted."  *See* **Exhibit 1**, Hushek Interview 1 at p. 75-76; Sandra Dowling deposition dated August 16, 2010 ("Dowling deposition"), at 385:7–387:5, 416:21–417:10, 428:2-13, attached hereto as **Exhibit 20**; Declaration of Sandra Dowling dated October 11, 2011 ("Dowling Declaration 2"), at ¶ 2, attached hereto as **Exhibit 21.**

29.     By this time, the Board decided to wage war on Dr. Dowling.  Mark Frazier, Director of Finance for the District, devised a plan to pay down the deficit over three years.  When he took the plan to County management, he was told that the Board was upset and angry at Dr. Dowling and was not interested in resolving the deficit; instead there was going to be some "heck to pay."  *See* **Exhibit 12,** Frazier deposition at 182:12-183:14, 186:16-187:22.

6

DB04/835989.0002/5045404.1DD02

30.     Not long after that meeting, Frazier met with Chairman Stapley, who promised them that if Dr. Dowling would step aside he would help fund the Pappas Schools.  *See* **Exhibit 12,** Frazier deposition at 196:24–199:12.

31.     The day after the Board issued its subpoena, and in response to her political opposition, it directed MCSO to investigate Dr. Dowling for criminal wrongdoing.   *See* Bruce Tucker deposition dated December 1, 2010 ("Tucker deposition), at 117:10-12, 118:3-5, 250:17 – 251:2, attached hereto as **Exhibit 22**; Arizona Republic article dated January 27, 2006 ("Ariz. Rep. article January 27, 2006), attached hereto as **Exhibit 23**; Kim Seagraves deposition dated May 11, 2011 ("Seagraves deposition") at 58:3-25, 54:17-22, attached hereto as **Exhibit 26**.

32.     The Board knew there were no real suspicions of criminal conduct.  *See* **Exhibit 6**, Stapley deposition at 121:25–122:20; **Exhibit 16**, Wilcox deposition at 49:6-13.

33.     Sheriff Arpaio assigned 35-40 of his "best detectives" to the investigation, delegated full control and authority of the investigation to his Chief Deputy, David Hendershott, and assigned him to act as liaison to the Board.  *See* **Exhibit 23**, Ariz. Rep. article January 27, 2006; **Exhibit 6**, Stapley deposition at 17:16-18:2; Joseph Arpaio deposition dated June 8, 2011, at 67:18-68:20, attached hereto as **Exhibit 24**.

34.     Hendershott met personally and individually with Board members to report on its progress throughout the investigation.  *See* **Exhibit 6,** Stapley deposition at 90:2-15, 105:22–107:20.

35.     The unit that conducted the investigation of Dr. Dowling was the unit that would soon be called the MACE unit which ineptly but zealously – and always unsuccessfully – investigated and charged the alleged political corruption cases involving Arpaio's political enemies.  *See* David Hendershott deposition dated March 1,

2011 ("Hendershott deposition"), at 74:17–75:5, attached hereto as **Exhibit 25, Exhibit 26,** Seagraves deposition  at 17:17–18:10, 36:6-25.

36.     The pattern and practice of this unit was to "conduct politically motivated investigations at the implicit direction of Hendershott."  *See* F. Munnell Memorandum dated August 17, 2010, at p. 29, attached hereto as **Exhibit 27**.

37.     Despite having no evidence of criminal behavior on Dr. Dowling's part, within hours of meeting with the Board and receiving his orders, Hendershott held the first meeting of the "Task Force."  *See* **Exhibit 26,** Seagraves deposition at 65:2-22.; B. Tucker Supplement re Initial advisement of investigation and response ("Tucker Report"), attached hereto as **Exhibit 78**.

38.     From the first interview conducted in the investigation—done just hours after the initial meeting of the group—it was clear that the "investigators" were not objectively fact-finding, but were seeking any support for any conceivable criminal charges.  Brian Hushek, the ***first*** person interviewed, was clearly biased and hostile towards Dr. Dowling and the investigators seemed to share his bias.  [change text in response to match this].  *See* **Exhibit 1,** Hushek interview 1 at p. 6, 14-16, 22, 25, 26, 35, 39-41, 62, 75-76, 137, 138, 152.

39.     Mr. Hushek told the MCSO officers the Board's agenda for this investigation:  "We want to see Sandra come begging on her hands and knees please, please, please help me out"  *See* **Exhibit 1**, Hushek interview 1 at p. 75-76.

40.     During the interviews that followed, the investigators frequently fished for evidence of wrongdoing, asking about drug use, child abuse, gambling, any rumors of misbehavior.  ***See for example*** **Exhibit 1,** Hushek interview 1 at p. 109; MCSO interview of Ben Arredondo dated January 12, 2006 ("Arredondo interview"), at p. 43, attached hereto as **Exhibit 28**; MCSO interview of Michael Hopper dated January 15,

2006, at p. 41-42, attached hereto as **Exhibit 29**; MCSO interview of Jim Hippel dated

January 16, 2006, at p. 37, 52, 65-66, attached hereto as **Exhibit 30.**

41.     They browbeat witnesses whose answers were not welcome, pressured others, threatened some, and openly accused Dr. Dowling of committing crimes.  *See for example* **Exhibit 26,** Seagraves deposition at 158:6–161:10; MCSO interview of Marc Frazier ("Frazier interview 1") dated January 13, 2006, at p. 78; attached hereto as **Exhibit 31**; MCSO interview of Joe Lopez dated January 30, 2006 ("Lopez interview 1"), at p. 21, 30-33, 36, 38, attached hereto as **Exhibit 32**; MCSO interview of Hope Ravens dated January 27, 2006, at p. 26, 37, 39-40, attached hereto as **Exhibit 33**; MCSO interview of Duane Fouts dated January 31, 2006, at p. 21-22, attached hereto as **Exhibit 34**; MCSO interview of Dick Bryce dated February 6, 2006, at p. 40-44, attached hereto as **Exhibit 35**.

