1   WO

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   Sandra Dowling and Dennis Dowling,)        No. CV 09-01401-PHX-JAT
    husband and wife,                        )
10                                            )   **ORDER**
                    Plaintiffs,              )
11                                            )
    vs.                                      )
12                                            )
                                             )
13  Sheriff Joseph Arpaio and Ava Arpaio,)
    husband and wife; Maricopa County Board)
14  of Supervisors; Maricopa County, a)
    Municipal entity; John Does I-X; Jane)
15  Does I-X; Black Corporations I-V; and)
    White Partnerships I-V,                  )
16                                            )
                    Defendants.              )
17                                            )
                                             )
18  _____)

19          Pending before the Court are: (1) Sheriff Joseph Arpaio and Ava Arpaio's (the

20  "Arpaio Defendants") Motion for Summary Judgment (Doc. 211) and the Maricopa County

21  Board of Supervisors (the "Board Defendants") and Maricopa County's (collectively, the

22  "Maricopa County Defendants") Joinder thereto (Doc. 219); and (2)  the Maricopa County

23  Defendants' Second Motion for Summary Judgment (Doc. 212).

24  **I.      FACTUAL BACKGROUND**

25          Plaintiff Sandra Dowling ("Dowling") was the Maricopa County Superintendent of

26  Schools, which is an elected office, for 20 years, from 1988 to 2008.  (Arpaio Defendants'

27  Statement of Facts, Doc. 214 at ¶ 1; Plaintiffs' Controverting Statement of Facts to Arpaio

28  Defendants' Motion for Summary Judgment, Doc. 227 at ¶ 1).  As Superintendent, Dowling

oversaw an accommodation district, known as the Maricopa County Regional School District (the "MCRSD"). (Doc. 214 at ¶ 5; Doc. 227 at ¶ 5). Dowling served as the sole member of the governing board of the MCRSD. (Doc. 214 at ¶ 5; Doc. 227 at ¶ 5). By 2006, there were 12 schools in the MCRSD, which included three campuses of the Thomas J. Pappas School for homeless children. (Plaintiffs' Omnibus Statement of Facts, Doc. 228 at ¶ 11).

In 2005, at Dowling's request, Ben Arredondo, the Deputy Superintendent of Schools and Dowling's liaison to the Maricopa County Board of Supervisors (the "Board"), approached Brian Hushek, the Deputy Budget Director at the Office of Management and Budget for Maricopa County to discuss resolving MCRSD's approximately $3 million deficit. (Doc. 214 at ¶ 36; Doc. 228 at ¶ 18).

In June 2005, Dowling wrote a letter to the Maricopa County Attorney requesting his opinion as to whether the Board[1] had a duty to fund the MCRSD. (Doc. 228 at ¶ 20). The County Attorney concluded it was the Board's duty to fund the MCRSD. (Doc. 228 at ¶ 21). In October 2005, Max Wilson, Chairman of the Maricopa County Board of Supervisors, wrote a letter to Tom Horne, the Superintendent of Public Instruction, on behalf of the Board. (Doc. 228 at ¶ 22). The letter detailed the approximately $3 million deficit and the Board's theory on matters it believed contributed to the deficit, and requested that Mr. Horne conduct any audits necessary to find the underlying reasons for the deficit. (Doc. 228 at 22 and Exhibit 15).

In response, in November 2005, the Associate Superintendent of Finance wrote a letter to the Board informing them that it appeared the deficit resulted from unfunded transportation costs necessary for the MCRSD, taxes, and excess utilities. (Doc. 228 at ¶ 23 and Exhibit 10). The letter stated: "review of financial records for MCRSD suggests that the deficit cash balances are the result of statutory language, rather than improper management of the district" and "A.R.S. § 15-1001 requires each county's board of supervisors to

---

[1] The individual members of the Board of Supervisors are Don Stapley, Mary Rose Wilcox, Fulton Brock, Andy Kunasek, and Max Wilson.

1  annually budget for the Special County School Reserve Fund." (*Id.*).

2  Thereafter, the Maricopa County Board of Supervisors asked Ross Tate, Maricopa

3  County Auditor, to perform an audit of the MCRSD. (Doc. 228 at ¶¶ 25-26). On December

4  21, 2005 and January 10, 2006, Dowling's attorney, David Cantelme, wrote Mr. Tate and

5  Dean Walcott letters, respectively, explaining that it was Dowling's opinion that the Board

6  could not authorize such an audit, but if the auditor worded the request as a "records request"

7  instead of an "audit," she would make documents available for review. (Doc. 228 at ¶ 27 and

8  Exhibits 17 & 18). On January 10, 2006, the Board then issued a subpoena duces tecum for

9  the documents it sought. (Doc. 228 at ¶ 27 and Exhibit 19). The subpoena was served on

10  Dowling by Detective Graham of the Maricopa County Sheriff's Office ("MCSO") the same

11  day. (Doc. 214 at Exhibit 15).

12  Thereafter, Brian Hushek and his supervisor, Sandi Wilson, Deputy County Manager,

13  made a phone call to MCSO Chief Deputy, David Hendershott, wherein they told him about

14  the deficit and their theory that Dowling had been misusing funds. (Doc. 227 at ¶¶ 49-50).

15  Hushek and Wilson also told Hendershott that there were other allegations of misconduct by

16  Dowling that he should look into. (Id. at ¶ 51). At some time after this phone call, Hushek

17  met with MCSO investigators and filed the initial criminal complaint against Dowling with

18  the MCSO. (Doc. 214, Exhibit 15 at 10 and Exhibit 16 at 11; Doc. 228 at Exhibit 1).

19  As part of its criminal investigation, MCSO obtained and executed a search warrant

20  for the MCRSD offices on January 25, 2006. (Doc. 228 at ¶ 53). Also on January 25, 2006,

21  MCSO obtained and executed a search warrant for Dowling's home. (*Id.*)

22  The criminal investigation conducted by MCSO resulted in a grand jury's indictment

23  of Dowling on 25 felony counts on November 16, 2006. (Doc. 228 at ¶ 61). Prosecutor Ted

24  Noyes ("Prosecutor Noyes") of the Arizona Attorney General's Office presented the case to

25  the grand jury. (Doc. 227 at ¶ 110).[2] Only two witnesses, Lieutenant Bruce Tucker, the

26

27  _____

28  [2]  The MCSO provided Issue Summaries to Prosecutor Noyes, wherein they set forth recommendations of the charges to be brought against Dowling and others. (Doc. 226 at 20

MCSO lead case agent on the Dowling case and Beverly Owens, the MCSO's internal auditor, testified before the grand jury. (Doc. 214 at ¶ 435).[3]  On May 4, 2007, based on motions filed by Dowling's attorney, Counts 1–10 and 22–23 of the indictment were remanded to the grand jury. (Doc. 228 at ¶ 63).  In mid-2007, the prosecution of the criminal case was transferred from the Arizona Attorney General's Office to the United States Attorney's Office due to a conflict of interest. (Doc. 228 at ¶ 64).

On August 26, 2008, the court presiding over the criminal case accepted a Plea Agreement, dated July 11, 2008, entered into by the State of Arizona and Dowling. (Doc. 228 at ¶ 67).  The Plea Agreement, in the case captioned CR 2008-007162, provided that Dowling agreed to plead guilty to a misdemeanor (employment of a relative), and the parties stipulated that, at sentencing, Counts 1–10 that were previously dismissed on August 20, 2007, and the remaining Counts in CR 2006-012508 (Counts 11–23 and Counts 26–27) would be dismissed with prejudice. (Doc. 228 at ¶ 66).[4]

---

and Exhibit 73).

[3]   The Record reflects the following facts with regard to the original presentation of evidence to the grand jury:  The Attorney General's Office convened a grand jury and heard from Lt. Tucker and the Sheriff's auditor.  It returned 25 felony counts against Dr. Dowling. (Doc. 228, Exhibits 45 and 46).  Counts 1-10 (Misuse of the Indirect Cost Fund) were later remanded by Judge Burke of the Maricopa County Superior Court.   After examining the grand jury transcripts, Judge Burke found that clearly exculpatory evidence was kept from the grand jury that might have deterred the grand jury from finding the existence of probable cause. (Doc. 228, Exhibit 47 at 4).  Judge Burke denied Dowling's request to remand Counts 11-18 (Lobbying), and Counts 19-21 (Real Estate Contract), finding that clearly exculpatory evidence was not kept from the grand jury on those Counts.  Judge Burke also remanded Counts 22-23, finding that the responses of  Prosecutor's Noyes and one of  his witnesses to certain questions regarding Counts 22-23 (the Landscaping Contract) unintentionally misled the grand jurors, but that clearly exculpatory evidence was not kept from the grand jury on those counts.  (*Id.* at 6).