42.     Less than one week after the investigation's launch, and after only twelve interviews had been conducted Hendershott told Chairman Stapley that "we know she's done it."  And that "he had all kinds of information and facts, evidence of wrongdoing." *See* **Exhibit 6**, Stapley deposition at 97:10-21, 141:5-15.

43.     Stapley reported that Hendershott showed great "enthusiasm" early in the investigation and exercised "animated involvement" in it, using such phrases as "we've got the goods." *See* **Exhibit 6**, Stapley deposition at 138:17–145:15.

44.     Several of those interviewed were astounded at the level of anger and hostility MCSO investigators displayed towards Dr. Dowling.  *See* **Exhibit 12**, Frazier deposition at p. 19:20–20:23; Joe Lopez deposition dated June 20, 2011 ("Lopez deposition"), at p. 114:3-15, attached hereto as **Exhibit 36.**

45.     There seemed to be "vengeance behind this whole thing." *See* **Exhibit 12**, Frazier deposition at p. 273:14-24.

9

46.     Veteran MCSO investigators found Hendershott's involvement "unusual." *See* **Exhibit 26**, Seagraves deposition at p. 25:19–26:4.

47.     He frequently provided his investigators with leads, was involved in the direction of the investigation and Lt. Tucker, lead case agent, felt pressured by Hendershott in the MACE cases. *See* **Exhibit 22**, Tucker deposition at 111:25–112:15, 114:15-18; **Exhibit 25**, Hendershott deposition at 153:14–156:2; **Exhibit 26**, Seagraves deposition at 23:17–24:16.

48.     Unlike the typical case, where a crime is committed and a suspect sought, here the suspect was Dr. Dowling and a "Task Force" was charged with finding a crime—a situation that even one of the MCSO investigators admitted was "out of the ordinary." *See* **Exhibit 26**, Seagraves deposition at 60:3-7; **Exhibit 78**, Tucker Report..

49.     According to investigators, a "lot more time [was spent] on this [investigation] than it warranted." *See* **Exhibit 26**, Seagraves deposition at 110:9-25

50.     Arpaio himself characterized the investigation as "high profile" and could recall no other time before Dowling that his office had investigated another elected official. *See* **Exhibit 24**, Arpaio deposition at 17:15-20, 21:6-11.

51.     Not long after the Dowling investigation was begun, the MCSO began an investigation of then-Attorney General, Terry Goddard, which is why the Dowling prosecution was transferred to the U.S. Attorney's office. *See* **Exhibit 22**, Tucker deposition at 104:16-105:16; T. Noyes memo dated June 13, 2007, attached hereto as **Exhibit 37**.

52.     Within a year or two, the MCSO was investigating a number of elected officials, including Supervisors Stapley and Wilcox. *See* **Exhibit 6**, Stapley deposition at 151:17-152:2, 162:2-18, 165:1-12; **Exhibit 16**, Wilcox deposition at 35:22-36:19.

DB04/835989.0002/5045404.1DD02

53.     On January 25, 2006 - two weeks after the investigation had begun, the Task Force very publically served search warrants on both of the District's offices and Dr. Dowling's home.  *See* **Exhibit 6**, Stapley deposition at 107:21-108:2;   Search Warrants SW 2006-002011, SW 2006-000272, SW 2006 002017, attached hereto collectively as **Exhibit 38**.

54.     Before the warrants were executed, the press was notified and were on scene with cameras running.  *See* **Exhibit 20**, Sandra Dowling deposition at 32:14-33:22.

55.     At the District's offices, the Sheriff's deputies were armed and heavy handed—one employee noted that "it seemed like a raid to me."  *See* **Exhibit 12**, Frazier deposition at 261:4-12.

56.     Execution of the warrant at Dr. Dowling's home took on the aspect of a three ring circus:  there were 10-15 officers involved, including the head of the SWAT unit, a helicopter flew overhead, and so many vehicles lined the street that neighbors were unable to get to their homes.  *See* **Exhibit 20**, Dowling deposition at 158:25-159:2, 158:4-9;  Erin Lindsay deposition dated July 26, 2010, at 63:4-17, 67:2-6, attached hereto as **Exhibit 39**; David Trombi deposition dated July 21, 2010, at 15:6-12, attached hereto as **Exhibit 40**; Barbara Hooper affidavit dated April 14, 2011, attached hereto as **Exhibit 41**.

57.     News crews from all the local stations were set up in the neighbors' yards and even Deputy Chief Jack MacIntyre of the MCSO, while appearing on national television in July 2010, characterized the service on Dowling's home as "over the top."  See CNN.com Transcript from July 8, 2010, Campbell Brown show at p. 4, attached hereto as **Exhibit 42**.

58.     While the criminal investigation was ongoing, three civil suits involving Dr. Dowling (in her official capacity), the Board and/or the Treasurer were filed to sort out the District's deficit.  *Dowling v. Stapley*, LC2006-000370-001; *Dowling v. Board of Supervisors*, CV2006-052611; and *Schweikart v. Dowling*, CV2006-014285.  *See* Joint Proposed Case Management Plan dated September 17, 2009, at p. 10-12, attached hereto as **Exhibit 43**.

59.     The Board and the Sheriff were not content to await the a judicial resolution and continued to try Dr. Dowling in the press, taking every opportunity to decry her alleged "theft" of money for homeless children and calling for her to resign her office.  *See* **Exhibit 3**, Joint News Release; **Exhibit 23**, Ariz. Rep. article; *See also* news article "Supervisors May Have to Run Schools", Ariz. Rep. Jan. 28, 2006; news article "Dowling Pursuing School for Homeless", Ariz. Rep. Mar. 10, 2006; news article "Sandra Dowling Must Give Up District Position", Don Stapley editorial Nov. 30, 2006, collectively attached hereto as **Exhibit 44**.