[4]   At the sentencing hearing, the U.S. Attorney said, "during the course of this investigation, we did not uncover any information regarding any sort of misuse of federal funds or any sort of personal profit on the part of Dowling.  And, additionally, during the course of this investigation, at least my portion, we were able to determine that other nonprofit organizations had created – – other government entities had created foundations

1   **II.     PROCEDURAL BACKGROUND**

2          On June 3, 2009, Plaintiffs filed the Complaint in this action in Maricopa County

3   Superior Court (Doc. 1-1, Exhibit A), and Defendants subsequently removed the case to this

4   Court (Doc. 1).

5          On July 27, 2010, the Court entered an Order that permitted Defendants to file two

6   motions for summary judgment.  (Doc. 53).  The Order allowed a first motion for summary

7   judgment on statute of limitations issues and a second motion for summary judgment on all

8   other issues after the close of discovery.  Thereafter, Defendants filed their First Motion for

9   Summary Judgment seeking summary judgment on Counts I, III, IV, V, VI of Plaintiff's

10  Complaint on statute of limitations grounds.   On March 8, 2011, the Court granted

11  Defendants' Motion for Summary Judgment with respect to Plaintiffs' claims for negligence

12  and abuse of process (Counts I and III of the Complaint) because they were barred by the

13  statute of limitations and denied Defendants' Motion for Summary Judgment on statute of

14  limitations grounds with respect to Counts IV, V, and VI of Plaintiffs' Complaint.  (Doc.

15  151).

16         Defendants have now moved for summary judgment on the remaining counts of

17  Plaintiffs' Complaint: Count II (Malicious Prosecution), Count IV (violations of  42 USC §

18  1983 - Unconstitutional Policies, Customs and Failure to Train), Count V (violations of 42

19  USC § 1983 - Conspiracy to Commit Violations of 42 USC 1983), Count VI (violations of

20  42 USC § 1983 - Free Speech, Law Enforcement Retaliatory Conduct, Malicious

21  Prosecution).[5]

22  **III.    LEGAL STANDARD**

23         Summary judgment is appropriate when "the movant shows that there is no genuine

24  _____

25  to support their education entities.  And so that one of the counts that Dr. Dowling was
    charged with quite frankly is something [sic] appears other educational entities had been
26  doing."  (Doc. 228, Exhibit 4 at 29).

27         [5] Plaintiffs have withdrawn any claims regarding search and seizure, abuse of process,
28  and privileges and immunities.  (_See_ Doc. 226 at 29).

1   dispute as to any material fact and the movant is entitled to judgment as a matter of law."

2   Fed.R.Civ.P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must

3   support that assertion by . . . citing to particular parts of materials in the record, including

4   depositions, documents, electronically stored information, affidavits, or declarations,

5   stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that

6   materials cited do not establish the absence or presence of a genuine dispute, or that an

7   adverse party cannot produce admissible evidence to support the fact."    *Id.* at

8   56(c)(1)(A)&(B).  Thus, summary judgment is mandated "against a party who fails to make

9   a showing sufficient to establish the existence of an element essential to that party's case, and

10  on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S.

11  317, 322 (1986).

12      Initially, the movant bears the burden of pointing out to the Court the basis for the

13  motion and the elements of the causes of action upon which the non-movant will be unable

14  to establish a genuine issue of material fact.  *Id.* at 323.  The burden then shifts to the

15  non-movant to establish the existence of material fact.  *Id.*  The non-movant "must do more

16  than simply show that there is some metaphysical doubt as to the material facts" by

17  "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'"

18  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting

19  Fed.R.Civ.P. 56(e) (1963) (amended 2010)).  A dispute about a fact is "genuine" if the

20  evidence is such that a reasonable jury could return a verdict for the nonmoving party.

21  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In the summary judgment

22  context, the Court construes all disputed facts in the light most favorable to the non-moving

23  party.  *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

24  **IV.  ANALYSIS**

25      At the outset, the Court notes that, in their Motions for Summary Judgment, both the

26  Arpaio Defendants and the Maricopa County Defendants attempt to guess at what claims

27  Plaintiffs are asserting against them from the face of the Complaint.  It is not clear to the

28  Court why, during the discovery process, Defendants were unable to determine the scope of

1    Plaintiffs' claims and which Defendants those claims were directed against. Likewise, in

2    their Responses to the Motions for Summary Judgment, Plaintiffs do not directly assert

3    which claims from their Complaint they are pursuing or who those claims are against.[6] This

4    has left the Court with the difficult task of determining which claims Plaintiffs intend to take

5    to trial.

6         Accordingly, in order for the Court to determine whether Defendants are entitled to

7    summary judgment on some or all of Plaintiffs' claims, the Court must necessarily determine

8    the claims from their Complaint on which Plaintiffs intend to proceed and the identity of the

9    individual Defendants that those claims are against. After carefully reading the full briefing

10   on both Motions for Summary Judgment, the Court has determined the claims Plaintiffs have

11   identified as inappropriate for summary judgment as follows: (1) a Section 1983 claim for

12   retaliatory investigation/prosecution in violation of Plaintiffs' First Amendment rights against

13   all Defendants (Count VI),[7] (2) a Section 1983 claim for selective prosecution against all

14   _____

15        [6] This has made it difficult for the Court to determine exactly which claims Plaintiffs
     intend to pursue against exactly which Defendants. For example, the only arguments
16   Plaintiffs make to support any claims against Maricopa County are based on *Monell* liability
     for the conduct of Sheriff Arpaio and/or the custom/policy of the MCSO. Plaintiffs have
17   failed to include any of these claims or arguments in their Response to *Maricopa County's*
     Motion for Summary Judgment. Rather, all of these arguments are included in Plaintiffs'
18   Response to the Arpaio Defendants' Motion for Summary Judgment. Because the Maricopa
     County Defendants filed a Joinder to the Arpaio Defendants' Motion for Summary Judgment
19   (Doc. 219), the Court will analyze Plaintiffs' claims against Maricopa County on the merits
20   of the Motion for Summary Judgment. However, because Plaintiffs did not raise these
     arguments in response to Maricopa County's Motion for Summary Judgment, the Court
21   could alternatively deem these arguments waived as against Maricopa County and could
     grant summary judgment to Maricopa County based on this ground.
22

23

24        [7] In their Response to the Arpaio Defendants' Motion for Summary Judgment (Doc.
     226) and their Response to the Board Defendants' Motion for Summary Judgment (Doc.
25   224), Plaintiffs use the following "headings:" "The Board Can Be and Is Liable for Malicious
     Prosecution" (Doc. 224 at 9) and "Dr. Dowling was Maliciously Investigated and
26   Prosecuted" (Doc. 226 at 12). Although Plaintiffs refer to these claims as "Malicious
     Prosecution," a Section 1983 Malicious Prosecution action exists when a "malicious
27   prosecution is conducted with the intent to deprive a person of equal protection of the laws
28   or is otherwise intended to subject a person to denial of constitutional rights." *Bretz v.*

Defendants (Count VI),[8] (3) a state law malicious prosecution claim against the Arpaio Defendants and Maricopa County (Count II), and (4) conspiracy to retaliate against Plaintiff in violation of her First Amendment rights against all Defendants (Count V).[9]  Defendants argue that they are entitled to summary judgment on all of these claims because Plaintiffs have failed to raise material issues of fact allowing a reasonable jury to find in Plaintiffs' favor.

Additionally, the Arpaio Defendants have identified three additional bases on which they argue they are entitled to summary judgment: (1) Sheriff Arpaio is entitled to qualified immunity, (2) Arpaio is not liable in his individual capacity; and (3) punitive damages are inappropriate against Sheriff Arpaio in his individual capacity.