60.     Andrew Thomas refused to convene a County Grand Jury to hear the Dowling Matter.  *See* **Exhibit 6,** Stapley deposition at 128:15-129:1.

61.     A Grand Jury was convened by the Attorney General's Office and heard only two witnesses: Lt. Tucker, the MCSO lead case agent, and the Sheriff's auditor.[8]  It returned 25 felony counts against Dr. Dowling.  *See* November 16, 2006, Indictment ("Indictment"), attached hereto as **Exhibit 45**; Reporters Transcript of Proceedings (Motion for Remand) dated April 30, 2007 ("Reporter's Transcript April 30, 2007"), at 36:6-37:5, attached hereto as **Exhibit 46**.

62.     Sheriff Arpaio, issued a joint news release with Attorney General Goddard just days later in which he crowed that Dr. Dowling had "misused" public

---

[8] Andrew Thomas refused to convene a County Grand Jury to hear the Dowling Matter.  **OSSOF 60**.

funds for personal gain and accused her of "helping herself" when she was "supposed to be helping homeless children." *See* **Exhibit 3**.

63.     Less than five months later, Judge Burke remanded Counts 1-10, finding that the Grand Jury was not presented with "clearly exculpatory evidence" known by the MCSO, and Counts 22 and 23 for a reassessment of probable cause in light of a evidence that was kept from the Grand Jury. *See* May 4, 2007, Under Advisement Ruling ("May 4, 2007, Order") at p. 4, attached hereto as **Exhibit 47**.

64.     When the Sheriff began a criminal investigation of then-Attorney General, Terry Goddard, the case was transferred to the U. S. Attorney for prosecution. *See* **Exhibit 37**.

65.     In July 2008, the State moved to dismiss all counts of the indictment. *See* July 11, 2008, Order re Motion to Dismiss, attached hereto as **Exhibit 48**.

66.     About one month later, all of the claims, including the earlier remanded and dismissed claims, were dismissed with prejudice. *See* Minute Entry dated August 26, 2008 ("August 26, 2008 Order"), at p. 2, attached hereto as **Exhibit 49**.

67.     At this time, Judge Burke accepted the Plea Agreement in the misdemeanor case, CR2008-007162, characterizing the charge against her for hiring her minor daughter at Pappas during a summer nine years earlier as "a little ol' misdemeanor." *See* **Exhibit 49,** August 26, 2008, Order; **Exhibit 4,** Reporter's Transcript August 26, 2008, at 8:8; 9:25-10:1.

68.     The U.S. Attorney's remarks at the sentencing hearing on the misdemeanor reflect the truth:  the felony charges brought against Dr. Dowling were not justified. *See*  **Exhibit 4,** Reporter's Transcript August 26, 2008, at 29:6-25.

69.     He unequivocally announced in court that Dr. Dowling had not stolen any money or misused federal funds:  "I think it is important to emphasize a couple things.

One is during the course of this investigation, we did not uncover any sort of misuse of federal funds or any sort of personal profit on the part of Dowling." *See* **Exhibit 4,** Reporter's Transcript August 26, 2008, at 29:6-25.

70.     Judge Burke reiterated this fact:  There is no restitution issue in this case that I'm aware of, not a dime disappeared, nothing was taken from the school district." *See* **Exhibit 4,** Reporter's Transcript August 26, 2008, at 47:9-11.

71.     The Board and the Sheriff were outraged at the dismissal of all charges. *See* **Exhibit 6**, Stapley deposition at 16:18-17:9.

72.     Chief Hendershott called for a meeting with the U.S.A. to express his extreme displeasure.  *See* **Exhibit 25** Hendershott deposition at 23:4-24:18.

73.     The Board, as part of its vendetta against Dr. Dowling, had earlier sued her, in her official capacity, for the return of the approximately $1.9 million transferred from the Indirect Cost Fund to the District, the alleged theft and misuse of which are reflected in Counts 1-10.  *See* **Exhibit 9,** Dowling Declaration 1 at ¶ 17-18.; **Exhibit 45**, Indictment at p. 3-4.

74.     Later, they dismissed this suit and re-filed it against Dr. Dowling and her husband, personally, forcing them to incur the costs of defense and exposing them to personal liability.  *See* **Exhibit 9,** Dowling Declaration 1 at ¶ 19; **Exhibit 6**, Stapley deposition at 134:14-135:21, 136:12-137:6; Declaration of Craig Mehrens dated October 5, 2010, at ¶ 4, attached hereto as **Exhibit 50**.

75.     This occurred despite the fact that Lt. Tucker admitted that they determined during the criminal investigation that Dr. Dowling had not stolen any money, the Judge in the criminal case concluded that no money was missing, and Stapley, himself, knew that Dr. Dowling had not taken any money.  *See* **Exhibit 22**,

Tucker deposition at 47:25-48:4; **Exhibit 4,** Reporter's Transcript August 26, 2008, at 47:9-11; **Exhibit 6,** Stapley deposition at 136:17-21.

76.    The Board persisted with this groundless suit until it was finally settled in November 2009. *See* **Exhibit 50**, Mehrens Declaration at ¶ 4.

77.    Sheriff testified that he delegated all criminal investigations, including the Dowling investigation, to Chief Hendershott and that the Chief did not need the Sheriff's approval to do anything in connection to the investigation – "I didn't interfere." *See* **Exhibit 24**, Arpaio deposition at 8:12-24, 56:12-15.

78.    Chief Hendershott was free to decide what resources to devote, whether to start the investigation initially, and whether and when to terminate it. Sheriff Arpaio never criticized the Chief for the investigation. *See* **Exhibit 24**, Arpaio deposition at [Arpaio 33: 1-21, 107:8 20, 108:25-109:12.