In light of this summary, the Court will now analyze the Motions for Summary

---

*Kelman*, 773 F.2d 1026, 1031 (9th Cir. 1985).  In this case, Plaintiffs claim that Dowling was denied equal protection of the laws and her First Amendment right to Free Speech.  Because Plaintiffs' equal protection argument appears to be alleged as Selective Prosecution and their First Amendment argument appears to be alleged as Retaliatory Prosecution, the Court will refer to Plaintiffs' Malicious Prosecution claims as Retaliatory Prosecution and Selective Prosecution/Enforcement, respectively.

[8]  In their Response to the Board Defendants' Motion for Summary Judgment (Doc. 224), Plaintiffs do not refer to Selective Prosecution or any equal protection violation.  In contrast, in their Response to the Arpaio Defendants' Motion for Summary Judgment (Doc. 226), Plaintiffs have included a heading and substantive argument regarding "Selective Prosecution" (Doc. 226 at 26-27).  Although Plaintiffs only assert this claim in their Response to the Arpaio Defendants' Motion for Summary Judgment, the substance of the claim appears to be against all Defendants.

[9]  Plaintiffs include a Conspiracy claim in Response to both Motions for Summary Judgment (Doc. 226 at 27 and Doc. 224 at 11).  Although Plaintiffs do not clearly state that this conspiracy claim is based on their First Amendment retaliation claim, the Court concludes from the substance of Plaintiffs' arguments that the First Amendment retaliation claim is the basis for their conspiracy claim.  *See* Doc. 226 ("Here, there is sufficient evidence to allow a jury to decide if there was a meeting of the minds between the Sheriff and the County.  Certainly, the evidence shows that the investigation was motivated for an improper purpose- a political retaliation that Chief Hendershott and the Sheriff were only too happy to oblige the Board's desire for revenge.").

Judgment.[10]

---

[10]  Before discussing the facts disputed by both Parties, the Court notes that the facts contained in Plaintiffs' Statement of Facts tend to reflect Plaintiffs' arguments, as opposed to facts actually taken directly from the Record.  Plaintiffs frequently characterize facts so that those facts are indistinguishable from the theory of their case.  This tends to create a discrepancy between the fact that is supported by the Record and the fact as characterized by Plaintiffs.

For instance, Plaintiffs assert the following fact in their Statement of Facts:  "Unlike in a typical case, where a crime is committed and a suspect sought, here the suspect was Dr. Dowling and a "Task Force" was charged with finding a crime - a situation that even one of the MCSO investigators admitted was 'out of the ordinary.'" (Doc. 228 at 10, ¶ 48). Plaintiffs support this fact with the following deposition testimony from Kim Seagraves, an investigator on Dowling's case: "It would be out of the ordinary in terms of professional law enforcement guidelines to pick out a person and investigate that person to try to find if they ever committed a crime?  A. Yes. . . . Q. . . . .Did you ever develop any concern that you were being asked to investigate Sandra Dowling to try to find a crime that she may have committed? A. No."  (Doc. 228, Exhibit 26 at 60:3-19).

In another part of their Statement of Facts, Plaintiffs state the fact that: "Chief Hendershott called for a meeting with the [U.S. Attorney] to express his extreme displeasure."  (Doc. 228 at 14).  Plaintiffs support this fact with Hendershott's deposition testimony "But my question to them was, why in the world - how do you get from 29 felony counts from [the Attorney General's Office] that charges 29 felony counts.  Where do you see the . . . logic in moving from there to there.  And the - I believe that what occurred then is that we had this meeting.  We didn't agree and I asked for a meeting with [the U.S. Attorney], the Sheriff and myself."  (Doc. 228, Exhibit 25 at 23: 9-19).

Further, in their Statement of Facts, Plaintiffs state the fact that "The Sheriff testified that the criminal investigation was started at the behest of the Board." (Doc. 228 at ¶ 169). Plaintiffs support this fact with Arpaio's deposition testimony and a news story that quotes Arpaio: "Q. All right.  This is a copy of a--of an article written--published , actually, January 27th, 2006.  The investigation started in earnest on January 11th, 2006, for–so about two weeks after the investigation starts. The second page, it says, quote, 'Sheriff Joe Arpaio said that prompted the Board to' quote 'ask us to look at her activities.' closed quotes. . . .Do you remember saying that to reporters?  A.  What is this?  A press release?  Q. No It's a . . . news story . . . with a quote from you.  Do you remember saying that to the reporters?  A. I don't remember.  Q.  No reason to believe you didn't sitting there today?  A.  No.  'Prompted the Board that' –then the quotes, 'I asked others to look at her activities.'  So I'm saying that the Board asked us?  Q.  Asked MCSO to look – look into her activities.  A.  It could be.  Q. Okay.  A.  I don't know who asked, as I said earlier, whether it was the Board, the County or what have you."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**A.      § 1983 Retaliatory Prosecution in Violation of Dowling's First Amendment Rights**

To demonstrate a claim for retaliatory prosecution in violation of Dowling's First Amendment rights, Plaintiffs must provide evidence showing that (1) Defendants possessed an impermissible motive to interfere with her First Amendment rights, (2) Defendants' conduct would chill a person of ordinary firmness from future First Amendment activities, and (3) that the Defendants would not have engaged in the conduct in question but for the retaliatory motive. *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999).

In a claim for retaliatory prosecution, the third element can only be satisfied if Plaintiffs prove that Defendants "induced the prosecutor to bring charges that would not have been initiated without their urging." *Hartman v. Moore*, 547 U.S. 250, 261-262 (2006). At the summary judgment stage, this means that Plaintiffs must show some evidence that there was a lack of probable cause for the charges brought against Dowling. *See id.* at 263 ("at the trial stage, some evidence must link the allegedly retaliatory official to a prosecutor whose action has injured the plaintiff. The connection, to be alleged and shown, is the absence of probable cause."). The Court will now examine whether Plaintiffs have presented disputed issues of material fact on each of the three elements of a retaliatory prosecution claim.

**i.  The Board Defendants**

Plaintiffs argue that the Board Defendants asked the MCSO to investigate Dowling and that they acted with a retaliatory motive when they did so. Plaintiffs argue that, in her position as Maricopa County Superintendent of Schools and sole member of the MCRSD Governing Board, Dowling took positions on various political issues that placed her in conflict with members of the Board. Plaintiffs argue that, as a result of these conflicts, when Dowling asked the Board to fund a deficit in the Maricopa County Regional School District,

---

Because many of Plaintiffs' arguments are listed as "facts," the Court found it necessary to analyze each portion of the Record referenced in Plaintiffs' Statement of Facts to see if the evidence in the Record actually substantiated Plaintiffs' stated "fact."

1   the Board Defendants viewed the deficit as an opportunity to oust her from office by entering

2   into a conspiracy with the MCSO to criminally investigate Dowling, despite their knowledge

3   that the basis for the criminal investigation was unfounded and despite the fact that the

4   Board's prior procedure for investigating budget issues did not include initiating a criminal

5   investigation.

6          The Board Defendants argue that (1) there is no evidence that the they participated in

7   MCSO's criminal investigation of Dowling and/or made any decisions with regard to

8   Prosecutor Noyes' decision to prosecute Dowling; (2) there is no evidence in the record that

9   County officials engaged in improper and wrongful or bad faith conduct in this case; and (3)

10  Plaintiffs failed to sue members of the Board in their individual capacity and have not shown

11  that the Board acted as a collective with a motive to prosecute Dowling in violation of her

12  First Amendment rights.

13         The Court agrees that Plaintiffs have not presented a genuine issue of material fact

14  with regard to the acts done by the Board, as an entity.  Rather, Plaintiffs seem to impute

15  each Board member's individual actions to the Board as a whole, but do not provide any

16  support for their allegations that the Board acted as an entity with a retaliatory motive to

17  violate Dowling's constitutional rights.[11]

18         Dowling has presented evidence that prior to the investigation into the deficit, she had

19  conflicts with certain individual members of the Maricopa County Board of Supervisors from

20

21

22         [11]  For instance, Plaintiffs do not present any facts showing that the Board voted to

23  involve the MCSO in the criminal investigation of Dowling or otherwise agreed as a group
    to do so.  Further, the Board, as a local governing body is only liable in a section 1983 action

24  if there is some evidence of a policy or custom that caused a violation of an individual's

25  constitutional rights.   *See Thomas v. Maricopa County Bd. of Supervisors*, CV 07-0258-
    PHX-DGC, 2007 WL 2995634, at *5-6  (D. Ariz. Oct. 12, 2007) ("The [Maricopa County]