79.    At this point, a reasonable sheriff would have halted the investigation as an obvious attempt by the Board to destroy a political opponent. *See* Report of D.P. Van Blaricom dated July 5, 2011, at p. 10, attached hereto as **Exhibit 51**; D. P. Van Blaricom deposition dated March 3, 2011, at 19:23-20:12; 41:25-43:6, 54:16-5:11, 63:9-11, attached hereto as **Exhibit 52**.

80.    Instead, the investigators, prompted and prodded by Chief Hendershott, spent another 11 months investigating Dr. Dowling. *See* **Exhibit 3**, News Release at p. 2; **Exhibit 24**, Arpaio deposition at 30:22-31:11.

81.    Dr. Dowling was charged with theft (Count 1) and misuse (Counts 2-10) of approximately $1.9 million of ICF monies by transferring them to the District to cover various expenses, allegedly without "authority of law." *See* **Exhibit 45**, Indictment, at p. 3-4.

DB04/835989.0002/5045404.1DD02

82.     Indirect cost funds are derived from a percentage withheld from every federal grant awarded, typically to cover any costs of administering the grants.  Over time, these funds accumulate and were held by the Treasurer.  *See* **Exhibit 22**, Tucker deposition at 291:1-10.

83.     The District's account had been set up long before Dr. Dowling took office.  *See* **Exhibit 1,** Hushek interview 1 at p. 42-43; **Exhibit 47**, May 4, 2007, Order at p. 4.

84.     All of the transfer requests reflected in Counts 2-10 were signed by the Deputy County School Superintendent.  *See* Ben Arredondo February 18, 2011, deposition at 100:18-101:22, attached hereto as **Exhibit 53**; MCSO interview of Brian Hushek dated July 12, 2006 ("Hushek interview 2"), at p. 12-13, attached hereto as **Exhibit 54**; **Exhibit 13**, Hushek deposition at 168:13-22.

85.     Dr. Kit Wood, former Superintendant of the MCRSD, Sherry Ferguson, former Deputy Superintendant of the MCRSD, and Ben Arredondo all told the MCSO that no Board approval was needed for the transfer of ICF funds.  *See* MCSO interview of Kit Wood dated January 13, 2006, at p. 105-106, attached hereto as **Exhibit 55;** MCSO interview of Sherry Ferguson dated June 10, 2006, at p. 20, attached hereto as **Exhibit 56**; **Exhibit 47**, May 4, 2007, Order at p. 4.; **Exhibit 53**, Arredondo deposition at 100:18 – 101:22, 166:12-21.

86.     As Deputy Superintendant, it was incumbent upon Ben Arredondo, who signed all the transfers, to obtain Board approval if he thought it  necessary.  *See* **Exhibit 12**, Frazier deposition at 52:15-22, 53:10-23.

87.     The District's Director of Finance, who handled ICF transfers before Mr. Arredondo took over, said the District had consulted with the County Attorney's office about the propriety of making the transfers without Board approval and was told they could do so.  *See* **Exhibit 12**, Frazier deposition at 228:17-229:14.

88.     No one ever accused anyone of impropriety with respect to these transfers before.  *See* **Exhibit 53**, Arredondo deposition at 178:11-179:12; Kit Wood deposition dated March 21, 2011, at 244:1-11, attached hereto as **Exhibit 57**; *See also* OSSOF 85 above.

89.     The majority of other County Superintendants of Schools in the state do not need Board approval to use ICF monies.  *See* **Exhibit 22**, Tucker deposition at 64:8-71:21, 78:24-86:7; Bruce Tucker interviews with other county school superintendents, attached hereto collectively as **Exhibit 58.**

90.     Interestingly, the Sheriff failed to contact the other Superintendents *before* the indictment, only after Dr. Dowling's defense counsel reported his findings on contacting them.  *See* **Exhibit 22**, Tucker deposition at 61:19-62:25.

91.     The Board's education expert, Lisa Graham Keegan, hired after Dr. Dowling's indictment to advise the Board on issues regarding Pappas, informed them that "Title 15 is vague and almost anything can be done with federal funds until a Court says 'no.'"  *See* **Exhibit 2**, Executive Session Minutes at ESM00077; **Exhibit 6**, Stapley deposition at 136:12-17.

92.     Brian Hushek, in his interviews with the MCSO, opined that it is "… no longer the County's opinion that she (Dr. Dowling) can do this" (transfer ICF funds) though when pressed several times for a statute or rule to support this, he was unable to cite any.  *See* **Exhibit 54**, Hushek interview 2 at p. 16, 24.

93.     One of the lawsuits filed in 2006, before the indictment was returned, had, as an issue, the question of whether Board approval was needed to transfer money from the ICF.  *See* Declaration of Susan Myers dated March 12, 2007, at ¶ 6-10, attached hereto as **Exhibit 59**.

17

94.     There is no statute and no rule requiring the Board's approval for use of the ICF monies and the policy the Board relies on does not even mention indirect cost funds.  *See* **Exhibit 22**, Tucker deposition at 74:1-4; Maricopa County Policy B1001 , Budgeting for Results Accountability Policy dated June 1994, attached hereto as **Exhibit 60**.

95.     Instead, it prohibits a County agency from exceeding its County appropriation.  But, the District, which had a budget of $10-12 million, received approximately $650,000 a year from the County and thus would always be in violation of this policy.  *See* **Exhibit 12**, Frazier deposition at 33:19-24; 173:10-24.

96.     Counts 11-18 of Dr. Dowling's indictment deal with the hiring, by the District, of federal lobbyists to raise the profile of Pappas and identify sources of federal grants to benefit its students.  *See* Pat Mitchell deposition dated August 17, 2010 ("Mitchell deposition"), at 23:18-24:14, attached hereto as **Exhibit 61**.