26  Board of Supervisors is a local governing body. *See* Ariz.Rev.Stat. § 11-251 *et seq*.  To
    maintain a § 1983 claim against a local governing body, the plaintiff must establish a "policy

27  or custom" attributable to the body and allege that the policy or custom was the 'moving

28  force' behind the constitutional deprivation.").

which a jury could possibly infer the basis of a retaliatory motive.[12]  However, there is no evidence in the record establishing that the Board, as an entity, decided to initiate a criminal investigation into the deficit[13] or that the Board, as an entity, provided misinformation to

---

[12] Plaintiffs have presented the following facts suggesting that Don Stapley disliked Dowling:   In an Op Ed piece published by the Arizona Republic in November 2006, Supervisor Don Stapley publicly called on Dowling to "step down." (Doc. 228 at ¶ 163). Ben Frazier testified in his deposition that Supervisor Don Stapley wanted Dowling to resign. (Doc. 228 at ¶ 30 and Exhibit 12 at 198-200).  Dowling testified as follows: "I had a conversation with Supervisor Stapley in the morning on the same day that he signed the Administrative Subpoena, January 10, 2006.  In that conversation, Supervisor Stapley screamed and swore at me.  He threatened that he would make sure I never held public office again or be able to 'show my face in the State of Arizona' again.  He insisted that I appear before the Board to discuss the deficit and that if I didn't he would 'turn this over to the Attorney General and things would get ugly.'  He told me that I needed to come to the Board, 'begging on my hands and knees' for their forgiveness." (Doc. 228 at ¶ 28, Exhibit 21 at 1, Exhibit 20).

[13] There is evidence that the Board investigated the deficit.  However, Plaintiffs have not controverted the evidence in the Record that the MCSO began the *criminal* investigation of Dowling, which was based on Brian Hushek's phone call and complaint.  The Court does not deny Plaintiffs' assertion that portions of the Record contain the statement that the Board of Supervisors initiated the investigation into Dowling.  However, there is no evidence in the Record supporting the statement that the Board of Supervisors, as an entity, initiated such a criminal investigation.  Nor is there evidence that an individual supervisor initiated the criminal investigation of Dowling.

The MCSO Affidavits for Search Warrants, which contain background information about the Dowling investigation, exemplify the confusion surrounding the statements about initiation of the criminal investigation.  However, when read in full, the Affidavits further support, rather than controvert, Defendants' contention that Brian Hushek was the initial complainant in the *criminal* investigation of Dowling.

Both affidavits contain the following unqualified paragraph: "On Wednesday, January 11th, 2006, the Maricopa County Board of Supervisors requested that the Maricopa County Sheriff's Office investigate possible illegal conduct of the Superintendent of Schools identified as Dr. Sandra Dowling.  The Board of Supervisors had learned that Dr. Dowling had spent funds far beyond the budget for the Regional School District of Maricopa County and there were rumors of criminal misconduct by Dr. Dowling and her staff at Dr. Dowling's request.  An investigation was initiated by the Maricopa County Sheriff's Office." (Doc. 215, Exhibits 15 and 16 at 4).

1    investigators or Prosecutor Noyes in an attempt to violate Dowling's First Amendment

2    Rights.[14]  Nor do Plaintiffs point to issues of material fact showing that each member of the

3

4          The Affidavits then go on to describe "Actions Taken on behalf of or by the Maricopa
5    County Board of Supervisors" as follows: In May or June of 2005, Dowling instructed Ben
6    Arredondo to ask the Board to provide funds to the deficit in the Maricopa County Regional
     School District Fund.  (Doc. 215, Exhibits 15 and 16 at 5).  As a result of the deficit, on
7    October 19, 2005, the Board's Chairman, Max Wilson sent a letter to Tom Horne (then
     Superintendent of Public Instruction) detailing the deficit , listing factors the Board believed
8    contributed to the deficit and asking Horne to look into the deficit.  (Doc. 215, Exhibits 15
9    and 16 at 5-6).  On November 14, 2005, Horne's office responded to Wilson's letter and
     attributed the deficit to un-funded transportation costs, the county equalization shortage, and
10   excess utilities.  (Doc. 215, Exhibits 15 and 16 at 6).  On December 6, 2005, Ross Tate (the
     County Auditor of the Internal Audit Department of Maricopa County) wrote Dowling a
11   letter requesting information for an audit of the Maricopa County Regional School District.
12   (Doc. 215, Exhibits 15 and 16 at 6).  Thereafter, letters were exchanged between Michael
     King and the Maricopa County Internal Audit Department regarding documents for the audit
13   and the Audit Department twice attempted to gain voluntary access to the records, but were
14   refused.  (Doc. 215, Exhibits 15 and 16 at 7-8).  On January 10, 2006, the Board issued a
     Subpoena Duces Tecum to Dowling seeking documentation for the audit.  (Doc. 215,
15   Exhibits 15 and 16 at 9).  On January 10, 2005, Detective Graham served that Subpoena on
     Dowling.  (Doc. 215, Exhibits 15 and 16 at 9-10).
16
17         The Affidavit then goes onto describe the "criminal" investigation as follows: "On
18   Wednesday, January 11th, 2006, Sergeant K. Seagraves #1018 conducted an interview with
     a subject identified as Mr. Brian Hushek.  Mr. Hushek is employed by Maricopa County as
19   Deputy Budget Director for the Office of Management and Budget.  Mr. Hushek filed the
20   initial complaint with the Maricopa County Sheriff's Office regarding the alleged conduct
     of Dr. Dowling and her staff at the Regional School District . . . .  Based upon Mr. Hushek's
21   Complaint, the Maricopa County Sheriff's Office initiated a criminal investigation that has
22   resulted in the interview of numerous present and former employees of the Regional School
     District."  (Doc.215, Exhibits 15 and 16 at 10-11).

23         The Affidavit then goes on to explain steps taken based on the information provided
24   by Hushek.  Accordingly, while the Affidavit states generally that the Board initiated the
25   criminal investigation into Dowling, the only specifics provided actually reveal that the
     Board initiated an investigation into the deficit and Brian Hushek initiated the "criminal"
26   investigation of Dowling when he filed a criminal complaint against her.

27         [14]  The Court declines to address any potential liability of the individual members of
28   the Board because Plaintiffs did not name any Board members as Defendants in their
     individual capacities.  Further, Plaintiffs' Responses to the Motions for Summary Judgment

Board engaged in acts from which this Court or a jury could infer that, even without a collective vote, each individual member of the Board of Supervisors acted with a retaliatory motive toward Dowling in an effort to violate her First Amendment rights and that those individual acts could somehow attribute liability to the Board as an entity.[15]

Accordingly, because Plaintiffs provide no support for their assertion that the motivation of an individual Board member could be imputed to the Board as whole or that the Board, or any individual Supervisor initiated the criminal investigation of Dowling, the Court finds that the Board is entitled to Summary Judgment with regard to Plaintiffs' claim of retaliatory prosecution in violation of Dowling's First Amendment rights.

**ii.   Maricopa County's Liability for Individual Board Member's Actions**

"To maintain a § 1983 claim against a local governing body, the plaintiff must establish a 'policy or custom' attributable to the body and allege that the policy or custom was the 'moving force' behind the constitutional deprivation." *Thomas v. Maricopa County Bd. of Supervisors*, CV 07-0258-PHX-DGC, 2007 WL 2995634, at *5-6 (D. Ariz. Oct. 12, 2007). To the extent that Plaintiffs did not name the individual Supervisors individually, but somehow *intended* to assert claims against the individual Supervisors in their official capacities by naming Maricopa County a Defendant in this action, Plaintiffs have not shown that the Board or Maricopa County had an official policy or custom[16] by which the

do not reference or argue that the individual Board members are liable.

[15]   One Board member, Don Stapley, testified in his deposition that "all five members of the Board of Supervisors were receiving periodic reports individually from Hendershott" regarding the progress of Dowling's criminal investigation. (Doc. 228, Exhibit 6 at 107). However, this alone is not enough to raise a material issue of fact as to whether all five Supervisors (or the Board as a collective) decided that, based on a retaliatory motive to oust Dowling from office, they would initiate a criminal investigation against Dowling that they knew to be meritless.