97.     In 1987, the McKenney-Vento Act was passed which essentially mandated the closure of separate schools for homeless children.  *See* Kevin Talley deposition dated July 15, 2010 ("Talley deposition"), at p. 101:5-8, attached hereto as **Exhibit 62**.

98.     With the help of lobbyists Pat Mitchell of Strategic Impact and Kevin Talley of Sagamore Associates, Dr. Dowling succeeded in obtaining for Pappas one of only five exemptions nationally from the act.  See **Exhibit 61**, Mitchell deposition at 82:11-25; Bruce Hunter July 14, 2010, deposition ("Hunter deposition") at 100:19-101:13, attached hereto as **Exhibit 63**.

99.     The exemption had to be renewed regularly.  *See* **Exhibit 62**, Talley deposition at 176:2-8; **Exhibit 63**, Hunter deposition at 112:17-113:2.

100.     Messrs. Mitchell and Talley had worked tirelessly with Dr. Dowling on a *pro bono* basis for two years, arranging meetings for her with legislators in Washington,

18

D.C.  *See* **Exhibit 61**, Mitchell deposition at 18:10-19:8, 20:25-21:15, 78:4-19; **Exhibit 62**, Talley deposition at 79:9-80:9, 170:8-18, 176:2-8, 187:16-188:20.

101.   Eventually, they indicated that they would need a contract.  *See* MCSO interview of Pat Mitchell dated February 16, 2006, at p. 4-7, attached hereto as **Exhibit 64**.

102.   The RFP committee – of which Dr. Dowling was not a member  – initially recommended the contract be awarded to Sagamore.  However, it was unaware that, during the proposal process, Talley left Sagamore, taking with him his educational expertise and historical knowledge of  Pappas.  *See* **Exhibit 64**, Mitchell deposition at 89:20-90:11; **Exhibit 62**, Talley deposition at 14:20-15:3; **Exhibit 31**, Frazier interview 1 at p. 45.

103.   Dr. Dowling then tabled the recommendation, which was her right, and met with District counsel, Mike King of Gammage & Burnham, who recommended that the bidders be asked for a "best and final" bid.  *See* **Exhibit 12**, Frazier deposition at 90:13-91:1, 102:7-24.

104.   The best and final process was initiated to try to effect a price reduction and to clarify some issues.  *See* **Exhibit 12**, Frazier deposition at 90:13-20

105.   An amended RFP was sent out.  *See* **Exhibit 61**, Mitchell deposition at 37:12-22.

106.   The bid committee was told by counsel that they should conduct discussions with bidders for clarification of some points, which Frazier, a member of the committee, said they did.  *See* **Exhibit 12**, Frazier deposition at 92:15-93:4.

107.   Strategic Impact's bid was better than Sagamore's and it had lowered its price, thus the committee awarded the contract to it.  *See* **Exhibit 12**, Frazier deposition at 99:21-100:5.

DB04/835989.0002/5045404.1DD02

108.   The contract was for one year and was renewed once.  *See* **Exhibit 62**, Talley deposition at 110:3-14.

109.   While some of the District employees offered ***their opinions*** that Dr. Dowling's efforts were hired to further her political career, the lobbyists interviewed by the Sheriff's office unequivocally denied the same.  *See* **Exhibit 61**, Mitchell deposition at 45:13-23, 46:8-10, 113:18-24, 115:2-4; **Exhibit 62**, Talley deposition at 170:21-171:19, 194:5-11.

110.   And the lobbyists' efforts did indeed benefit Pappas—bringing in at least $500,000 in grants over the two year contract period.  *See* **Exhibit 61**, Mitchell deposition at 41:1-11; **Exhibit 62**, Talley deposition at 150:15-151:1, 176:9-13, 177:1-179:7.

111.   Dr. Dowling was charged with violating A.R.S. § 38-503(A) and § 38-504(C).  *See* **Exhibit 45**, Indictment at p. 5-6.

112.   Mark Frazier and Joe Lopez, who were directly involved in the bid process, both categorically denied ***ever discussing the landscaping contract with her***. **Exhibit 32**, Lopez interview 1 at 22, 45; **Exhibit 31**, Frazier interview 1 at 102.

113.   Frazier and Lopez were charged with rigging the bid by providing Dennis a copy of a competitor's bid, with the bid price included, allegedly because they feared reprisals from Dr. Dowling if Dennis did not get the contract.  *See* **Exhibit 45**, Indictment at p. 13.

114.   Lopez denied that he had ever had problems with Dr. Dowling or that he had ever been threatened by her.  *See* **Exhibit 36**, Lopez deposition at 102:14-18, 111:6-11.

115.   He repeatedly denied, too, that he had given Dennis a copy of the bid with the price included until, ***after*** being threatened with prosecution and while under interrogation, he allowed as how he ***might*** have done so.  See **Exhibit 32,** Lopez

20

interview 1 at p. 30-31, 33, 37, 42, 44-45; MCSO interview of Joe Lopez dated May 17, 2006 ("Lopez interview 2"), at 59, 65, 66, 73, 75, attached hereto as **Exhibit 65**.

116.    When he immediately tried to recant that testimony, he was told that he could not!!  "And you told us you did it.  So let's not start that over again, ok?  Because none of us really have the time."  *See* **Exhibit 65**, Lopez interview 2 at p. 133-134.

117.    And when Lopez made a call to Dennis, taped by the Sheriff, Dennis told Lopez to tell investigators the truth and denied that Lopez had sent him a copy of the bid with the price included:  "I would of walked away from the whole thing.  But that would have been completely outta (sic) character for you to do something like that.  You couldn't have done that."  See **Exhibit 65**, Lopez interview 2 at p. 131-132.