[16]   The Court could find nothing in Plaintiffs' Response to the Board's Motion for Summary Judgment suggesting that they are arguing that the Board was acting pursuant to

Supervisors were acting to deprive Plaintiff of her rights.

Rather, if Plaintiffs named Maricopa County as a Defendant based on the actions of individual Board members, in the absence of a showing of a policy or custom, Plaintiffs only theory for Maricopa County's liability for actions of individual Board members would be respondeat superior.  However, a municipality cannot be responsible for the acts of its employees on a respondeat superior basis.  *See Zolnierz v. Harris*, No CV 11-1182-PHX-RCB, 2011 WL 2560217, at *5 -7  (D. Ariz. June 28, 2011) ("When individuals, such as members of the Maricopa County Board of Supervisors, are sued in an official capacity, the real party in interest is the entity of which the officers are agents. In this case, that entity is Maricopa County. The actions of individuals may support municipal liability only if a claimed injury resulted pursuant to an official policy or custom of the municipality"); *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983"); *Kentucky v. Graham*,  473 U.S. 159, 167 (1985).

Plaintiffs have not pointed to any policy or custom of Maricopa County or the Board of Supervisors to show that municipal liability is warranted.  Accordingly, because there is no support for the proposition that the motivation of individual Board members could be imputed to the Board as whole or that individual Board members were acting in accordance with a policy or custom of the County or Board, the Court finds that Maricopa County is entitled to Summary Judgment with regard to a claim of retaliatory prosecution based on actions by individual Board members.

### iii.   Arpaio and Maricopa County

---

a policy or custom.  In fact, the words policy or custom do not even appear in the Response. (*See* Doc. 224).

1    Arpaio argues that: (1) MCSO's investigation of Dowling was "initiated in response
2    to her own employees' allegations of possible criminal behavior, including misuse of public
3    funds," and, thus, Dowling was not investigated pursuant to a retaliatory motive that violated
4    her constitutional rights, (2) the criminal charges that resulted from the investigation were
5    supported by probable cause, and (3) Arpaio delegated the investigation to Hendershott and
6    did not know and had no reason to suspect that Hendershott was conducting a politically
7    motivated investigation against Dowling.

8    Plaintiffs argue that Arpaio is individually liable for Hendershott's alleged retaliatory
9    investigation of Dowling because Arpaio "encouraged and ratified" unconstitutional conduct
10   by employees under his supervision.  Plaintiffs argue that Maricopa County is liable for
11   Arpaio's delegation and ratification of Hendershott's actions because Arpaio "had a custom
12   and practice of delegating all authority for sensitive criminal investigations to Chief
13   Hendershott, created and fostered an atmosphere in which political vendettas were
14   justifications for criminal investigations and ratified the conduct that followed." (Doc. 226
15   at 11).  While Plaintiffs clearly explain this theory of the case in their Response to the Motion
16   for Summary Judgment, it is not entirely clear how the underlying evidence supports this
17   theory and/or how this theory would impose liability on Arpaio and Maricopa County.

18   The Court construes Plaintiffs' theory regarding Arpaio's alleged retaliation as
19   follows:

20   (1)  Sheriff Arpaio and Dowling had a history of bad blood between them;[17]

21   (2)  Because of this history, when Hendershott received a call from Brian Hushek and

22
23

24   [17]  Dowling testified that during the summer and fall of 2005, Ben Arredondo told her
     that the Sheriff was upset with her because she would not draw down the federal funding for
25   Hard Knocks High.  (See Doc. 228 at ¶ 142; Doc. 228, Exhibit 20 at 54-55).  Marc Frazier
     testified that the relationship between Dowling and Arpaio soured when he chose not to
26   endorse her in her last election and that there was an issue between Arpaio and Dowling
     because "Sandra felt that as the County School Superintendent, she should be running the
27   school inside the jail.  And Sheriff Joe didn't want that to happen."  (Doc. 228, Exhibit 12
28   at 151).

Sandy Wilson describing the deficit and their suspicions regarding Dowling's possible mismanagement of the fund and other allegations obtained from Dowling's employees, Hendershott saw this as an opportunity to retaliate against Dowling for her prior disagreements with the Sheriff and oust her from Office;[18] and

---

[18] The Court gleans that this is Plaintiffs' argument regarding the connection between the alleged retaliatory motive and the alleged retaliatory conduct from Plaintiffs' assertion that: "On only the vaguest allegations, a 'Task Force' was assembled and told to find a crime to press against Dowling." (Doc. 226 at 13). Plaintiffs cite to no facts to support this statement, so the Court has done its best to determine the basis for their theory on this claim. Although Plaintiffs argue that the Board involved Sheriff Arpaio and the MCSO in the investigation of Dowling, both Brian Hushek and Chief Deputy Hendershott testified during their depositions that Brian Hushek and Sandi Wilson called Chief Deputy Hendershott to inform him about the deficit and their suspicions regarding possible misuse of funds. (*See* Doc. 214, Exhibit 3 at 76-79 and Exhibit 10 at 72-73). Plaintiffs have no presented any evidence to refute this testimony.

The Court again notes that, in their Response, Plaintiffs tend to disregard Hushek's role as the criminal complainant in the Dowling criminal investigation, suggesting that because Hushek displayed disrespect and dislike for Dowling during his interview with the MCSO that the MCSO would have disregarded his allegations were it not for the MCSO's desire to retaliate against Dowling because of her history with Arpaio. However, Plaintiffs fail to cite to any facts supporting this theory.

To the extent that Plaintiffs suggest that the MCSO needed probable cause before an *investigation* could commence, the Court is aware of no such requirement. *See Sanders v. City and County of San Francisco,* 226 Fed. App'x. 687, 689, 2007 WL 841027, at *1 (9th Cir. 2007) ("Appellants point to no case law that supports the proposition that probable cause must exist before an investigation can commence. That is not surprising, given that the impetus behind criminal investigations is to develop probable cause.").

It also appears that Plaintiffs allege an alternate theory that the Board of Supervisors met with Arpaio prior to Hushek's complaint and together they decided that because they both had reasons to want Dowling out of office, they would initiate a meritless investigation against her. (*See* Doc. 224 at 2 ("Still the Board loosed Sheriff Arpaio on Dowling for its own malicious reasons, well knowing there was bad blood between the Sheriff and Dr. Dowling and knowing too, that Arpaio and Hendershott 'looked for fights with every division within Maricopa County.'")).

However, this theory is not supported by the Record. (*See* Doc. 214 at 45 and Exhibit 10 at 82 (During his deposition, Hendershott testified: "I got a phone call, and then I would

1    (3) that Arpaio knew about this conduct, ratified, and encouraged it.

2              **a.**     **Legal Standard**

3        Plaintiffs allege that Arpaio is liable in his official and individual capacities.  "A suit

4 against a governmental officer in his official capacity is equivalent to a suit against the

5 governmental entity itself."  *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991)

6 (internal citation omitted).   Arpaio may be found liable in his official capacity only if a

7 policy or custom  played in the violation of federal law.  *Id.* (internal citations omitted).  "To

8 the extent that the terms 'policy' and 'custom' imply something beyond a single decision,

9 official liability may also be imposed where a first-time decision to adopt a particular course

10 of action is directed by a governmentally authorized decisionmaker."  *Id.* (internal citation

11 omitted).  Municipal liability has been found when there was evidence that there was a

12 custom or policy to use excessive force, or when an authorized policymaker made, or ratified

13 a decision that deprived plaintiffs of their constitutional rights.  *Id.* (internal citations

14 omitted).  Accordingly, for Arpaio to be liable in his official capacity, Plaintiffs must show

15 evidence that he maintained or ratified a policy or custom pertinent to Dowling's alleged

16 injury and that such policy or custom caused the injury.