118.    This information was withheld from the Grand Jury and was the reason Counts 22-23 were remanded.  *See* **Exhibit 47**, May 4, 2007, Order at p. 6.

119.    Frazier, too, denied being pressured in any way by Dr. Dowling regarding the contract.  *See* **Exhibit 31**, Frazier interview 1 at p. 102.

120.    Frazier told the Sheriff that he had no idea that Lopez felt Frazier wanted him to pick Dennis, that he had never indicated to Lopez that he should pick Dennis. *See* MCSO interview of Marc Frazier dated February 1, 2006, at p. 6-7, attached hereto as **Exhibit 66.**

121.    Dr. Dowling was charged with procurement code fraud (Count 19) for allegedly influencing the selection of a real estate broker, John Dyer, to sell a piece of District property.  *See* **Exhibit 45**, Indictment at p. 10.

122.    The email that Steve Zimmerman sent to staff indicating that Dr. Dowling wanted Mr. Dyer to sell the property, was sent ***before*** the District realized it needed to put the matter out to bid.  *See* **Exhibit 33**, Ravens interview at p. 1-3; MCSO interview of Steve Zimmerman dated January 30, 2006 ("Zimmerman interview"), at 14-15, 17, attached hereto as **Exhibit 67**; Hope Ravens deposition dated March 15, 2011 ("Ravens deposition"), at 84:16-86:5, attached hereto as **Exhibit 68**.

21

123.   Once the District realized an RFP was necessary, a bid committee was formed.  Dr. Dowling was not a member of the committee and the decision to award the contract to Mr. Dyer, the only bidder, was made by the committee. *See* **Exhibit 33**, Ravens interview at p. 30; **Exhibit 67**, Zimmerman interview at 8-9, 18-19; **Exhibit 68**, Ravens deposition at 89:8-18, 92:24-95:4.

124.   Zimmerman, who headed the committee, repeatedly told the Sheriff's investigators that Dr. Dowling had absolutely no input in the decision and had not influenced the process in any way.  *See* **Exhibit 67**, Zimmerman interview at 10, 14-15, 44-45; **Exhibit 68**, Ravens deposition at 96:11-23.

125.   Dr. Dowling was also accused of having conflicts of interest for failing to disclose her purported interest in the Dyer contract.  Yet, she had no interest, substantial or otherwise, in the contract that would trigger a duty to disclose anything.   The members of the bid committee knew that Dr. Dowling had a real estate license in the same firm as Mr.  Dyer – as did 1800 other agents.  *See* **Exhibit 12**, Frazier deposition at 115:17-21; **Exhibit 34**, Fouts interview at p. 3; **Exhibit 68,** Ravens deposition at 50:10-12.

126.   But, there was no evidence that Dr. Dowling would benefit if Mr. Dyer received the contract.  In fact, the evidence was unequivocally to the contrary:  both Mr. Dyer and Duane Fouts, his broker, told the MCSO that Dr. Dowling would not receive any commission or referral fee from the transaction.  *See* **Exhibit 34**, Fouts interview at 13-14; MCSO interview of John Dyer dated January 31, 2006 ("Dyer interview"), at p. 22-23, attached hereto as **Exhibit 70**.

127.   Mr. Dyer testified that Dr. Dowling always told him that she could have no involvement in any contract to sell District property.  *See* **Exhibit 70**, Dyer interview at 22-23.

DB04/835989.0002/5045404.1DD02

128.    The Maricopa County Schoolhouse Foundation, whose primary purpose was to raise money to support the Pappas Schools, was established in March 2005.  *See* **Exhibit 12**, Frazier deposition at 121:10-20.

129.    Dr. Dowling was its President/CEO/Board Member and Mr. Frazier was its Fundraiser Liaison.  *See* **Exhibit 12**, Frazier deposition at 122:12-17; 124:3-2.

130.    In September 2005, a bequest of $89,000 was left to the "J. Thomas Pappas School," (sic) which was deposited in the District's general account.  *See* **Exhibit 12**, Frazier deposition at 128:3-19, 131:5-21; MCSO interview of Marc Frazier dated June 15, 2006 ("Frazier interview 3"), at p. 5-6 attached hereto as **Exhibit 71**.

131.    Mr. Frazier then filled out a purchase requisition for $89,000 and asked that the money be transferred from the District to the Schoolhouse Foundation, "to establish an endowment."  *See* **Exhibit 71**, Frazier interview 3 at p. 5-6.

132.    Dr. Dowling was charged with theft of the $89,000 in Count 27 based solely on her approval of hundreds of vouchers contained within a lengthy Voucher Detail List in which the entry reflecting the transfer appeared.  *See* **Exhibit 71**, Frazier interview 3 at p. 32-33.

133.    The Sheriff's investigators knew that Mr. Frazier and Ms. Meredith made the decision to transfer the bequest without consulting Dr. Dowling or informing her of the transfer.  *See* **Exhibit 71**, Frazier interview 3 at p. 12, 20-22, 32.

134.    The listing of the voucher that reflected the transfer was one of several contained in a multi-page Voucher Detail Listing which made no mention of the Craig bequest.  *See* MCRSD #509 Voucher No. 5118, ("Voucher Detail Listing") attached hereto as **Exhibit 72.**

135.    Included in this Voucher Detail Listing were such things as the electric bill, payroll, and other routine expenses for the District.  *See* **Exhibit 71**, Frazier interview 3 at p 32; **Exhibit 72**, Voucher Detail Listing.

136.    During the investigation, Mr. Frazier told the MCSO investigators that if he had done anything wrong in connection with the bequest, he would fix it and if need be, he would return the money.  The MCSO told him not to do anything.  *See* **Exhibit 12**, Frazier deposition at 136:17-137:10.