17        Moreover, for Arpaio to be liable in his individual capacity, he must have participated

18 in the deprivation of Plaintiffs' constitutional rights.  *Id.* at 645. "Supervisory liability is

19 imposed against a supervisory official in his individual capacity for his own culpable action

20 or inaction in the training, supervision, or control of his subordinates, for his acquiescence

21

22 have told Miller.  Miller could have said something that caused him to think that I was in a
23 meeting with the board, but there was not a meeting with the board, ever.  Q.  Did you get
a call from . . . A.  Sandi Wilson.  Q.  Okay.  Not from anyone with the board?  A.  No.  Sandi
24 Wilson and Hushek, I think, was on the phone."); Doc. 225 at ¶ 10 (Stapley testified in his
deposition, "We [the Board] had nothing to do with the inception of the criminal
25 investigation."); Doc. 213 at ¶ 13 (Sheriff Arpaio testified in his deposition, "Once again,
26 [Hendershott] ran this operation, and I don't think I should have called the Board of
Supervisors.  This is a criminal investigation, and he ran it.  So I don't recall ever talking to
27 the Board of Supervisors over Sandra Dowling.")).  Plaintiffs have not presented any
controverting evidence that Arpaio ever met with the Board or an individual Board member
28 to initiate a criminal investigation against Dowling.

in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 646 (internal quotations and citations omitted). Such participation may involve the setting in motion of acts or knowingly refusing to terminate a series of acts which cause others to inflict constitutional injury. *Id.* at 646 (internal citations omitted). A supervisor is not liable for the actions of subordinates on any theory of vicarious liability. *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989).

### b.    Analysis

Plaintiffs allege that Sheriff Arpaio "has a custom and practice of delegating all authority for sensitive criminal investigations to Chief Hendershott, created and fostered an atmosphere in which political vendettas were justifications for criminal investigations, and ratified the conduct that followed." (Doc. 226 at 11). Arpaio does not dispute that he delegated the day-to-day operations of the MCSO, including criminal investigations to Hendershott. (Doc. 239 at 2).

### i.    Retaliatory Motive

Although Arpaio denies disliking Dowling or having any retaliatory motive toward her, Plaintiff has presented a genuine issue of material fact as to whether or not Sheriff Arpaio had a retaliatory motive that might lead him to act in violation of Dowling's First Amendment rights. (*See* Footnote 17).

### ii.    Connection between Retaliatory Motive and Conduct Violating Dowling's First Amendment Rights

The necessary connection between a possible retaliatory motive and a violation of Dowling's First Amendment rights is a lack of probable cause. "[I]f a plaintiff can prove that the officials secured [her] arrest or prosecution without probable cause and were motivated by retaliation against the plaintiff's protected speech, the plaintiff's First Amendment suit can go forward." *Beck v. City of Upland*, 527 F.3d 853, 863-64 (9th Cir. 2008).

Plaintiffs have raised a material issue of fact as to whether or not probable cause existed for the prosecution of Dowling. Accordingly, whether or not probable cause existed for the prosecution of Dowling is a question for the jury. *Harper v. City of Los Angeles*, 533

F.3d 1010, 1022 (9th Cir. 2008) ("Our task in determining whether probable cause to arrest existed as a matter of law in this § 1983 action is slightly different from a similar determination in the context of a direct review of a criminal arrest. In the latter situation, we are called upon to review both law and fact and to draw the line as to what is and is not reasonable behavior. We are not always in agreement as to its location, but a line must be drawn. By contrast, in a § 1983 action, the factual matters underlying the judgment of reasonableness generally mean that probable cause is a question for the jury.") (quoting *McKenzie v. Lamb*, 738 F.2d 1005, 1007 (9th Cir.1984)); *Graves v. City of Coeur D'Alene*, 339 F.3d 828, 845 (9th Cir. 2003) ("In section 1983 claims, the existence of probable cause is a question for the jury if reasonable persons might reach different conclusions on the facts."), *abrogated on other grounds by Hiibel v. Sixth Judicial Dist. Ct. of Nevada*, 542 U.S. 177 (2004)).

### c.   Qualified Immunity and *Monell* Liability

Sheriff Arpaio argues that he is entitled to qualified immunity because reasonable law enforcement officers could disagree as to whether his conduct in this case was permissible. (Doc. 211 at 25).  In response, Dowling argues that there is a causal connection between Sheriff Arpaio's conduct and her constitutional injuries and whether Sheriff Arpaio acted with deliberate indifference to her constitutional rights is a question for the jury.  (Doc. 226 at 10). Dowling further argues that Sheriff Arpaio is personally liable because he encouraged and ratified unconstitutional conduct by employees under his supervision.

There is a two-step test for resolving a qualified immunity claim: the "constitutional inquiry" and the "qualified immunity inquiry."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The "constitutional inquiry" asks whether, when taken in the light most favorable to the non-moving party, the facts alleged show that the official's conduct violated a constitutional right.  *Id.* If so, a court turns to the "qualified immunity inquiry" and asks if the right was clearly established at the relevant time.  *Id.* at 201-02.  This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201.  Courts are "permitted to exercise their sound discretion in deciding which of the

two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). A dispositive inquiry in the qualified immunity analysis "is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). "Courts should decide issues of qualified immunity as early in the proceedings as possible, but when the answer depends on genuinely disputed issues of material fact, the court must submit the fact-related issues to the jury." *See Ortega v. O'Connor*, 146 F.3d 1149, 1154 (9th Cir. 1998).

Because whether Arpaio had a retaliatory motive to oust Dowling from office and whether or not probable cause existed for the prosecution of Dowling are questions for the jury, the Court will assume for the purposes of the qualified immunity analysis that Arpaio did not like Dowling and no probable cause existed for her prosecution.

Because Plaintiffs have not presented any evidence establishing that Arpaio gave direction to Hendershott on the manner in which he initiated or handled the Dowling investigation, Plaintiffs necessarily ask the Court to infer that Hendershott encouraged Prosecutor Noyes to prosecute Dowling in the absence of probable cause because he knew of and shared Arpaio's retaliatory motive toward Dowling and Arpaio ratified that behavior. Plaintiffs argue that Hendershott sharing Arpaio's motive can be inferred from facts showing that later investigations conducted by Hendershott and the MACE unit were initiated because of Arpaio's political vendettas against individuals.[19]

---

[19]   Plaintiffs argue that the following facts establish that the MACE Unit, at Hendershott's direction, always "ineptly but zealously - and always unsuccessfully - investigated and charged the alleged political corruption cases involving Arpaio's political enemies." (Doc. 228 at ¶ 35). Plaintiffs support this argument with the following portions of the Record: (1) Deposition testimony by David Hendershott and Sergeant Kim Seagraves that some of the MCSO employees that investigated Dowling were later part of the MCSO's "MACE Unit," which was later found to have corruption within it with regard to investigations that occurred after the investigation of Dowling; (2) a 8/17/2010 Memo from Frank D. Munnell, Deputy Chief to Joseph M. Arpaio regarding misconduct by Hendershott,

1    However, even if the Court assumes that Hendershott had a retaliatory motive and

2    encouraged Noyes to prosecute Dowling in the absence of probable cause, based on the

3    Record before the Court, Plaintiffs have failed to establish that Arpaio acted unreasonably

4    in delegating the investigation to Hendershott and believing Hendershott when he claimed

5    probable cause existed for the prosecution of Dowling.[20]   The facts that Plaintiffs have

6    presented to the Court regarding the MCSO's investigation into Dowling do not present an

7    issue of material fact regarding whether Arpaio knew a retaliatory investigation was being

---

stating "Since the MACE investigative unit was established, it has been the pattern and practice of this unit to conduct politically motivated investigations at the implicit direction of Hendershott in the very short time that the unit has been in existence it has suffered from poor morale, high turnover of personnel and command staff due the intense pressure, micromanagement and the unethical conduct of David Hendershott." (Doc. 228, Exhibit 27 at 29-30); and (3) MCSO began investigations of Terry Goddard, and other elected officials, including Stapley and Wilcox. (Doc. 228 at ¶¶ 51-52). Stapley and Wilcox testified in their depositions that they believe Arpaio and Hendershott's investigations of them were politically motivated. (Doc. 228 at ¶ 52).

[20] Plaintiffs argue that the MCSO should have known that probable cause did not exist because testimony from certain interviews was clearly exculpatory and other exculpatory information could have been found if the MCSO had interviewed other witnesses and more thoroughly researched some of the charges against Dowling. In response, Defendants argue that based on Plaintiffs' theory, even if Hendershott knew there was a lack of probable cause to prosecute Dowling, based on the information Hendershott gave him, Arpaio had no reason to know that no probable cause existed or that Hendershott was acting with a retaliatory motive.