137.    Later, Mr. Frazier was charged with theft of the bequest, along with Dr. Dowling.  *See* **Exhibit 45**, Indictment at p. 15.

138.    At the time of his sentencing, Mr. Frazier deposited an $89,000 check from the Schoolhouse Foundation with the Clerk of the Court.  The Probate Court later returned the check after determining that the intent of the bequest was to benefit the children of Pappas.  *See* **Exhibit 12**, Frazier deposition at 138:10-140:11.

139.    No wrongdoing was involved in the District paying Mr. Frazier's salary as he was always an employee of the District, not the Foundation.  *See* **Exhibit 12**, Frazier deposition at 31:22-32:7.

140.    The MCSO provided the prosecutor with extensive Issue Summaries in which it set forth its recommendations of the charges that should be brought against Dr. Dowling and the others.  *See* Issue Summaries attached hereto as **Exhibit 73.**

141.    Chairman Stapley knew that in 2005-2006 Hendershott and Arpaio looked for fights with every division within Maricopa County.  *See* **Exhibit 6**, Stapley deposition at 167:11-168:9.

142.    He also knew that Dr. Dowling and the Sheriff had previously sparred over control of the jail schools and bad blood existed between them.  *See* **Exhibit 12**, Frazier deposition at 151:2-20; **Exhibit 20**, Dowling deposition at 55:17-57:10.

143.    The plea agreement by its terms, contemplates a later malicious prosecution suit and provides that it does not "in any way compromise or abrogate any civil actions, including actions pursuant to A.R.S. § 13-2301 *et. seq*, or § 13-4301 *et.*

24

*seq*, or the provisions of A.R.S. § 13-2314(H) or A.R.S. § 13-4310(C)." *See* Plea Agreement dated July 11, 2008 ("Plea Agreement"), attached hereto as **Exhibit 74**.

144.   The plea agreement the Sheriff relies on was entered in the misdemeanor case: CR2008-007162.  The sentencing hearing in which the plea was accepted occurred in the misdemeanor case. *See* **Exhibit 4**, Reporter's Transcript August 26, 2008, at p. 1.

145.   The Agreement specifically defines the "plea" as the Class 2 misdemeanor:  "**Plea:** The defendant agrees to plead **GUILTY** to: **Employment of a Relative,** a Class 2 Misdemeanor."  (Bold emphasis in original.)   And, the agreement contains a provision specifically providing that it does not "in any way compromise or abrogate any civil actions…" *See* **Exhibit 74**, Plea Agreement.

146.   An unrelated criminal investigation was launched against Dr. Dowling simply because she was running a deficit – similar to her predecessors for 18 years.  See **Exhibit 6**, Stapley deposition at 129:9-132:3.

147.   Typically, the State Board of Education reviews allegations of school district "insolvency and gross mismanagement."  When this occurs, the Superintendant of the district is given an opportunity to respond to the allegations at a public meeting. If the Board of Education determines that the school district is insolvent or has "grossly mismanaged its finances" the Board appoints a receiver.  See **Exhibit 7**, A.R.S. § 15-103.

148.   This is the procedure that was followed with regards to the former Superintendent of the Peach Springs Unified School District, as well as the school districts of Colorado City Unified School District, Union Elementary District, and Saddle Mountain Unified School District.  *See* **Exhibit 7**, A.R.S. § 15-103, **Exhibit 21**, Dowling Declaration 2 at ¶ 3.

25

DB04/835989.0002/5045404.1DD02

149.    The Board knew that the deficit existed because of a "loophole" in the law and that there was nothing illegal about incurring a deficit.  See **Exhibit 2**, Executive Session Minutes at ESM00003; **Exhibit 6**, Stapley deposition at 129:9-132:6.

150.    Dr. Dowling did not appear before the Board in person to discuss her budget and instead sent her management staff.  She was not as available to the Board as it wanted her to be.  This rankled the Supervisors.  See **Exhibit 12**, Frazier deposition at 189:22-193:22.

151.    The Board wanted Dr. Dowling to increase the number of people on the Governing Board of the District, though the statute required that only one person act in that capacity.  A.R.S. § 15-101(11) and 15-308.  See **Exhibit 7**, A.R.S. § 15-101(11); **Exhibit 8**, A.R.S. § 15-308; **Exhibit 12**, Frazier deposition at 193:7-22.

152.    Dr. Dowling received national recognition from her work at Pappas – a cause of professional jealousy among the politicians on the Board.  *See* **Exhibit 21**, Dowling Declaration 2 at ¶ 4.

153.    Because the Pappas Schools and their mission were so well known and so intimately linked to Dr. Dowling and her efforts, Pappas frequently had visitors from the U.S. Department of Education, including Secretary Ron Page and Undersecretary Nina Rees, as well as presidential candidates, and other national politicians.  *See* **Exhibit 21**, Dowling Declaration 2 at ¶ 5.

154.    This, too, was a source of political jealousy.  *See* **Exhibit 21**, Dowling Declaration 2 at ¶ 6.

155.    All of these reasons built the launching pad; the deficit built the rocket that the County would cause the Sheriff to launch against Sandra. *See* **Exhibit 12**, Frazier deposition at 273:10-24.

156.    In November 2005, the Board was told by Office of Management and Budget ("OMB") employees that accommodation school districts, such as the MCRSD, operate differently from other school districts in the County.  While the County does not budget expenditures above revenue, the Revenue Control Limit, which is applicable to the MCRSD, relieves schools from this restriction and thus their budgeted expenditures can be set above revenues – the situation that existed in the District.  *See* **Exhibit 2**, Executive Session Minutes at ESM00003.

157.    When this occurs, the Treasurer borrows money to pay the warrants.  *See* **Exhibit 2**, Executive Session Minutes at ESM00003.