Defendants argue that Arpaio's deposition testimony establishes that: Hendershott had 31 years experience in the Sheriff's Office and it was his job to do the Dowling investigation and many other things in the Sheriff's Office, and, at the time of the Dowling investigation, Arpaio had no reason to be concerned about Hendershott's ability to conduct an investigation. (Doc. 214 at ¶ 174 and Exhibit 20 at 42-43). To rebut this argument, Plaintiffs point to later corruption in the MACE unit and the MCSO's later investigation of Supervisors Don Stapley and Mary Rose Wilcox to demonstrate that Arpaio must have known of Hendershott's conduct. However, this evidence of later corruption and later investigations does not rebut Arpaio's argument that he had no reason to suspect corrupt conduct by Hendershott at the time of the Dowling investigation.

1    conducted against Dowling.[21]   Because Plaintiffs have been unable to demonstrate facts

2

3        [21] Plaintiffs point to the following evidence to establish Arpaio's involvement in the
     Dowling investigation:

4

5        (1)  In a November 20, 2006 News Release, Arpaio said "Sandra Dowling knowingly
     put herself as the sole authority over large sums of public an private money and proceeded
6    to misuse that money for her personal and professional gain . . . .  She was supposed to help
     homeless and troubled children.  Instead she was helping herself."  (Doc. 228, Exhibit 3 at
7    2);

8        (2)  A January 27, 2006 Arizona Republic Article quoted Arpaio as follows: "Sheriff
     Joe Arpaio said that prompted the board to 'ask us to look at her activities.'  Two weeks ago
9    investigators began interviewing current and former employees and seeking records. He said
     35 to 40 officers are assigned to the case, including members of his internal affairs and
10   computer crime units."  (Doc. 228, exhibit 23 at 2); and

11

12       (3)     Hendershott told Stapley that Arpaio was outraged when the charges against
     Dowling were dismissed pursuant to the plea agreement.  (Doc. 230, Exhibit 6 at 17).

13

14       The Court notes that Defendants object to all of this evidence on hearsay grounds,
     among others.  "At the summary judgment stage, we do not focus on the admissibility of the
15   evidence's form.  We instead focus on the admissibility of its contents."  *Fraser v. Goodale*,
     342 F.3d 1032, 1036-1037 (9th Cir. 2003).  The Court will briefly discuss Defendants'
16   hearsay objections.

17

18       With regard to the 2006 News Release, the Statement is not being offered for the truth
     of the matter asserted and because it was issued by the Sheriff's Office, the News Release
19   has sufficient trustworthiness that it would likely fall into a hearsay exception.  *See Larez v.*
     *City of Los Angeles*, 946 F.2d 630, 642-43 (9th Cir. 1991).

20

21       With regard to the 2006 Arizona Republic Article, the statement itself is an admission
     of a party opponent.  However, the admission of the article itself would present a hearsay
22   issue that Plaintiffs would have to overcome before the Article could be admitted at trial.  *See*
     *id.* ("The statements' repetition in the newspapers, however, posed a more difficult problem
23   which the district court failed to address. As the reporters never testified nor were subjected
     to cross-examination, their transcriptions of [Defendant's] statements involve a serious
24   hearsay problem. First, the reporters' transcriptions were out-of-court statements. By
     attributing quotations to Defendants, the reporters necessarily made the implicit statement,
25   '[Defendant] said this!'").

26

27       The final statement regarding what Stapley said Hendershott said is hearsay and the
     Court is not aware of any exception this would fall into.

28

1    showing that it was unreasonable for Arpaio to rely on Hendershott running the Dowling

2    investigation or that Arpaio was aware that there was not probable cause to prosecute

3    Dowling, the Court cannot say that it would have been clear to Arpaio that Hendershott was

4    improperly pressuring Noyes to prosecute Dowling in the absence of probable cause for such

5    a prosecution.

6        To support their claim that Arpaio must have known that there was no probable cause

7    for the prosecution of Dowling, Plaintiffs argue that there is evidence of a policy, practice

8    and custom by Arpaio and the County to conduct politically motivated investigations.  To

9    establish that there is a material issue of fact as to the policy, practice, and custom by Arpaio

10   and the County, Plaintiffs rely heavily on the facts that members of the task force that

11   investigated Dowling later became known as the MACE unit, which was later accused of

12   conducting politically motivated investigations and that the MCSO was later found to have

13   conducted meritless investigations into other local political figures.  (*See* Footnote 20).

14       However, although Plaintiffs present Stapley and Wilcox's beliefs that the MCSO's

15   investigations into them were based on Arpaio and Hendershott's political motivations, there

16   is no evidence that Arpaio did not act reasonably in the Dowling investigation.  Further, aside

17   from delegating authority to Hendershott for criminal investigations, Plaintiffs have failed

18   to show that Arpaio's involvement in the Dowling investigation would warrant *Monell*

19   liability from the facts pertaining to Arpaio's involvement currently in the Record.  *See City*

20   *of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988) ("Simply going along with discretionary

21   decisions made by one's subordinates, however, is not a delegation to them of the authority

22   to make policy. It is equally consistent with a presumption that the subordinates are faithfully

23   attempting to comply with the policies that are supposed to guide them. It would be a

24   different matter if a particular decision by a subordinate was cast in the form of a policy

25   statement and expressly approved by the supervising policymaker. It would also be a

26

27       Nonetheless, the Court has considered all three statements when evaluating Plaintiffs'

28   arguments.

1   different matter if a series of decisions by a subordinate official manifested a "custom or

2   usage" of which the supervisor must have been aware.  In both those cases, the supervisor

3   could realistically be deemed to have adopted a policy that happened to have been formulated

4   or initiated by a lower-ranking official. But the mere failure to investigate the basis of a

5   subordinate's discretionary decisions does not amount to a delegation of policymaking

6   authority, especially where (as here) the wrongfulness of the subordinate's decision arises

7   from a retaliatory motive or other unstated rationale. In such circumstances, the purposes of

8   § 1983 would not be served by treating a subordinate employee's decision as if it were a

9   reflection of municipal policy.").

10          Although Plaintiffs argue that Arpaio's credibility is an issue and a jury should be able

11   to assess whether he is telling the truth about his involvement in the Dowling investigation,

12   they have not pointed to other evidence in the Record establishing that Arpaio engaged in the

13   type of conduct that would subject the County to *Monell* liability or establishing that he acted

14   unreasonably based on his knowledge of the investigation.  Further, to the extent Plaintiffs

15   rely on statements that Arpaio made to the press regarding Dowling, these do not establish

16   that Arpaio knew or ratified Hendershott's activities of conducting a meritless, retaliatory

17   investigation into Dowling in violation of her First Amendment rights.  While Arpaio's

18   statements could suggest (as is Plaintiffs' theory) that Arpaio wanted the public to believe

19   Dowling was guilty of crimes she did not commit, they could also suggest that he believed

20   the charges to be substantiated based on the reports of his investigators that there was enough

21   evidence to charge Dowling with those crimes.  Without more, Plaintiffs have failed to

22   present facts showing that no reasonable officer would have acted as Arpaio did.

23          Accordingly, because Plaintiffs have failed to establish that Arpaio acted

24   unreasonably in his delegation of the investigation to Hendershott, Arpaio is entitled to

25   qualified immunity on the Section 1983 Retaliatory Prosecution claim and Maricopa County

26   is entitled to Summary Judgment with regard to Plaintiffs' claim of retaliatory prosecution

27   based on actions taken by Arpaio.

28          **B.      § 1983 Selective Prosecution**

To state an equal protection claim based on the allegedly selective enforcement of a law, plaintiff must "show that the law is applied in a discriminatory manner or imposes different burdens on different classes of people." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995). To do so, plaintiff must "identify a 'similarly situated' class against which plaintiff's class can be compared." *Id.* Then, if the alleged selective enforcement "does not implicate a fundamental right or a suspect classification, the plaintiff can establish a 'class of one' equal protection claim by demonstrating that [he] 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (recognizing an equal protection violation where ordinance targeted a single individual on basis that state action was arbitrary and irrational)).

Plaintiffs allege that Dowling was treated differently than all of her predecessors, who also ran a deficit at the MCRSD and that she was treated differently than other School District managers who were accused of mismanagement. Plaintiffs argue that it is the State Board of Education's obligation to look into allegations of mismanagement and to appoint a Receiver if they make a finding of mismanagement. Plaintiffs argue that Dowling was treated differently because she insisted the Board fund her district, which gave the Board "a desire for political vengeance" and Arpaio and Hendershott were willing to implement this desire. (Doc. 226 at 26-27).