158.    County Manager, David Smith, on learning this, noted he had not realized that the "County was in such a weak position on this matter."  *See* **Exhibit 2**, Executive Session Minutes at ESM00003.

159.    Chairman Stapley suggested the Legislature be notified because "… the law as written has allowed Ms. Dowling to create this problem."  *See* **Exhibit 2**, Executive Session Minutes at ESM00003.

160.    He later went to the Legislature to urge them to fix this "loophole" and recognizes that while this may have been a "bad practice" there was nothing nefarious about it.  See **Exhibit 6**, Stapley deposition at 129:9-132:6.

161.    The Board was "troubled" by the conclusion of the State Superintendant of Public Instruction that District's chronic deficits was the higher than normal school bus costs and the District's inability to levy taxes.  See **Exhibit 6**, Stapley deposition at 125:11-15.

162.    Chairman Stapley did not believe the District was cooperating as he expected it should, he issued an Administrative Subpoena for the District's documents on January 10, 2006.  See **Exhibit 6**, Stapley deposition at 67:1-68:3.

163.    Chairman Stapley made this desire for Dr. Dowling to step down far more publicly when he called for Dr. Dowling to leave office in an Op Ed piece published in the Arizona Republic on November 30, 2006.  See **Exhibit 44**, "Sandra Dowling Must Give Up District Position."

164.    Chairman Stapley, in particular, seemed "unnecessarily agitated" by the situation with Dr. Dowling.  See **Exhibit 12**, Frazier deposition at 205:8-14.

165.    Chairman Stapley just wanted to create a criminal investigation to help the Board get documents for their administrative audit.  See **Exhibit 6**, Stapley deposition at 86:2-87:16, 102:12-103:7.

166.    Other County witnesses confirmed that was a reason for this meritless criminal investigation  *See* **Exhibit 13,** Hushek deposition at 225:16-226:7, **Exhibit 16**, Wilcox deposition at 139:13-23.

167.    The primary suspicion, based on "innuendo and rumor," of  purported wrongdoing on Dr. Dowling's part before the criminal investigation was started involved claims of nepotism – that she had hired her children to work in the District. See **Exhibit 6**, Stapley deposition at 120:6-121:14.

168.    This is not against the law, a fact that was obvious before this investigation was started.  See A.R.S. § 15-323, attached hereto as **Exhibit 75**; C. Mehrens letter dated February 17, 2006, attached hereto as **Exhibit 76.**

169.    The Sheriff testified that the criminal investigation was started at the behest of the Board.  *See* **Exhibit 23,** Ariz. Rep. article January 27, 2006; **Exhibit 24,** Arpaio  deposition at 67:18-68:20.

170.    The Board's Executive Session minutes reflect Chairman Stapley's deep involvement in the direction of the investigation.  As early as January 17, 2006, just days after it had begun, he had been told by Chief Hendershott that they already had

28

evidence of criminal wrongdoing and he, in turn, told the Board that they "need to get a good criminal lawyer involved with the sheriff's investigation and the audit."  *See* **Exhibit 2**, Executive Session Minutes at ESM00015.

171.  Chairman Stapley believes that Chief Hendershott asked for the criminal lawyer – a request he was willing to consider.  See **Exhibit 6**, Stapley deposition at 100:1-101:5.

172.  He also told the Board that it was important to get as much provable information from the audit as soon as possible and that the Sheriff's investigation provided a "missing link."  See **Exhibit 6**, Stapley deposition at 101:15-102:11.

173.  He wanted the audit team to provide information to the Sheriff's investigation, which it did.  See **Exhibit 6**, Stapley deposition at 116:18-117:6.

174.  Oddly enough, even after they had enlisted the Sheriff, Mr. Stapley asked of the Board: "Do we have absolute proof of a deficit?"  *See* **Exhibit 2**, Executive Session Minutes at ESM00016.

175.  Within three months of the investigation's start and long before Dr. Dowling's indictment, the Board took steps to shutter Pappas.  It passed Resolution 5 which affected its funding and was done, according to Mr. Stapley, to "close it down." See **Exhibit 6**, Stapley deposition at 196:1-198:20.

176.  The land on which the Pappas campus sat was appraised for $14 million in 2008 and was the subject of a very profitable purchase/sale agreement with the City. *See* Appraisal of Mixed Use Redevelopment Property "Pappas Elementary School and Administration Building Site" dated July 2, 2008, attached hereto as **Exhibit 77**.

177.  Mr. Hushek brought the issue of the ICF transfers to the attention of the investigators and Hendershott ordered Tucker to begin work on this issue "ASAP." *See*

DB04/835989.0002/5045404.1DD02

1   **Exhibit 54**, Hushek interview 2 at 12-14; B. Tucker's Case Activity Log dated

2   August 31, 2006, at p. Arpaio0255, attached hereto as **Exhibit 69**.

3         RESPECTFULLY SUBMITTED this 11th day of October, 2011.

4                                    **STINSON MORRISON HECKER** LLP

5

6                         By:   s/ Michael C. Manning

7                                 Michael C. Manning

8                                 Larry J. Wulkan
                                1850 North Central Avenue, Suite 2100
                                Phoenix, Arizona 85004-4584

9                                 Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DB04/835989.0002/5045404.1DD02

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of October, 2011, I caused the foregoing document to be filed electronically with the Clerk of Court through ECF; and that ECF will send an e-notice of the electronic filing to:

The following ECF participants:

Jorge Franco, Jr.
Larry J. Crown
JENNINGS, HAUG & CUNNINGHAM, LLP
*Attorneys for Maricopa County Board of Supervisors*
 *and Maricopa County*

Lisa S. Wahlin
GRAIF, BARRETT & MATURA, P.C.
*Attorneys for Joseph and Ava Arpaio*

By:   s/ Kathleen Kaupke

31

DB04/835989.0002/5045404.1DD02