Plaintiffs have not presented the Court with evidence showing that initiating the criminal investigation into Dowling was arbitrary or irrational or that the Board, as an entity, and Sheriff Arpaio were involved in the decision to initiate the investigation. Rather, the evidence shows that Hendershott started the investigation based on Brian Hushek's phone call and complaints about Dowling.

Further, Plaintiffs have not provided the Court with enough information about similarly situated individuals for the Court to determine that Dowling was treated differently than others similarly situated. Plaintiffs do not provide any details about other school's

District Managers who were accused of mismanagement, except to say that they were solely investigated by the Board of Education.  In the absence of any evidence showing that other individuals were truly similarly situated to Dowling, Plaintiffs have failed to establish any genuine issue of material fact supporting a claim a selective prosecution.  Accordingly, the Court will grant summary judgment to Defendants on Plaintiffs' Selective Prosecution claim.

### C.     Malicious Prosecution (State law Claim)

In his Motion for Summary Judgment, Sheriff Arpaio argues that probable cause is a complete defense to malicious prosecution under Arizona law.  (Doc. 211 at 18).  Sheriff Arpaio also argues that the prosecution did not terminate in Dowling's favor because she signed a plea agreement pleading guilty to a misdemeanor in exchange for the felony charges being dropped.  *Id.*  Under Arizona law, to "prevail on a malicious prosecution claim, a plaintiff must prove that the defendant instituted a civil action that was motivated by malice, begun without probable cause, and terminated in favor of the plaintiff."  *Giles v. Hill Lewis Marce*, 988 P.2d 143, 147 (Ariz. Ct. App. 1999).

In their response to Sheriff Arpaio's Motion for Summary Judgment, Plaintiffs do not refer to a state law claim for malicious prosecution nor do they cite to any Arizona cases to support their claim for malicious prosecution.  Accordingly, the Court assumes Plaintiffs have abandoned their claim for malicious prosecution under state law and the Court will grant summary judgment to Defendants on any state law claim for malicious prosecution (Count II of Plaintiffs' Complaint).

Alternatively, the Court notes that to show that Sheriff Arpaio maliciously prosecuted Dowling in the absence of probable cause, Plaintiffs must show that a reasonably prudent man in Arpaio's position would not have instituted or continued the proceeding.  *Hockett v. City of Tucson*, 678 P.2d 502, 505 (Ariz. Ct. App. 1983) (quoting *McClinton v. Rice*, 265 P.2d 425, 431 (Ariz. 1953)).  As discussed in the Qualified Immunity section above, Plaintiffs have failed to present facts suggesting that Arpaio knew there was not probable cause for the prosecution of Dowling.  Although the claims that arose from the MCSO investigation of Dowling were later dismissed, this dismissal does not show that Arpaio

should have known that the investigation and prosecution of Dowling lacked probable cause. *See id.* ("Probable cause to make an arrest may exist despite the fact that the charges are subsequently dismissed or the accused is found to be innocent.").

The Court declines to speculate on any possible liability Maricopa County may have under Arizona law based on the conduct of Hendershott in the Dowling investigation. Plaintiffs did not name Hendershott as a Defendant in this action, and as noted above, have not presented any arguments to the Court regarding Maricopa County's liability for Hendershott's actions under state law.

### D.   § 1983 Conspiracy to Maliciously Prosecute Dowling in Violation of her First Amendment Rights

Sheriff Arpaio argues that he is entitled to summary judgment on Plaintiffs' conspiracy claim because Dowling has not demonstrated that any of her constitutional rights were violated or, even if they were, the intracorporate conspiracy doctrine bars Plaintiffs' conspiracy claim.  (Doc. 211 at 27).  Sheriff Arpaio also argues that Plaintiffs cannot demonstrate that an agreement existed between him and the County Defendants through the investigation and prosecution of Dowling.  (Doc. 211 at 28).

The Maricopa County Defendants argue that they are entitled to summary judgment on Dowling's conspiracy claims because the evidence contradicts any conspiracy. (Doc. 212 at 9).  The Maricopa County Defendants argue that the evidence reveals: (1) that Marc Frazier, former assistant superintendent at the MCRSD testified that numerous individuals within the MCRSD first raised concerns about financial matters involving the district and he communicated those concerns to Ben Arredondo, chief deputy at the Maricopa County Superintendent of Schools ("Arredondo"). (Doc. 212 at 10); (2) Arredondo then conveyed these financial concerns to Hushek and that is when Hushek first learned of the District's deficit.  (*Id.*  at 11); (3)  The Board, in response to these fiscal concerns, then asked for MCSO's assistance in obtaining financial records from MCRSD.  (*Id.* at 11-12); and (4) Hushek called Hendershott and then filed a criminal complaint against Dowling.  The Maricopa County Defendants argue that there is no evidence in the Record to infer that an

agreement or meeting of the minds occurred between MCSO and the Board Defendants to
violate Dowling's constitutional rights.

### i.      Legal Standard

> To establish the defendants' liability for a conspiracy, a plaintiff
> must demonstrate the existence of an agreement or meeting of
> the minds to violate constitutional rights.  The defendants must
> have, by some concerted action, intended to accomplish some
> unlawful objective for the purpose of harming another which
> results in damage.  Such an agreement need not be overt, and
> may be inferred on the basis of circumstantial evidence such as
> the actions of the defendants.  For example, a showing that the
> alleged conspirators have committed acts that are unlikely to
> have been undertaken without an agreement may allow a jury to
> infer the existence of a conspiracy.

*Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir.
1999) (internal quotations and citations omitted).

"A claim of conspiracy, being dependent on questions of intent, may not always be
amenable to disposition on summary judgment." *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir.
1983) (internal quotations and citation omitted).  "The mere fact that a conspiracy is alleged,
however, will not defeat an adequately supported motion for summary judgment."  *Id.*
(internal citations omitted).

### ii.      Analysis

Plaintiffs argue that although there is not direct evidence of a conspiracy in this case,
a conspiracy can be inferred because the criminal investigation into Dowling was undertaken
at the Board's behest.  (Doc. 224).  As discussed above, the evidence in the Record does not
support Plaintiffs' claim that the investigation was undertaken at the Board's behest.  Further,
as discussed above, there is no evidence of the Board, as an entity, initiating an investigation
against Dowling and there is no evidence that any individual Board member initiated the
criminal investigation of Dowling.

Plaintiffs also argue that a conspiracy to bring criminal charges against Dowling can
be inferred from: (1) Hendershott assembling a "Task Force" of 35-40 of the Sheriff's best
detectives; (2) hostility shown by Lieutenant Bruce Tucker, Sergeant Kim Seagraves, MCSO
investigators and Loretta Barkell, MCSO's Chief Financial Officer, in their interview of

Brian Hushek; (3) Stapley's deposition testimony that Sheriff Arpaio looked for fights within every division of Maricopa County; and (4) Pima County Judge John S. Leonardo's finding in *State of Arizona v. Mary Rose Wilcox*, that Sheriff Arpaio "misused the power of his office to target members of the [Maricopa County Board of Supervisors] for criminal investigation." (Doc. 224 at 12-13).

This evidence is not sufficient to raise the inference that the Board and Sheriff Arpaio entered into a conspiracy to bring criminal charges against Dowling in order to oust her from office. Defendants have presented specific facts establishing the manner in which the criminal investigation against Dowling arose. Plaintiffs have failed to present evidence contradicting such evidence. Plaintiffs and Defendants widely dispute the facts in this case, but Plaintiffs have failed to present evidence supporting their theory of the facts. Without evidence supporting this theory, Plaintiffs have failed to establish a genuine issue of material fact that Sheriff Arpaio and the Board entered into a conspiracy to violate Dowling's First Amendment Rights. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' Conspiracy claim.

**V.     CONCLUSION**

Based on the foregoing,

**IT IS ORDERED** that the Arpaio Defendants' Motion for Summary Judgment (Doc. 211) is granted.

**IT IS FURTHER ORDERED** that the Maricopa County Defendants' Second Motion for Summary Judgment (Doc. 212) is granted.

The Clerk of the Court shall enter judgment for Defendants accordingly.

DATED this 14th day of March, 2012.

James A. Teilborg
United States District Judge